Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

## Complaint Exhibit # 1

## RBJ's Facebook "friends only" post made during work break on 1:42pm on September 10, 2025



Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

## Complaint Exhibit # 2

## Notice of Termination effective immediately given to RBJ by Gila County Attorney Beauchamp on September 15, 2025

Joseph E. Collins, Chief Deputy
Jessica Scibelli, Civil Division

Joe Albo
Ryan Alcorn
Tanner Beckwith
Denise Boode
Mariana Cheskis
Kayla Evans
Macie Hamblen
Jessica Oortman
Barry Standifird
Michael VanAuker

## GILA COUNTY ATTORNEY
### Bradley D. Beauchamp

**HAND DELIVERED**

September 15, 2025

Robert B. Johnston, Jr.
8494 West Fossil Creek Road
Pine, Arizona 85544

Dear Mr. Johnston:

This letter is official notice of your dismissal from the Gila County Attorney's Office effective Monday, September 15, 2025, at the conclusion of this meeting.

This action is taken under the authority of the Gila County Merit System Rules, Policies and Procedures, Rule 11 for "cause."

The specific reasons for your dismissal are:

1. On Wednesday, September 10, 2025, during your regularly scheduled work hours and while at work, you posted on your social media, Facebook page, "Rot in Hell Charlie Kirk."

As the Gila County Attorney, it is my statutory duty to prosecute such heinous crimes with the support of my staff. Your posting of this comment is totally inappropriate and cannot be tolerated. Further, your actions constitute a serious violation of County and/or Departmental rules, policies and procedures, which provide for appropriate disciplinary measures.

Please return all County property immediately so that we can issue your final paycheck.

You have the right to appeal this action under the Gila County Merit System Rules, Policies and Procedures, Rule 12.5.A.1., if you wish. Your appeal should provide evidence in an effort to show this disciplinary action is arbitrary and capricious. Your appeal should be made in writing to the Gila County Personnel Commission in care of the Gila County Human Resources Director, 1400 E. Ash St., Globe, Arizona 85501. You must file your appeal within ten (10) calendar days of the

---

receipt of written notice of this action and must state the facts with specificity upon which your appeal is based, along with the action you request of the Personnel Commission.

Sincerely,

Bradley D. Beauchamp
Gila County Attorney

Cc:  Employee Personnel File

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

**Complaint Exhibit # 3**

**RBJ's "letter of appeal" of termination received by Defendants on September 22, 2025, asserting his right of free speech citing *Rankin v. McPherson*, 483 U.S. 318 (1987)**

Gila County Personnel Commission

In the care of the Gila County Human Resources Director

1400 E. Ash St

Globe, AZ 85501


Letter of Appeal


I am formally appealing  my dismissal as arbitrary and capricious on the following grounds:

1. **I have been an exemplary employee**.

I have never been disciplined or written up for any reason during my employment with the Gila County Attorney's Office. I have received satisfactory performance reviews. I have never been on the "late list", nor have I ever called in sick. I have always performed my duties to the best of my ability and have done everything asked of me. I have improved the efficiency of my position and that has been recognized by both the Justice Court, defense attorneys, and my assigned attorney, Denise Boode. I was told as recently as February 2025 by Misty Price that "We are very happy we hired you". I am well liked in the office and have not had problems with any other employees. I have sought to increase my value to Gila County by entering the Sandra Day O'Connor Master of Legal Studies program and have invested thousands of dollars of my own money in tuition, fees, and books and maintain a 3.89 GPA with 9 of 30 credits completed and a 4.0 GPA halfway through my current class. Gila County also invested $5250 in my education through the tuition reimbursement program, for which I am thankful.

2. **My termination is arbitrary and capricious.**

My termination letter states that I was terminated "*for cause*" under Rule 11 of the Gila County Merit System Rules, Policies, and Procedures for:

 "The specific reason of: 1. On Wednesday, September 10th, 2025, during your regularly scheduled work hours and while at work, you posted on your social media Facebook page "Rot in Hell Charlie Kirk". "

However, the section of Rule 11 that I violated is not specified in the letter, and posting on social media during work hours is not a specific violation under Rule 11, which is defined as "the specific reason" in the letter.

Rule 11 states that it is to establish a process of progressive discipline, however; this may be overridden by the seriousness of the offense and require immediate dismissal. It is hard to imagine how a *private* post on a personal Facebook page rises to such seriousness. To be clear, and as I stated repeatedly in the meeting, my personal Facebook page is set to underline private and I have not made any of my posts publicly available during my time with Gila County, working or not with the one exception of December 25th, 2023 when I shared a Bloomberg news article discussing how well the S&P 500 did that year. The only people who can see my content are people who are "friends". The fact that I work for Gila County is also not publicly available on my personal Facebook page.

On September 11th at 8:30 A.M. we had a staff meeting where BOS-HRS-004 policy on Political Activity was reviewed by Deputy County Attorney Joe Collins, who also admitted that "I am guilty of this too". We were specifically told not to discuss politics in the office anymore, and Mr. Collins also stated that "any social media posts encouraging criminal activity will be seen as negatively reflecting on this office and will be handled through the disciplinary process" or words to that effect. A specific policy on social media use was not reviewed.

"Regularly scheduled work hours" and "while at work" is not specifically defined in either Merit System Rule 1 or Gila County Computing and Communication Technology Use and Ethics Policy BOS-ADM-002. The relevant section, V. (B) Use of Social Media Sites states:

1. Personal/private employee blogging or personal/private use of such social media sites as Facebook or Twitter is prohibited during working hours.

When I am on personal time, I am relieved of all responsibility and not "working" so they cannot be considered "working hours". We are allowed two, 15 minute breaks and a 1 hour lunch break. There has been no official policy regarding the taking of this personal time, and I tend to not take all the time allowed as at my previous job I am used to only 1 hour of personal time in a 14 hour day. The only guidance I have received is that I was not allowed to combine my lunch and breaks, which I understood to be that I could not take 1.5 hours of personal time combined. Office practice has just been to manage our own personal time and to make sure that we have coverage for the phones and front door at any given time which has never been a problem. On this particular day I recall only taking about 50 minutes of lunch time and only considered myself on break the few times I used the restroom, which is when I would typically use my personal cell phone to access social media same as everyone else does.

In my experience, everyone in the office has used their personal cell phones to access social media during "working hours" and while at work since the day I started there. In fact,

Joe Collins was well aware of my social media use as we quickly became "friends" on Facebook and would share and discuss social media during lunch and during the working day. In fact, it is harder to find someone who hasn't been on their phone using social media than not, and that's just looking at the public Facebook posts that I have attached from people who were or had been "friends" on my Facebook page. To summarize just a cursory perusal of such posts:

- Wednesday Sept 13, 2023 4:27 PM full picture of Todd Baty in the office
- Monday Sept 2, 2024 at 8:10 AM by Joe Collins
- Monday Sept 2, 2024 at 9:46 AM Todd Baty responds to Joe Collins Post
- Monday Sept 2 2025 at 12:22 PM Joe Collins responds to Todd Baty's comment
- Monday July 8, 2024 at 9:30 AM post by Joe Collins
- Wednesday November 6th, 2024 at 8:19AM post by Ray Hernandez
- Wednesday June 7th, 2023 at 12:54 PM by Ray Hernandez
- Thursday Nov 28th, 2024 at 10:44AM post by Lisa King
- Wednesday Sept 13, 2023 at 424PM post by Todd Baty he showed me in office.

Again, these are just *public posts* available. There are public posts from nearly every employee that I searched that can be traced back to "working hours" and "while at work". Some of these posts above are political in nature and intended to be provocative. In summary, the social media policy was and is widely disregarded. A widely disregarded policy, especially by those with supervisory authority, is no policy at all.

### 3. At no time have I undermined or failed to support the prosecution of any crime, nor do I have any authority to do so.

As previously stated, I have always performed my duties to the best of my ability. I am certified as a paralegal and as such have had extensive training in my ethical responsibilities and limitations. Under AZ Bar Ethical Rules 5.3 and 5.5 I am specifically forbidden, as a non-lawyer, from limiting or materially influencing the lawyers' professional judgment; violating confidentiality, offering pleas or signing any legal documents and more. I find it personally offensive to suggest that I, who has been a victim of various crimes, would have any political motives for undermining any prosecution in our County. Gila County is knows as a "harsh jurisdiction" and for that I am proud to be a part of because we may be harsh but I believe we are fair, ethical, and unbiased. As I work for a misdemeanor prosecutor, I also do not handle "heinous crimes" and could not influence those in any way even if I were so inclined which is absurd.

### 4. My discharge is arbitrary and capricious because it is political in nature.

Our Payson office has always had a healthy political debate going on at any given time. This has been true when Brad Soos was Chief Deputy and continued when Joe Collins succeeded him. Joe Collins and I have had political discussions at work from day one including showing each other social media posts on our phones and discussing them. Joe even commented this August, in the presence of Todd Baty and Barry Standifird that "I attack someone's argument on Facebook rather than the person". I was personally present when Rick Husk voiced his opinion of the current Sheriff candidates in 2024, calling Shepard a "piece of shit", Morrissey an "incompetent moron" and Kerszykowski a "joke". This happened in front of Joe Collins and Todd Baty right next to my desk. I was personally present in Globe when Mr. Beauchamp boasted about besting the Board of Supervisors over a budget request because he had the power to approve their budget. Our inter-office debates were focused mainly on national politics, and were more civil in nature, but the fact remains that spirited debate was not unknown in our office.

In the meeting, Brad Beauchamp said that "he didn't care what someone's political beliefs are" which was obviously untrue. He then proceeded to say that he has to take action when "someone celebrates an execution". That phrase was almost an exact quote of what J.D. Vance said when he hosted the Charlie Kirk podcast at 12PM ET  that Monday morning and was widely reported. It is patently obvious that Brad & Steve Shaw were listening to this podcast on their way to Payson, as they arrived at around 10:15 AM which is 1:15 PM ET.

My comment "Rot in Hell" is the antithesis of "Rest in Peace", and to infer anything else is to inject your own political presumptions. If the Office had concerns about how my political beliefs could affect the efficiency of the work performed, they could have addressed this at my initial interview where my B.S. degree in Political Science was highlighted as well as my long career as a Teamster Union Steward at United Parcel Service. As such, until Monday September 15th, my political positions have never been addressed with any concern.


**5. The grounds for my termination violate my 1st Amendment rights under the U.S. Constitution.**


I ask you to consider *Rankin v. McPherson*, 107 S.Ct. 2891 (1987), where a clerical government employee such as myself was discussing with another employee the recent assassination attempt of then-President Reagan and said "if they go for him again, I hope they get him".   Her termination was held to violate her 1st Amendment right to freedom of expression. *107 S.Ct. at 2901*. As in the statement made by McPherson, my comment was private in nature as specifically limited by my Facebook account settings and not readily

accessible by the Public. *107 S.Ct. at 2893*. It was not meant to be sent, viewed, or disseminated by Mr. Beauchamp, and as my post was set to 'private', my words are protected by copyright other than the license given to Facebook as necessary to host them. My private Facebook comments are also not in any reflective upon the policies or positions of the office.

As in *McPherson*, neither my comment at issue nor any previous comments have ever affected the efficient functioning of the office. *107 S.Ct. at 2894*. If anything, it has had the opposite effect, as previously mentioned I have had many fruitful discussions with Joe Collins, Ray Hernandez, and Todd Baty regarding something I posted or shared on my private Facebook page as they were all "friends" at the time.

Also as in *McPherson*, I am not in any sort of confidential or policymaking role. I have no influence on office or prosecution policy whatsoever. It has not been demonstrated that my political beliefs somehow make me unfit to answer the phone, direct visitors to offices, prepare files and provide disclosure. *107 S.Ct. at 2894*. I do not have any public relations authority, and my "public contact" is highly limited as it is mostly other government workers that visit the office in person. Mr. Beauchamp made no effort to inquire why I made the statement, what I meant by it, or even ask if I would take it down and not post similar content in the future.

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in the freedom of speech" 107 S.Ct. at 2896 paraphrasing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) and I demand redress.

*McPherson* created a balancing test for determining whether a public employer has properly discharged an employee for engaging in speech. 107 S.Ct. at 2896. Quoting *Pickering v. Board of Education*, 391 U.S. 563 at 568 (1968), the court said this determination requires "a balance between theThatinterests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through it's employees." 107 S.Ct. at 2896. As demonstrated by my performance reviews and an email sent by defense attorney Tyler Allen, improving the efficiency of the misdemeanor prosecution process has been the main benefit my employment has had at the Gila County Attorney's Office. If anything, my dismissal diminishes efficiency as it has had a chilling effect on the office culture which is now described to me as "toxic". Given that we are just now getting ahead of the backlog of felony cases created during Beauchamp's tenure, it is a wonder why he would want to disrupt the efficiency of the misdemeanor prosecutions in the Payson office because of some political axe he has to grind with a purely clerical

employee who has never had political aspirations nor ever debated politics with him. I have never had any such feelings towards Mr. Beauchamp nor do I now.

The death of Charlie Kirk, while he is not a government official, is obviously a matter of public concern given his previous political visibility and stature, the ongoing news coverage, public firings, and public debate on social media same as the assassination attempt on Reagan in *McPherson*. 107 S.Ct at 2897. In applying the balancing test, the speech in question must be determined to be a matter of public concern by examining the "content, form, and context of a given statement as revealed by the whole record." 107 S.Ct. at 2897 quoting *Connick v. Meyers*, 461 U.S. 138 at 147-148 (1983). My comment plainly was on a matter of public concern, being posted within hours of the news of the shooting and subsequent death of Charlie Kirk, at a time of "heightened attention" on the matter as social media and news media was blowing up at the time. My statement was not criminal in nature and did not "celebrate the assassination" as those facts were not even known with any reliability at the time it was made.

In its reasoning affirming the Appeals Court decision that *McPherson*'s discharge was improper, the Court stated that "Vigilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech". 107 S.Ct. at 2897. In no way has Mr. Beauchamp demonstrated that my comment or sincerely held political beliefs have ever 'hampered public functions' or somehow allowed me to influence or subvert prosecutions with powers and authorities I do not possess and that I am prohibited from performing. In fact, the Court said that "The inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and ... may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials"". 107 S.Ct. 2898 quoting *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964); see also *Bond v. Floyd*, 385 U.S. 116 (1966).


The State bears the burden of proving that my speech somehow is against the State's interest in promoting the "efficiency of the public services it performs through it's employees". 107 S.Ct. 2899 quoting *Pickering*, 391 U.S. at 568. The Court considered the tests laid out in *Pickering* in determining whether the speech "impairs discipline by superiors, or harmony among co-workers, has a detrimental effect on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise". 107 S.Ct. at 2899 quoting *Pickering*, 391 U.S. at 570-573. The State has failed to

demonstrate that their interests outweigh my First amendment right to free expression. There has been no evidence presented, nor was it addressed at the meeting that I have impaired the efficiency of the office. Mr. Beauchamp only addressed that the statement, which was not directed nor easily available to him, upset himself and not any other employees. Mr. Beauchamp did not identify with any specificity any disruption in the harmony of our office or the work we perform. He repeatedly described my comment as 'public' when it demonstrably is not and there is no danger of the Public viewing my comments without a third party taking the illegal and unethical step of screenshotting and sharing it as they are set to 'private'.

As in *McPherson*, because Mr. Beauchamp did not like the content of my private political speech, he alone decided that I was unfit to work for a law enforcement agency without any evidence that my political positions have undermined the efficiency or mission of the County Attorney's office. 107 S.Ct. at 2900. As my authority and policymaking ability is non-existent and I have only basic public contact with no public relations role, the danger of my private political speech affecting the office's efficiency or mission is minimal and cannot be outweighed by my First amendment right of free expression. 107 S.Ct. at 2900.


As such, <u>I demand and will only accept</u>, full reinstatement to regular status at my former position as Legal Secretary, Senior (<u>U</u>) without loss of pay, benefits, or seniority; without change in working conditions or location (both in the Town of Payson and within our office); without demotion, suspension, or transfer; without reassignment or modification; without any probationary period upon returning to work; and without any mention of the matter inserted in my permanent employment record. It is my sincere hope that "cooler heads will prevail" and that we can put this matter behind us and that I can get back to work at the job I enjoy and have been fully invested in since I started.




Robert Johnston

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

**Complaint Exhibit # 4**

**Amended Notice of Termination (adding new charge of sexual harassment of un-named female co-worker) given to RBJ by Gila County Attorney's office dated September 26, 2025 and given to him on that date**

Joseph E. Collins, Chief Deputy
Jessica Scibelli, Civil Division



Joe Albo
Ryan Alcorn
Tanner Beckwith
Denise Boode
Mariana Cheskis
Kayla Evans
Macie Hamblen
Jessica Oortman
Barry Standifird
Michael VanAuker

## *GILA COUNTY ATTORNEY*
### *Bradley D. Beauchamp*

**SERVED**

September 26, 2025

Robert B. Johnston, Jr.
8494 West Fossil Creek Road
Pine, Arizona 85544

Dear Mr. Johnston:

This Amended Notice of Disciplinary Dismissal is notice of additional charges for your dismissal from the Gila County Attorney's Office under the authority of the Gila County Merit System Rules, Policies and Procedures, Rule 11 for "cause."

On September 10, 2025, County employees reported that you engaged in acts of Sexual Harassment on numerous occasions. These acts were a clear violation of Merit System Rule 11. The Gila County Attorney's Office has zero tolerance for sexual harassment and Gila County has provided training for employees to understand that acts of sexual harassment are strictly prohibited and will lead to severe consequences.

A female employee reported the following:

> i. During the week of August 4, 20225, you made comments about her leaving her husband to be with you.
> ii. On or about August 13 or 14, 2025, you told her "if you ever leave [your husband] I will be your sugar daddy."
> iii. On or about August 27 or 28, 2025 you said, "if you ever want to take advantage of me on that couch, you know where to find me."

The seriousness of these offenses overrides progressive discipline and equates to your immediate dismissal under Merit System Rule 11.

This Amended Notice of Disciplinary Dismissal has been served for the purpose of including the charge of Sexual Harassment in your Termination. The allegations of misconduct included in the original Termination Notice sent on September 10, 2025, are incorporated into this Notice.

---

Globe Main Office:     1400 E. Ash Street, Globe, AZ 85501     Phone: (928) 425-3231 Ext. 8630   Fax: (928) 425-3720
Payson Office:         714 S. Beeline Hwy Ste. 202, Payson, AZ 85541   Phone: (928) 474-4068     Fax: (928) 474-9066

Witnesses are prepared to testify regarding the charges against you. However, under Merit System Rule 12.6(O), you have the right to withdrawal your appeal.

Sincerely,

Bradley D. Beauchamp
Gila County Attorney

Cc: Employee Personnel File

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

# Complaint Exhibit # 5

# Gila County Human Resources Administrative Procedures HRS-001

| Gila County Human Resources<br><br>**EQUAL EMPLOYMENT OPPORTUNITY, UNLAWFUL DISCRIMINATION, HARASSMENT, AND RETALIATION** | **ADMINISTRATIVE PROCEDURES HRS-001** | **Page** |
|---|---|---|
| | **Effective Date:**<br>**November 2, 2021** | **1** of **4** |

## I.    PROCEDURES

A.  Equal Employment Opportunity

Employee Responsibility

All Gila County employees (including Elected Officials, Department Heads, Manager and Supervisors) have the responsibility to:

1.  Understand and abide by Gila County's EEO Policy and comply with its terms.

2.  Respect the difference of others.

3.  Contribute to a harassment free environment by acting and behaving in an appropriate, respectful, and professional manner.

4.  Immediately report any violations of this policy that they personally observe or have knowledge of.

5.  Cooperate completely in any investigation of violations of this policy.

B.  Sexual Harassment

1.  For the purposes of this policy, sexual harassment is defined as unwelcome sexual advances, requests for sexual favors and other communication or physical conduct of a sexual nature when:

    a.  Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment;

    b.  Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual; or

    c.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

2.  Sexual harassment may include a range of subtle and not so subtle behaviors and may involve individuals of the same or different gender.  Depending on the circumstances, these behaviors may include, but are not limited to:

| Gila County Human Resources<br><br>EQUAL EMPLOYMENT OPPORTUNITY, UNLAWFUL DISCRIMINATION, HARASSMENT, AND RETALIATION | ADMINISTRATIVE PROCEDURES HRS-001 | Page |
|---|---|---|
| | Effective Date:<br>November 2, 2021 | **2** of **4** |

    a.  Unwanted sexual advances or requests for sexual favors;

    b.  Sexual jokes and innuendo;

    c.  Verbal abuse of a sexual nature;

    d.  Commentary about an individual's body, sexual prowess, or sexual deficiencies;

    e.  Leering, catcalls or touching;

    f.  Insulting or obscene comments or gestures;

    g.  Display or circulation in the workplace of sexually suggestive objects or pictures (including through e-mail or mobile devices);

    h.  Other physical, verbal or visual conduct of a sexual nature that is considered unacceptable by a reasonable person.

3.  Sex-based harassment not involving sexual activity or language may constitute discrimination if it is severe or pervasive and directed at employees because of their sex.

4.  Quid pro quo harassment occurs when (1) job benefits, including employment, promotion, salary increase, shift or work assignments, performance expectations and other conditions of employment are made contingent on the provision of sexual favors usually to an employer, supervisor, or agent of the employer who has the authority to make decisions about employment actions, or (2) the rejection of a sexual advance or request for sexual favors results in a tangible employment detriment.

C.  Other Harassment

1.  Harassment on the basis of any other protected characteristic is also strictly prohibited. Under this policy, harassment is verbal or physical conduct that denigrates or shows hostility or aversion toward an individual because of his/her race, color, religion, sex, age, national origin, disability, or any other characteristic protected by law or that of his/her relatives, friends, or associates, and that:

    a.  Has the purpose or effect of creating an intimidating, hostile, or offensive work environment;

| Gila County Human Resources | ADMINISTRATIVE PROCEDURES HRS-001 | Page |
|---|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY, UNLAWFUL DISCRIMINATION, HARASSMENT, AND RETALIATION** | **Effective Date:** **November 2, 2021** | **3** of **4** |

    b.  Has the purpose or effect of unreasonably interfering with an individual's work performance; or

    c.  Otherwise adversely affects an individual's employment opportunities.

  2.  Other harassment includes, but is not limited to:

    a.  Threatening, intimidating, or hostile acts;

    b.  Denigrating jokes;

    c.  Display or circulation in the workplace via paper, email, or mobile device of written or graphic materials that denigrate or show hostility or aversion toward an individual or group.

D.  Hostile Work Environment

  1.  The legal requirements for a hostile work environment include:

    a.  The actions or behavior must discriminate against a protected classification such as age, religion, disability, or race; and,

    b.  The behavior or communication must be pervasive and severe in that it disrupts an employee's work or interferes with an employee's career progress.

  2.  Anti-discrimination statutes governing hostile work environment are not a general civility code. Federal law does not prohibit simple teasing, isolated offhand comments, or isolated incidents that are not extremely serious. Rather the conduct must be so objectively offensive as to alter the conditions of the individual's employment. The conditions of employment are altered only if the harassment culminates in a tangible employment action or is sufficiently severe or pervasive.

E.  County Complaint Procedures

  1.  The County strongly urges the reporting of all incidents of discrimination, harassment or retaliation, regardless of the offender's identity or position. Individuals who believe they have experienced conduct that is contrary to this policy or who have concerns about such matters should file a report or their complaint with their Appointing Authority, immediate supervisor, or the Director immediately.

| Gila County Human Resources<br><br>**EQUAL EMPLOYMENT OPPORTUNITY, UNLAWFUL DISCRIMINATION, HARASSMENT, AND RETALIATION** | **ADMINISTRATIVE PROCEDURES HRS-001** | **Page** |
|---|---|---|
| | **Effective Date:**<br>**November 2, 2021** | **4** of **4** |

2. Any Appointing Authority, or supervisor who receives a complaint or report of discrimination, harassment or retaliation under this policy is required to inform the Director immediately.

3. The availability of this reporting procedure does not preclude individuals who believe they are being subjected to harassing conduct from promptly advising the offender that his or her behavior is unwelcome and requesting that it be discontinued.

F. Investigation

1. The Director or designee will expedite an investigation into any allegation(s) of violation of this policy or procedure.

2. Confidentiality of all parties involved will be maintained throughout the investigatory process consistent with adequate investigatory methods and to the degree that it does not interfere with the County's legal obligation to investigate allegations of misconduct and to take appropriate action.

3. The outcome of any investigation will be reviewed and discussed with the complainant and other appropriate parties as deemed necessary.

G. Retaliation

1. The law forbids retaliation when it comes to any aspect of employment, including hiring, firing, pay, job assignment, promotion, layoff, training, fringe benefits, and/or any other term or condition of employment.

2. An employee shall not take any disciplinary or punitive action against another employee which impedes or interferes with that employee's exercise of any right granted under the law or this policy.

3. Retaliation against an individual for reporting harassment or discrimination or for participating in an investigation of a claim of harassment or discrimination is a prohibited.

H. Discipline

Any employee found to have violated this policy or related procedures shall be subject to disciplinary action up to and including termination.

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

**Complaint Exhibit # 6**

**RBJ's appeal from Amended Notice of Termination dated October 1, 2025**

Gila County Personnel Commission

In the care of the Gila County Human Resources Director

1400 E. Ash St

Globe, AZ 85501

October 1st, 2025


Letter of Appeal


I am formally appealing the AMENDED notice of Dismissal 'served' Friday September 26th, 2025, as Arbitrary and Capricious on the following grounds:

1. This attempt to "fire me some more" is *prima facie* ludicrous and absurd. There is no provision in Rule 11 to amend a termination after it has been issued, served and witnessed, much less 11 days later. The letter, in paragraph 1, attempts to draw authority that does not exist in Rule 11.
2. The letter, delivered improperly on September 26th, 2025, did not include a statement of the employees' right to appeal, as required in Rule 11(5)(b).
3. The letter alleges absurd 'sexual harassment' statements I never made on vague dates without times, some of which the alleged, suspected, victim was not present, and I have plenty of text messages between us and others during and around these dates noting occasions and behavior that will cause reasonable people serious doubt to the veracity of these allegations. I eagerly await the testimony of the Appointing Authorities' witnesses. The letter does not provide "sufficient detail", required under Rule 11(5)(b) in order to properly understand and defend these unfounded charges such as specific dates and times that they allegedly occurred, who witnessed them and to whom they were made.
4. These defamatory allegations of unproven and uninvestigated misconduct are stated to be "included in the original Termination Notice sent on September 10th, 2025..." **I was not sent any termination notice on September 10th, 2025**, so I am unaware of what *that* termination letter may contain or what charges are being added to it. I was at work on September 10th, 11th and 12th, attending meeting on the 10th with Chief Deputy Joe Collins and Deputy Attorney Denise Boode and a full Payson Staff meeting with Chief Deputy Joe Collins on September 11th,2025 to which there were no allegations of misconduct raised in either meeting and I was not informed nor delivered any such termination letter on September 10th, 11th, or

12th.  If these new charges are "so egregious" as to warrant the progressive disciplinary process being overridden, you would think the Appointing Authority would have mentioned them on the meeting that did not occur on the 10th or in the meeting that did occur on the 15th. Perhaps the Appointing Authority has confused himself with whom he has terminated with someone else.

5. The notice was improperly served. Under Rule 11 (5) iii "An attempt is made to personally serve the dismissal letter, but the employee refuses to sign for the letter. Such attempt to personally serve the letter shall be witnessed." Only Ray Hernandez came to my home and there was no independent witness, of which I have documentation. I was not asked to sign for this letter on September 26th, 2025.

6. The true motive of this letter, which is an obvious attempt at retaliation for my appeal of the September 15th termination, is in the blatant attempt at coercion to get me to "withdrawal your appeal [sic]" (for filing an appeal of the illegal, Unconstitutional reasons I was terminated for on September 15, 2025).

7. The right to appeal was only provided in a letter mailed September 29th, 2025, with a delivery on October 1, 2025, so any delay in receiving this appeal letter should consider the utter incompetence and complete failure by the Appointing Authority to confer with the H.R. Director so that he could issue a properly written termination notice.

This appeal letter is in addition to the appeal letter sent on September 19th, 2025, and received September 22, 2025, which remains the ONLY charges that have been properly served upon me, unconstitutional as they are, and should already be scheduled for an appeal hearing. Should the Appointing Authority like to try to "fire me some more" for a third time (fourth?), rest assured that I will appeal whatever bogus charges he comes up with, as many times as it takes.

Robert Johnston

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

**Complaint Exhibit # 7**

**Gila County Merit System Rule 11**

| Gila County Human Resources | Merit System Rule 11 | Page |
|---|---|---|
| **DISCIPLINARY ACTIONS** | **Replaces BOS-HRS-610** | |
| | **Previously Adopted: 03-15-2016**<br>**Adopted: 11-02-2021** | 1 of 6 |

This rule is to establish a process of progressive discipline. Progressive discipline is designed to provide a structured corrective action process to improve and prevent a recurrence of undesirable employee behavior and performance issues. Such a process ensures that employees are afforded adequate notice and opportunity to correct unacceptable behavior.

This rule applies to all Gila County employees except Elected Officials.

Gila County wishes to create and maintain a work environment that promotes efficiency, productivity, and positive reinforcement of actions through work standards met or exceeded. The County advocates the use of progressive discipline as a means toward maintaining a positive work environment. However, the seriousness of an offense may dictate overriding progressive discipline, and serious offenses may lead to administrative suspension or immediate dismissal. When circumstances dictate, a combination of disciplinary actions may be used.

11.1 Procedures

   A. General

      1. Causes for disciplinary actions include, but are not limited to:

         a. Fraud in securing appointment

         b. Incompetence

         c. Neglect of duty

         d. Insubordination

         e. Sleeping while on duty

         f. Disorderly conduct

         g. Malicious gossip or false accusations which tend to destroy friendly relations between the County and the public or between employees or in any way hinder County operations

         h. Dishonesty

         i. Absence without leave

         j. Commission or conviction of a felony or misdemeanor involving moral turpitude which would affect the employee's suitability for continued employment

| Gila County Human Resources | Merit System Rule 11 | Page |
|---|---|---|
| DISCIPLINARY ACTIONS | Replaces BOS-HRS-610 | |
| | Previously Adopted: 03-15-2016<br>Adopted: 11-02-2021 | 2 of 6 |

    k.  Discourteous treatment of the public and/or co-workers

    l.  Willful disobedience

    m.  Engaging in prohibited political activity

    n.  Misuse of government property

    o.  Being under the influence of alcohol, a narcotic, barbiturate, marijuana, tranquilizing or hallucinogenic drug or other controlled substances on duty, except in accordance with medical authorization

    p.  Seeking to obtain financial, sexual or political benefit from another employee with his/her consent induced by wrongful use of force or fear, or under color of official right

    q.  Discrimination or harassment based upon race, color, religion, sex (including pregnancy), age (40 or older), national origin, disability, genetic information or, Vietnam era or disabled veteran status

    r.  Revocation, suspension or loss of Arizona driving privileges where having an Arizona Driver's License is a requirement for the position

    s.  Revocation, suspension or loss of certification issued by a governmental entity where such certification is a requirement for the position

    t.  Engaging in sexual harassment

    u.  Inefficiency

    v.  Unsatisfactory attendance

    w.  Mishandling of County funds

    x.  Falsification or unauthorized use of County records

    y.  Unauthorized possession of firearms, weapons or explosives in County buildings

    z.  Unsafe actions

    aa. Any other conduct or performance which constitutes cause for disciplinary action

| Gila County Human Resources | Merit System Rule 11 | Page |
| --- | --- | --- |
| **DISCIPLINARY ACTIONS** | **Replaces BOS-HRS-610** | |
| | **Previously Adopted: 03-15-2016** **Adopted: 11-02-2021** | 3 of 6 |

B. Types of Disciplinary Action

Behavior that is illegal or violent will not be subject to the progressive discipline process and may be reported to local law enforcement agencies. All disciplinary actions must be discussed with Human Resources (HR) prior to implementing the disciplinary action. All disciplinary actions must be documented, and the original sent to HR to be placed in the employee's file.

1. Verbal Warning

   A verbal warning creates an opportunity to bring attention to existing performance, conduct, or attendance issues with the employee. Expectations and steps that must be taken to improve performance or resolve the issue should be discussed here. Verbal warnings must be documented and sent to Human Resources.

2. Written Reprimand

   A written reprimand is a formal notice to an employee that further disciplinary action will be taken unless their behavior or performance improves. A copy of the written reprimand is to be forwarded to the HR Department for placement into the employee's personnel file. A Performance Improvement Plan (PIP) may be applicable to assist the employee in meeting expectations.

3. Suspension

   a. Before an employee with regular status can be suspended, the Appointing Authority shall give the employee written notice of the charges, a summary of the Appointing Authority's basis for the charges, and an opportunity for the employee to present a written response. The employee's response shall be made not later than three working days after the employee receives the notice of the charges, unless extended in writing by the Appointing Authority.

   b. The Appointing Authority may suspend any employee with regular status for cause, but not before attempting to serve the employee personally or by registered or certified mail, return receipt requested (addressee only), with written notice of the specific reasons for suspension in sufficient detail to inform the employee of the facts, with a copy to the Director. The Appointing Authority shall include a statement of the employee's right to appeal. The action is not effective until one of the following occurs:

      i. The employee signs for receipt of the suspension letter personally served or served by mail or,

      ii. Five (5) days have passed since the letter was mailed to the employee; or,

| Gila County Human Resources | Merit System Rule 11 | Page |
| --- | --- | --- |
| **DISCIPLINARY ACTIONS** | **Replaces BOS-HRS-610** | |
| | **Previously Adopted: 03-15-2016**<br>**Adopted: 11-02-2021** | **4 of 6** |

    iii. An attempt is made to personally serve the suspension letter, but the employee refuses to sign for the letter. Such attempt to personally serve the letter shall be witnessed.

    c. Except as otherwise provided by statute or this rule, suspensions shall not exceed a total of thirty working days during any twelve (12) month period. The twelve (12) month period begins with the first day of the first suspension.

4. Demotion

    a. A regular status employee may be demoted for cause by an Appointing Authority to any regular status position, provided the employee meets the minimum qualifications for such class.

    b. Before an employee with regular status can be demoted, the Appointing Authority shall give the employee written notice of the charges, a summary of the Appointing Authority's basis for the charges, and an opportunity for the employee to present a written response. The employee's response shall be made not later than three working days after the employee receives notice of the charges, unless extended in writing by the Appointing Authority.

    c. The Appointing Authority may demote any employee with regular status only for cause, but not before attempting to serve the employee personally or by registered or certified mail, return receipt requested (addressee only), with written notice of the specific reasons for demotion in sufficient detail to inform the employee of the facts, with a copy to the Director. The Appointing Authority shall include a statement of the employee's right to appeal. The action is not effective until one of the following occurs:

       i. The employee signs for receipt of the demotion letter personally served or served by mail; or

       ii. Five (5) days have passed since the letter was mailed to the employee; or

       iii. An attempt is made to personally serve the demotion letter, but the employee refuses to sign for the letter. Such attempt to personally serve the letter shall be witnessed.

    d. An employee who is demoted shall serve a demotion probationary period under the same rules as an original probation, except that the employee retains the right of appeal should they be dismissed due to failure of the demotion probationary period.

| Gila County Human Resources | Merit System Rule 11 | Page |
|---|---|---|
| **DISCIPLINARY ACTIONS** | **Replaces BOS-HRS-610** | |
| | **Previously Adopted: 03-15-2016** <br> **Adopted: 11-02-2021** | **5** of 6 |

5. Dismissal

    Recommendations for dismissal must be approved by the Human Resources Director before the following steps occur:

    a. Before an employee with regular status can be dismissed, the Appointing Authority shall give the employee written notice of the charges, a summary of the Appointing Authority's basis for the charges, and an opportunity for the employee to present a written response. The employee's response shall be made not later than three working days after the employee receives notice of the charges, unless extended in writing by the Appointing Authority.

    b. The Appointing Authority may dismiss any employee with regular status for cause, but not before attempting to serve the employee personally or by registered or certified mail, return receipt requested (addressee only), with written notice of the specific reasons for dismissal in sufficient detail to inform the employee of the facts, with a copy to the Director. The appointing Authority shall include a statement of the employee's right to appeal. The action is not effective until one of the following occurs:

        i. The employee signs for receipt of the dismissal letter personally served or served by mail; or

        ii. Five (5) days have passed since the letter was mailed to the employee; or

        iii. An attempt is made to personally serve the dismissal letter, but the employee refuses to sign for the letter. Such attempt to personally serve the letter shall be witnessed.

    c. If an employee is on an approved period of leave with pay, the action will be effective at the end of the approved period of leave with pay, and the dismissal letter shall be served on the employee in accordance with this subsection.

    d. Dismissal During Probation

        i. An employee on original probation may be dismissed without the right of appeal.

        ii. An employee on promotional probation may not be dismissed without the right of appeal.

| Gila County Human Resources | Merit System Rule 11 | Page |
| --- | --- | --- |
| **DISCIPLINARY ACTIONS** | **Replaces BOS-HRS-610** | |
| | **Previously Adopted: 03-15-2016**<br>**Adopted: 11-02-2021** | 6 of 6 |

6. Administrative Leave

   Nothing in this rule shall preclude the Appointing Authority from immediately placing an employee on administrative leave pending implementation of procedures under this section, but no pay shall be withheld for such period.

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

## Complaint Exhibit # 8

## Gila County Merit System Rule 12

| Gila County Human Resources | Merit System Rule 12 | Page |
|---|---|---|
| | Replaces BOS-HRS-615; Rule 22.4 | |
| GRIEVANCE AND APPEAL PROCEDURE | Previously Adopted: 01-05-2016; 12-16-2003 Adopted: 11-02-2021 | 1 of 7 |

12.1　The purpose of the grievance and appeal process is to afford Gila County employees a written and systematic means of obtaining further consideration of disputes after every reasonable effort has failed to resolve them through informal discussions initiated with their immediate supervisor.

12.2　This rule applies to all Gila County employees except Elected Officials and unclassified employees.

12.3　It is the policy of Gila County to establish a means through which employees may obtain consideration of grievances or problems in matters over which the Appointing Authority has complete or partial jurisdiction and for which redress is not provided elsewhere in these policies.

12.4　Procedures

　　A. General

　　1. If an employee complaint of unlawful discrimination or harassment based upon race, color, religion, sex (including pregnancy), national origin, age (40 or older), disability, genetic information, or Vietnam era or disabled veteran status is not resolved through the procedures outlined in Policy BOS-HRS-001, EEO, Unlawful Discrimination, Harassment and Retaliation the employee may file a grievance with the Gila County Personnel Commission (Commission) in accordance with Rule 12.4.B.

　　2. If the employee alleges misinterpretation or misapplication of the policy, departmental work rules, unsafe or unhealthy working conditions, an employee grievance may be filed in accordance with Rule 12.4.C.3.

　　3. If an employee alleges improper suspension, demotion, reduction in pay, or dismissal on any grounds including alleged unlawful discrimination, Rule 12.6 shall be used.

　　4. All time frames specified on the form shall be met. If the immediate supervisor or department head fail to meet the time frame requirement, the employee has the right to take the grievance to the next step. If the employee fails to meet the time requirements, the grievance shall be deemed abandoned.

　　B. Grievance Procedure for Claims of Discrimination or Harassment

　　1. Within ten (10) calendar days after an employee has been informed of a remedial action taken in response to an allegation of unlawful harassment or

| Gila County Human Resources | Merit System Rule 12 | Page |
|---|---|---|
| | Replaces BOS-HRS-615; Rule 22.4 | |
| GRIEVANCE AND APPEAL PROCEDURE | Previously Adopted: 01-05-2016; 12-16-2003 Adopted: 11-02-2021 | 2 of 7 |

discrimination filed under Policy BOS-HRS-001, the employee may grieve the action by requesting a review of the determination by the Commission. The employee must request the review and relief requested on the Employee Grievance form and submit it to the Human Resources Director. The Commission shall designate one of its members to investigate and hear the complaint and provide the Commission with a report. The Commission shall review the report on the complaint and issue a final determination in writing upholding or reversing the report. The Director shall furnish a notice of the final determination to the employee and the Appointing Authority within ten (10) calendar days of the determination by the Commission.

C. Grievance Procedure for Other Issues

1. By employees on original probation in cases alleging illegal discrimination or compelled participation in any election campaign for public office or partisan political activity.

2. The grievance procedure may not be used:

   a. For matters involving compensation, classification schedules, classes of positions, personnel records, performance appraisals, reprimands, or employee counseling; or,

   b. For matters involving dismissal, demotion, or suspension.

3. The four steps of the grievance process are as follows:

   a. Step 1: Using the "Employee Grievance Form", the employee shall state the grievance and the remedy requested. A copy shall be given to the immediate supervisor and a copy sent to the Director within five (5) working days of the incident giving rise to the grievance. The immediate supervisor shall respond in the designated portion of the form and send a copy to the employee and the Director within five (5) working days of receipt.

   b. Step 2: If the employee disagrees with the supervisor's response, the Employee Grievance Form shall be sent to the Appointing Authority within (5) working days of the supervisor's response to Step 1. The Appointing Authority shall respond by completing the designated section of the form and sending a copy to the employee and the Director within five (5) working days of receipt of the employee's Step 2 grievance. If the employee disagrees with the Appointing Authority's response and desires to continue the grievance process, the

| Gila County Human Resources | Merit System Rule 12 | Page |
|---|---|---|
| | Replaces BOS-HRS-615; Rule 22.4 | |
| **GRIEVANCE AND APPEAL PROCEDURE** | **Previously Adopted: 01-05-2016; 12-16-2003** **Adopted: 11-02-2021** | 3 of 7 |

specific reason shall be indicated on the form. The employee may then proceed to Step 3.

   c. <u>Step</u> 3: Within five (5) working days of receipt of the Appointing Authority's response, the employee shall submit the Employee Grievance Form to the Director. The Director shall complete his/her section of the form by making a recommendation and returning it to the employee, with a copy to the Appointing Authority, within five (5) working days of receipt of the employee's Step 3 grievance. If either the employee or the Appointing Authority disagrees with the recommendation of the Director at Step 3, and desires to continue the grievance process, the employee or Appointing Authority shall indicate the disagreement on the Employee Grievance form. An appeal to Step 4 must be filed within the (10) working days of receipt of notice of action taken by the Director.

   d. <u>Step 4</u>: The Employee Grievance Form shall be resubmitted to the Director who will notify the Commission within five (5) working days. The Appointing Authority or designee shall be considered the respondent and shall be served with a copy of the form. Authority or designee shall be considered the respondent and shall be served with a copy of the form

## 12.5 Appeals

  A. Matters That May be Appealed

    1. A regular status employee, except as otherwise provided in these Rules, may appeal an action resulting in dismissal, demotion, reduction in pay, or suspension on any grounds including alleged unlawful discrimination. Within ten (10) calendar days of receipt of written notice of the action, Respondent may serve an amended notice of disciplinary suspension, demotion, or dismissal prior to the beginning of the Appeal hearing.

    2. Matters not specifically stated in this Rule cannot be appealed.

## 12.6 Appeal Procedure

  A. Filing the Appeal. Appeals to the Commission must be filed with the Director in writing within ten (10) calendar days of the receipt of written notice of demotion, disciplinary suspension, or termination. In the event the prescribed deadline falls on a non-working day, the deadline shall be 5:00 p.m. of the next regularly scheduled working day of the Human Resources Department. Failure

| Gila County Human Resources | Merit System Rule 12 | Page |
|---|---|---|
| | Replaces BOS-HRS-615; Rule 22.4 | |
| GRIEVANCE AND APPEAL PROCEDURE | Previously Adopted: 01-05-2016; 12-16-2003 Adopted: 11-02-2021 | 4 of 7 |

to file a timely appeal is a jurisdictional defect and the Commission will not hear such appeal. The appeal shall state the facts upon which it is based and the remedy requested. Within ten (10) days of the hearing, or at the time the names of witnesses are submitted for subpoena, the appellant shall state the reason each witness is being called and the testimony being offered. The Appellant's Appointing Authority shall be considered the Respondent. The Director shall forward a copy of the appeal to the Respondent.

B. Initial Determination of Jurisdiction. The Director, in conjunction with appointed counsel for the Personnel Commission, shall make an initial determination of whether or not the Commission has jurisdiction over the appeal under these Rules.

1. If it is determined by the Director that the Commission does not have jurisdiction, the Director shall so notify the employee in writing.

2. If it is determined that the Commission does have jurisdiction, the hearing shall be scheduled in accordance with these Rules.

3. The Commission shall make an independent determination as to jurisdiction prior to the commencement of a hearing pursuant to Rule 12.6.H.2.

4. Any party disputing this initial determination of jurisdiction must file written notification with the Director within ten (10) calendar days of receipt of the notice from the Director including the legal basis for such dispute. The dispute shall be heard in accordance with Rule 12.6.H.2.

C. Answer to Appeal

The Respondent need not file an answer to the appeal. If an answer is filed prior to the hearing, the Director shall send a copy to the Appellant. Within ten (10) days of the hearing, or at the time the names of witnesses are submitted for subpoena, the respondent shall state the reason each witness is being called and the testimony being offered.

D. Hearing Officers. The Commission or its chair may assign appeals to a Commission member who shall be the Hearing Officer. When an appeal is so assigned, the Hearing Officer shall be the authorized representative of the Commission and is fully empowered to grant or refuse extensions of time, to set the proceedings for hearings, to conduct the hearing, and to take action in connection with the proceedings which the Commission itself is authorized to take by law or by these Rules other than making the final findings and decisions. No assignment of an appeal to a Hearing Officer shall preclude the

| Gila County Human Resources | Merit System Rule 12 | Page |
|---|---|---|
| | Replaces BOS-HRS-615; Rule 22.4 | |
| GRIEVANCE AND APPEAL PROCEDURE | Previously Adopted: 01-05-2016; 12-16-2003 Adopted: 11-02-2021 | 5 of 7 |

Commission or its chair from withdrawing it and conducting the hearing itself or from reassigning an appeal to another Hearing Officer. The Hearing Officer shall prepare and submit a Hearing Officer's report. Said report shall be submitted to the Director for transmittal to the Commission not less than fifteen (15) working days prior to the Commission meeting during which action on the appeal is to be taken. Copies of the Hearing Officer's report shall, upon receipt by the Director, be mailed to all members of the Commission and to the employee and the Appointing Authority, and their respective representatives. Written objections to the Hearing Officer's report may be submitted no less than five (5) working days prior to the Commission meeting. The Commission may, at its discretion, take further testimony or hear arguments at the Commission meeting.

E.  Time for Hearing. Every hearing on an appeal shall commence within twenty (20) calendar days from receipt by the Director, unless the time is extended by mutual agreement, or for other good cause as determined by the Commission.

F.  Notice of Hearing. Written notice of the time, date, place of hearing, and the name of the Hearing Officer, may be mailed or delivered personally by the Clerk of the Commission to the Appellant and the Respondent. If the notice is mailed, it shall be mailed at least ten (10) calendar days before the date of such hearing. If the notice is delivered personally, written acknowledgment of the time of receipt by the employee shall be obtained or verified.

G.  Continuance of Hearing.

1.  Either Respondent or Appellant may request that a hearing set pursuant to these Rules be continued. Such a request must be submitted in writing to the Clerk of the Commission five (5) calendar days prior to the date set for the hearing. The Clerk of the Commission must send copies to all concerned parties, together with an Order for Continuance to be signed by a member of the Commission so designated by the Commission to sign such orders.

2.  Failure to request a continuance in conformance with these Rules and subsequent failure by either party to appear at the time and place set for hearing shall be grounds for dismissal of the case upon motion of either party or on motion to the Commission or to the Hearing Officer.

H.  Nature of Hearing

1.  Each hearing shall be held pursuant to A.R.S. §38-431 and shall be closed unless the Appellant requests an open hearing as provided by A.R.S. §11-

| Gila County Human Resources | Merit System Rule 12 | Page |
|---|---|---|
| | Replaces BOS-HRS-615; Rule 22.4 | |
| GRIEVANCE AND APPEAL PROCEDURE | Previously Adopted: 01-05-2016; 12-16-2003 Adopted: 11-02-2021 | 6 of 7 |

356.    Any party may represent him/herself or be represented by legal counsel. The hearing shall be informal and technical rules of evidence shall not apply to the proceedings, except that irrelevant, immaterial, incompetent or unduly repetitious evidence or evidence protected by the rules of privilege recognized by law, may be excluded. All testimony at the hearings shall be recorded manually or by mechanical or electronic device. The Commission shall pay all charges incurred in connection with the presence of a court reporter or the utilization of mechanical or electronic devices, excluding, however, the costs of the preparation of all or any part of any transcript. The party or parties ordering the transcription shall pay the cost of a copy or copies of any such transcription.

2. On any appeal hearing, the Hearing Officer or the Commission shall first take evidence with respect to jurisdictional. If the Hearing Officer or the Commission concludes that the Commission has jurisdiction to hear the appeal, then they shall proceed to take evidence on all remaining issues. In the event that the Hearing Officer or the Commission concludes that the Commission is without jurisdiction, then they shall terminate said hearing and take no further evidence.

I.  Power of Subpoena. The Hearing Officer or Commission may request the chairman of the Board of Supervisors to issue subpoenas to compel attendance of any person and the production of any books, papers or any other evidence relating to any investigation or hearing authorized by these Rules in accordance with the power of the Board pursuant to A.R.S. §11-218.

J.  Exclusion of Witnesses. Upon the motion of any Appellant or Respondent, the Hearing Officer or Commission may exclude from the hearing room any witnesses not at the time under examination. The Appellant, Respondent, their attorneys, or other representatives, shall not be excluded.

K.  Witness Fees. Witnesses, other than employees, who are subpoenaed to attend a hearing or investigation, are entitled to the same fee as is allowed witnesses in civil cases of the State of Arizona. If any Hearing Officer on his/her own motion subpoenas a witness, fees and mileage may be paid from funds of the Commission upon presentation of a duly executed claim. If a witness is subpoenaed upon request of the Appellant or Respondent, the requesting party shall pay the fees and mileage of the witness. Reimbursements to County employees subpoenaed as witnesses shall be limited to payment of mileage, if appropriate, by the party requesting the witness.

L.  Depositions. If a witness does not reside within Gila County or within one hundred (100) miles of the place where the hearing or investigation is to be

| Gila County Human Resources | Merit System Rule 12 | Page |
|---|---|---|
| | Replaces BOS-HRS-615; Rule 22.4 | |
| GRIEVANCE AND APPEAL PROCEDURE | Previously Adopted: 01-05-2016; 12-16-2003 Adopted: 11-02-2021 | 7 of 7 |

held, is out of state, or is too infirm to attend the hearing or investigation, any party, at its own expense, may cause a deposition to be taken. If the presence of a witness cannot be procured at the time of the hearing or investigation, the deposition may be used in evidence by either party or the Commission.

M. Proposed Findings of Fact. Both Appellant and Respondent shall have the right to file with the Commission or its Hearing Officer, at any time prior to the hearing, proposed findings of fact. The Commission or its Hearing Officer shall include a ruling upon findings of fact proposed by any party in its findings of fact.

N. Findings of Fact; Conclusions of Law; and Order. The Commission shall make written findings of fact, conclusions of law and an order within twenty (20) working days from the conclusion of the hearing. Copies shall be sent to the Appellant and Respondent at their addresses listed in the Commission records or to their legal counsel, if any. In the event the Commission orders the Appellant to be reinstated, it may also award back pay for such periods and in such amounts as the Commission deems appropriate under the circumstances.

O. Withdrawal of an Appeal. The Appellant may submit a written request to withdraw the appeal at any time prior to the decision by the Commission. Such request shall be filed with the Director.

P. Decision by Commission. If, after the hearing, a majority of the Commission determines that the appealed action was arbitrary or capricious, the action shall be reversed. Otherwise, the action shall be affirmed.

Q. Compliance of Appointing Authority. Within ten (10) working days of a notice of decision by the Commission revoking or modifying any order of disciplinary action, the Appointing Authority shall comply with the Commission's decision, and shall render a report to the Director.

R. Administrative Review. The findings and decisions of the Commission shall be final and shall be subject only to administrative review as provided in A.R.S. §12-901, *et seq.*

S. Law enforcement officers right to representation, right to evidence on appeal, and right to change of hearing officer or administrative law judge are in accordance with A.R.S. §38-1101. Law enforcement officer means an individual, other than a probationary employee, who is certified by the Arizona Peace Officer Standards and Training board or who is a detention officer or correction officer and who is employed by this state or a political subdivision of this state.

Merit System Rule 12

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

**Complaint Exhibit # 9**

**Reporter's transcript of Gila County Personnel Commission appeal hearing on October 21, 2025**

IN THE STATE OF ARIZONA

IN AND FOR THE COUNTY OF GILA


GILA COUNTY PERSONNEL COMMISSION



In the Matter of:          )
                           )
                           )
ROBERT JOHNSTON            )
                           )
                           )
In Re: Termination Appeal  )



REPORTER'S TRANSCRIPT OF HEARING



BEFORE:  GILA COUNT PERSONNEL COMMISSION



Globe, Arizona
October 21, 2025



Denise R. Vaishville
Certified Court Reporter
Arizona Certification # 50310
(480) 703-4569

```
 1   APPEARANCES:

 2

 3     COMMISSIONER CHAIRWOMAN CHRISTA DAL MOLIN-EAST

 4

 5     COMMISSIONER DAVID LAGUNAS

 6

 7     COMMISSIONER JESSE LEETHAM

 8

 9     COMMISSION LEGAL COUNSEL RODNEY STATES

10

11   COMMISSION CLERK ANGELO CUTTER

12

13   RESPONDENT LEGAL COUNSEL JESSICA SCIBELLI

14

15   PETITIONER LEGAL COUNSEL JOSHUA BLACK

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                        INDEX

 2

 3   DISCUSSION/ARGUMENTS before the COMMISSION        6

 4

 5   OPENING STATEMENTS by MS. SCIBELLI              77

 6   OPENING STATEMENTS by MR. BLACK                 78

 7      WITNESSES:

 8    BRADLEY BEAUCHAMP

 9   Direct Examination by Ms. Scibelli             84

10   Cross-examination by Mr. Black                 97

11   Redirect Examination by Ms. Scibelli          132

12

13    JOSEPH COLLINS

14   Direct Examination by Ms. Scibelli            139

15   Cross-examination by Mr. Black                150

16   Redirect Examination by Ms. Scibelli          154

17

18    LISA KING

19   Direct Examination by Ms. Scibelli            155

20   Cross-examination by Mr. Black                158

21

22    TODD BATY

23   Direct Examination by Ms. Scibelli            159

24   Cross-examination by Mr. Black                164

25
```

```
 1                    INDEX CONT'D

 2     WITNESSES:

 3    RAMON HERNANDEZ

 4   Direct Examination by Ms. Scibelli          165

 5   Cross-examination by Mr. Black              167

 6

 7     CORRIE TINSDALE

 8   Direct Examination by Ms. Scibelli          169

 9   Cross-examination by Mr. Black              171

10   Redirect Examination by Ms. Scibelli        173

11   Recross-examination by Mr. Black            176

12   Re-Redirect Examination by Ms. Scibelli     177

13

14     GARRETT TINSDALE

15   Direct Examination by Ms. Scibelli          177

16

17     TANNER BECKWITH

18   Direct Examination by Ms. Scibelli          178

19

20     ROBERT JOHNSTON

21   Direct Examination by Mr. Black             182

22

23   CLOSINGS BY MS. SCIBELLI                    193

24   CLOSINGS BY MR. BLACK                       197

25   FINAL DISCUSSIONS/DECISION BY COMMISSION    203
```

```
1                        EXHIBITS

2

3       EXHIBIT NO. ADMITTED:              PAGE:

4

5              1                            89

6             5                            96

7           2 & 3                         122

8            4                            194

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**P R O C E E D I N G S**

1

2

3          MS. DAL MOLIN-EAST:  We will call

4   this meeting of the Gila County Personnel Commission

5   to order at 10:09 a.m., on Tuesday, October 21st.

6          We will stand and do the Pledge of

7   Allegiance.

8          (Pledge of Allegiance was done.)

9          MS. DAL MOLIN-EAST:  Let the record

10  show that Commissioner Leetham and Commissioner

11  Lagunas and Commissioner Dal Molin-East are present.

12          Prior to getting started with the formal

13  hearing, I do want to clarify whether or not you

14  would like have this hearing be open to the public

15  or have it be a closed hearing?  You have the right

16  to choose that.

17          MR. JOHNSTON:  I prefer it be open.

18          MS. DAL MOLIN-EAST:  Open?

19          MR. JOHNSTON:  Yes, ma'am.

20          MS. DAL MOLIN-EAST:  So this will be

21  an open hearing at the Appellant's request.

22          Are there any motions that the

23  Commission should cover?

24          So the Commission now needs to

25  determine whether or not we have jurisdiction to

```
 1    hear this matter and make a decision on this matter.

 2                    Commissioners, would you like to

 3    discuss that here or do we need to go into a regular

 4    session to determine whether or not we have

 5    jurisdiction?

 6                    MR. LEETHAM:  I make the motion to go

 7    into executive session.

 8                    MR. LAGUNAS:  And I second it.

 9                    MS. DAL MOLIN-EAST:  So Commissioner

10    Leetham makes the motion and it's seconded by

11    Commissioner Lagunas.  All in favor to move to

12    executive session for discussion on the Commission's

13    jurisdiction.  All in favor say aye.

14                    ALL COMMISSIONERS:  Aye.

15                    MS. DAL MOLIN-EAST:  Opposed?

16                    We will convene to executive session.

17        (All appropriate parties left the room.)

18                    MS. DAL MOLIN-EAST:  We are in

19    executive session.

20                    So of course we need to determine if

21    we have jurisdiction.  So it sounds, based upon what

22    I'm seeing in number two is this employee was

23    terminated, which I believe then does give us

24    jurisdiction.

25                    MR. STATES:  So what the Commission's
```

1  rules say as far as the scope of the Commission's

2  jurisdiction is that the Commission has jurisdiction

3  for any employee -- this is Merit Rule 12.5A1, an

4  action resulting in a dismissal, demotion, reduction

5  in pay or suspension on any grounds, including

6  alleged unlawful discrimination.

7           MS. DAL MOLIN-EAST:  So it sounds

8  like we have jurisdiction.

9           MR. STATES:  One portion I'm not sure

10 of, I guess it's been assumed in the parties filings

11 up to this point, is whether or not the Appellant,

12 Mr. Johnston, is classified, or in other words

13 covered by the merit rules, because the merit rules

14 do make certain exceptions for certain elected

15 officials and part-time and volunteers.  So that

16 could be something to clarify if the Commission so

17 desires.  I don't know.

18           THE CLERK:  If Mr. Johnston's covered

19 by the merit?  He would be covered by the merit.

20           MR. STATES:  Okay.

21           MS. DAL MOLIN-EAST:  I believe we

22 have jurisdiction then.  So this isn't a vote;

23 right?

24           MR. STATES:  That is the first thing

25 you decide in executive session.  We have a motion,

1  we can reconvene and you can have a motion to

2  confirm that the counsel has jurisdiction over this

3  matter.

4          MS. DAL MOLIN-EAST:  Okay.  Anybody

5  need any further clarification before we start?

6          MR. LEETHAM:  No.

7          MR. STATES:  So that was the motion

8  made.  If there are any other questions along the

9  way, for example, so now as to jurisdiction, you

10  guys are going to vote on how you decide on that.

11  If the Commission votes that it has jurisdiction

12  over the matter, then there are some pending motions

13  before the Commission.  There was one motion, I'm

14  guessing is obsolete, and that's Appellant's motion

15  for his counsel to appear remotely, but it looks

16  like counsel is with him here.

17          The other one was Appellant's motion

18  to continue the hearing.  And that's the second tab

19  in your packets.  So if you have any questions about

20  that, we could convene to an executive session for

21  that motion.

22          MR. LEETHAM:  Okay.

23          MR. LAGUNAS:  What was his position?

24          MR. LEETHAM:  It think it was like a

25  legal secretary.

```
 1                    Okay.  I will make a motion no go back
 2     to regular session.
 3                    MR. LAGUNAS:  I second that.
 4                    MS. DAL MOLIN-EAST:  All in favor say
 5     aye?
 6                    ALL COMMISSIONERS:  Aye.
 7                    MS. DAL MOLIN-EAST:  All opposed?
 8                    Okay.  We'll be back in open session.
 9                    (All parties returned to the room.)
10                    MS. DAL MOLIN-EAST:  Is there a
11     motion to reconvene in regular session?
12                    MR. LEETHAM:  Yes.
13                    MR. LEETHAM:  I second it.
14                    MS. DAL MOLIN-EAST:  The motion is
15     made by Commissioner Leetham and seconded by
16     Commissioner Laguna.  All in favor say Aye.
17                    ALL COMMISSIONERS:  Aye.
18                    MS. DAL MOLIN-EAST:  All opposed?
19                    Is there any further discussion on
20     whether or not this is within the jurisdiction of
21     the Commission, and if there is not, is there a
22     motion on the table?
23                    MR. LEETHAM:  I make a motion that
24     the Commission has jurisdiction of this matter.
25                    MR. LAGUNAS:  I second that.
```

1          MS. DAL MOLIN-EAST:  The motion is

2   made that we have jurisdiction over this matter by

3   Commissioner Leetham and seconded by Commissioner

4   Lagunas. All in favor say aye.

5          ALL COMMISSIONERS:  Aye.

6          MS. DAL MOLIN-EAST:  All opposed?

7          Thank you.

8          So with the determination that we do

9   have jurisdiction over this matter, I'd like to ask

10  if there were any motions for the Commission's

11  consideration prior to proceeding with today's

12  hearing?

13          MR. BLACK:  Yes.  Actually there's a

14  motion related to the continuation of this hearing.

15  We're requesting that this hearing be continued so

16  that we have time to get evidence and witnesses to

17  present testimony.

18          MS. DAL MOLIN-EAST:  Thank you for

19  giving us that motion.  Is there anything else that

20  needs to be shared regarding the request for

21  continuation with the Commission before we talk with

22  legal counsel?

23          MR. STATES:  Can I ask, I'm assuming,

24  because I see that counsel is with you present

25  today, I just wanted to know if you're withdrawing

1  your motion for Commission to approve counsel to

2  appear telephonically or not?

3             MR. BLACK:  I'm counsel and I'm

4  here --

5             MR. STATES:  Oh, you're counsel?

6             MR. BLACK:  And since the motion's

7  not been ruled on, so I came in person.  Thank you,

8  that was another outstanding motion, was whether --

9             MR. STATES:  So that's withdrawn. I'm

10 sorry, I wasn't sure who was how.

11             MS. DAL MOLIN-EAST:  So that's been

12 withdrawn, so it's the motion to continue then.

13             MR. BLACK:  You did ask if I had

14 anything else to express to the Commission regarding

15 our motion to extend, and I do.  Essentially this is

16 something that we feel is very important and it's

17 very fact-intensive because it's related to First

18 Amendment protections.  As such, we have witnesses

19 that we would like to call that we subpoenaed that

20 haven't -- we haven't had subpoenas issued yet.

21             Also, we would like to either submit

22 prehearing submissions or briefs from the parties

23 regarding whether or not the Second Amended Notice

24 of Termination is valid because as we read the

25 regulation, it was not within the ten days required

 1  by the Rules.

 2              So that would be an important issue

 3  too, whether we're just holding the hearing on the

 4  first termination, or whether it includes the

 5  amended added claims in the second termination, that

 6  we content were untimely.

 7              MS. DAL MOLIN-EAST:  Let me ask a

 8  question just for clarification, you're talking

 9  about multiple terminations, it appears, so sir,

10  were you terminated and then reinstated and

11  terminated a second time?

12              MR. JOHNSTON:  No, I was terminated

13  on September 15 and I receive my last paycheck on

14  the 16th.

15              MS. DAL MOLIN-EAST:  So what is the

16  second termination?

17              MR. JOHNSTON:  The second termination

18  did not occur until I filed my appeal for the first

19  termination.  So I fired again, fired some more.

20              MR. BLACK:  We have a copy of the

21  notice if you'd like to see it, the second notice of

22  termination.

23              MR. STATES:  Before we get into that,

24  so I just want to confirm that the current motion

25  before the Commission is the motion to continue.

1  Part of Appellant's basis for that is he needs to

2  subpoena witnesses, confirm the witness list, due to

3  the breadth and complexity of the First Amendment

4  challenge?

5              And the additional basis that we're

6  now discussing as a reason to continue towards

7  continuance, would also be Appellant's desire to

8  challenge the amended disciplinary notice that was

9  served on the Appellant?

10             MR. BLACK:  Correct.

11             MR. STATES:  But the motion before

12  the Commission at this point is not deliberating on

13  --

14             MR. BLACK:  Not on any of that --

15             MR. STATES:  Just the validity of the

16  disciplinary --

17             MR. BLACK:  Right, exactly.  Just

18  background information to explain why we're

19  requesting more time.

20             MS. SCIBELLI:  I'm just confused as

21  to the first and second terminations.

22             Is there anything else that you

23  wanted to state?

24             MR. BLACK:  No, thank you, Chairman.

25             MS. SCIBELLI:  Yes, Chairwoman, I

```
 1    just wanted to know if there was a written request
 2    for the continuance?  I believe it was received
 3    yesterday.  I am no in receipt of that, so I just
 4    want to make sure that there's not additional
 5    arguments in there as to why we need to continue
 6    today's hearing.
 7              MS. SCIBELLI:  And with that, I'm
 8    going to look to legal counsel, Ms. States.
 9              MR. STATES:  Just confirming with the
10    Clerk of the Commission, as I understand it, the
11    written continuance was received via mail yesterday,
12    October 20, at 10:22 a.m.  That's the time and date
13    stamp.
14              THE CLERK:  That's correct.
15              MR. STATES:  And if the clerk can
16    confirm, I believe a copy of this or a request to
17    continue was also emailed -- when I was looking at
18    the emails, October 16th, at around 3:00 p.m.; does
19    that sound accurate?
20              THE CLERK:  Regarding the email
21    request for it?
22              MS. SCIBELLI:  Yes, there was an
23    email request and then there was a mailed written
24    request.
25              MS. SCIBELLI:  I don't believe there
```

 1    was an email request.  I believe that there was just

 2    an email from you, Mr. States, indicating that you

 3    were informed that there would be a continuance

 4    coming, but that a written request had not been

 5    received yet.

 6                  THE CLERK:  That is correct.

 7                  MR. STATES:  There was an email, if I

 8    may, there was an email sent on October 16, at

 9    3:17 p.m.  Dear Mr. States and Respondents, I hope

10    this message finds you well.  Our office has just

11    been retained to represent Mr. Johnston, who

12    recently mailed a request on Tuesday, October 14th,

13    for a motion to continue the hearing, currently

14    scheduled for Tuesday, October 21.

15                  For your reference I have attached

16    the documents Mr. Johnston submitted via mail, along

17    with the tracking information.  I also left a voice

18    mail for Ms. Scibelli to discuss this matter.  I

19    sincerely hope we can all come to an agreement on a

20    continuance.  The additional time would allow our

21    firm, particularly Mr. Black as lead counsel, to

22    adequately prepare and ensure that we can fully and

23    properly address the matters before the hearing.

24                  Surely appreciate your understanding,

25    time and consideration of this request.  Your

1  cooperation would be immensely helpful and we work

2  to work collaboratively towards a solution that

3  accommodates all parties.

4          Thank you very much for your attention and

5  I look forward to your kind response.

6          MS. SCIBELLI:  Yes, Chairwoman, I do

7  have that email.  It was received October 20th, at

8  9:15 a.m.

9          MR. BLACK:  I can show you were it

10  was sent. It was also sent to the clerk that same

11  date.  So he would have it showing it was

12  October 16th.

13          MS. DAL MOLIN-EAST:  To answer the

14  second part of your question on the table for this

15  Commission, there are five reasons for the request

16  for the continuance.  I'm not sure what's in the

17  emails or not, but it's stating reasons of lack of

18  compliance, recently retained legal counsel,

19  counsel's calendar may not accommodate, but counsel

20  is here.  And then what was stated, so a potential

21  claim about violation of rights and subpoena time to

22  subpoena witnesses.  I believe that addresses the

23  second part of your request.

24          MS. SCIBELLI:  If I may --

25          MR. STATES:  So that's something I

1    think we'll want to confirm.  So the email that I'm

2    referring to that the Clerk of the Commission

3    received on the 16th at around 3:00 p.m., it had, I

4    believe, a copy of the written request attached.  As

5    to the email, I was copies at my email address, and

6    the according to what my email in inbox says, it was

7    sent from Nancy Trujillo @AZemploymentlawyer.com.

8                    MR. LEETHAM:  Can the clerk give her

9    a copy of that?  Do you have a copy?

10                   MR. STATES:  We can give her a copy.

11   I just also wanted to see if she received any of

12   this because once things go into email, you never

13   know if and when someone gets it.

14                   It was sent to JScibelli @gilacounty

15   az.gov, and to my email.  Copied were Rick Husk,

16   Anglo Cutter, Josh Black and it appears some

17   in-house employees at the law firm.

18                   MR. STATES:  So Mr. States, I just

19   want to confirm that you have received that email on

20   the 16th?

21                   MR. STATES:  Yes, I did.

22                   MS. SCIBELLI:  Okay. So if you want

23   to just take a look here, just so you see you when I

24   received it.  I do think it's relevant that he did

25   send it in on the 16th.  I was misinformed, I'm not

```
1    sure why my server received it on the 20th.
2                    MR. STATES:  This is P different
3    email.  I don't know if --
4                    THE CLERK:  I don't think I got it
5    either.
6                    MR. BLACK:  We didn't get any returns
7    saying that it was undelivered.
8                    MR. STATES:  Here's the verbiage in
9    this one.
10                    MS. DAL MOLIN-EAST:  Whether or not
11   it was received or when it was received, it feels to
12   me like it has been confirmed that there was a good
13   faith effort on the 16th to send this email, and it
14   was, at least, received by the Commission's
15   attorney.  And then the details of who got it when,
16   in my opinion, is not as relevant for us to be able
17   to answer this question.
18                    MR. LEETHAM:  I agree.  I believe the
19   details can be worked out amongst the counsel at
20   another time.  We're just currently dealing with the
21   continuation, we're dealing with that question right
22   now.  We need to discuss that.
23                    MS. DAL MOLIN-EAST:  I think that the
24   time and date that it was received or not is not as
25   important for us to determine as to whether or not
```

1  we want to grant a continuation.

2              With that, Ms. Scibelli, did you have

3  anything else you wanted to state?

4              MS. SCIBELLI:  I do. I'm just going

5  to make my argument to object to the continuance.  I

6  understand that it may be received by the by the

7  Commission on the 16th.

8              So, the Petitioner did request this

9  hearing today.  Under Merit Rule 12.6, it indicates

10  that the appeal shall commence within 20 calendar

11  days of receipt by the director, unless either the

12  time is extended by mutual agreement or other good

13  cause, as determined by the Commission.

14              There has not been a mutual agreement

15  with my client to continue this matter.  However,

16  it's already been extended to allow the Petitioner

17  time to respond to the amended termination notice.

18              The initial termination notice was

19  sent on September 15th. It's been well over a month.

20  The Petitioner decided to wait to obtain counsel

21  until last week.  The amended termination was served

22  September 26th.  Again, that was a month ago, almost

23  a month ago.  The Petitioner had ample time to seek

24  counsel prior to that or right after he filed for

25  his appeal, but he failed to do that, he just

1    recently obtained counsel.

2              The request for continuance is

3    explicit in the Rules.  It does indicate that it

4    must be received with five calendar days.  It also

5    indicates that the Clerk of the Commission must send

6    copies to all concerned parties.  Here the Clerk of

7    the Commission did not have receipt of that written

8    request.  I was not in receipt of the written

9    request until right now.

10             The question is whether there's good

11   cause to continue the hearing.  We argue that it's

12   been almost six weeks after he was terminated.

13   That's ample time to obtain legal counsel.

14   Additionally, under 12.6, everyone should have been

15   in receipt of this so that we know why the

16   continuance is being requested.

17             I will make my arguments in objection

18   to these points, however, please acknowledge that I

19   did just receive this notice.

20             The deadline for the written

21   continuance would have been the 16th.  I do

22   understand that it was received on the 21st, now in

23   hearing otherwise.

24             We do have all of our witnesses

25   present in the other room.  They've all traveled

1    here from Payson.  They do have other work to be

2    attending to.  Among those witnesses we do have the

3    County Attorney.  We also have the Chief Deputy

4    County Attorney.  They are handling heinous crimes

5    right now that they should be attending to, but

6    again, they're waiting for this hearing to proceed

7    today.

8              We're here today to resolve this,

9    again, at the request of the Petitioner.  We're

10   asking that you deny the motion to continue.  Under

11   Merit Rule 12.6, there is a specific rule that all

12   parties should be in receipt of this written

13   request.  I think the Petitioner waiting to obtain

14   counsel is certainly not good cause to delay the

15   hearing.

16             Now, in regard to the subpoenas,

17   under Rule 12.6, within ten days of a hearing or at

18   the time the names of the witnesses are submitted

19   for subpoena, the Appellant shall state the reason

20   each witness is being called and the testimony being

21   offered.

22             Just to remind you, these Rules were

23   adopted by the Board of Supervisors.  The Commission

24   does not have any authority to modify these Rules.

25   That Rule is very specific, it does state that

1    within ten days of this hearing, that list of

2    witnesses and their testimony should be received.

3    Petitioner failed to do that.  He did submit what he

4    referenced as a draft witness list with his amended

5    appeal notice, but a final version was never

6    received.  He didn't list why each witness was being

7    called, nor did he list the testimony that each

8    witness would give, and that's a specific

9    requirement under Merit Rule 12.6A.

10                   Although not required by the Rules,

11   my client provided a list of the witnesses and the

12   testimony that they were offering to the Petitioner.

13   The Petitioner received this, which could have

14   triggered the thought that he should possibly do the

15   same.  However, to date my client still has not

16   received any list of witnesses with their suggested

17   testimony.

18                   The hearing, assuming it presumes

19   today, the Commission wouldn't have time to request

20   subpoenas from the Chairman of the Board of

21   Supervisors, nor provide notice to the list of

22   witnesses.  Further, all of the relevant witnesses

23   are sitting in the room next door.  They're here and

24   prepared, ready to testify.  The Petitioner would

25   have the opportunity to cross-examine all of those

1    witnesses.

2              In the draft witness list that the

3    Petitioner provided, it listed 39 witnesses.  I'm

4    questioning whether or not one of them could be here

5    today without the requirement of a subpoena.  And

6    among those witnesses, the Petitioner listed people

7    who don't work for the County and have no relevance

8    for the charges at hand.  Even if we wasted the time

9    of trying to obtain subpoenas for all of these

10   individuals and trying to locate them, because we

11   don't even have an address that was provided to us,

12   under Merit Rule 12.6, it indicates that irrelevant,

13   immaterial and incompetent or unduly repetitious

14   evidence may be excluded.  Those witnesses do not

15   help in any way to prove or disprove whether his

16   termination was arbitrary or capricious, and it has

17   no bearing on the matter at hand.  The Petitioner

18   put a list of 39 witnesses together, but he failed

19   to comply with the Rules, and again, this was after

20   his request to have this hearing today.

21              The Respondent respectfully requests

22   that the Commission not request the Chairman to

23   issue any subpoenas, as they were not properly

24   requested by the Petitioner and do not comply with

25   Merit Rule 12.6H1.  And as explained, the Commission

1  has no authority to modify this Rule, as it was set

2  forth by the Board of Supervisors, and it's not an

3  arbitrary Rule, it's not ambiguous, it's very clear

4  that the list shall include the testimony of the

5  witnesses.

6          As far as the FOIA request, this has

7  no bearing on the hearing.  FOIA requests are

8  received all the time at Gila County. We're a rural

9  county, we don't have many resources to allocate

10 towards public records requests.  We do the best

11 that we can, however there are many public records

12 requests that are in the cue and we are processing

13 them. IT has to pull all of the data that is

14 requested and it takes time, because then it needs

15 to be transported over to the department, and they

16 need to review it, whether there's redactions or

17 what have you, it takes many, many months for

18 certain FOIA requests to be responded to.  And

19 again, in the Rules here, it's the intent for these

20 hearings to happen timely, within 20 days of an

21 appeal.  FOIA requests should not have anything to

22 do with a continuance.

23         Again, as far as the counsel recently

24 being retained, that was the Petitioner's choice.

25 He did request this hearing today.  He could have

1    requested counsel prior to last week.  It was his
2    choice to wait.

3              In regard to the amended termination
4    notice.  We will get further into that when we have
5    the witnesses testify.  But that's not how it
6    happened.  The County Attorney's Office did not
7    attempt to fire him again or submit another
8    termination notice just because he appealed.  The
9    timeline will tell you that after he was terminated,
10   females reported allegations of sexual harassment,
11   that are taken very seriously and they needed to be
12   reported.  The County Attorney had no choice but to
13   file an amended termination notice so that we
14   document those allegations properly.

15             Nothing further.  Thank you.

16             MS. DAL MOLIN-EAST:  Mr. Johnston, do
17   you mind introducing your lawyer?

18             MR. JOHNSTON:  Yes, I'm sorry.  This
19   is Joshua Black.

20             MS. DAL MOLIN-EAST:  Thank you.  We
21   didn't get his name.

22             MR. BLACK:  I didn't think we'd done
23   introductions yet.  Joshua Black, counsel for Mr.
24   Johnston.

25             As counsel mentioned, it takes a lot

1    the time to find the right type of lawyer for this

2    process.  I've sat on the Board of the Arizona

3    Employment Lawyers Association, we're in charge of

4    all employment lawyers in the state.  There is about

5    110.  Out of those less than 20 will work on cases

6    that involve government employees.  I'm not alleging

7    there's not some others of us out there that we're

8    not aware of, but as far as that goes, there's about

9    20 lawyers in the whole state that my client could

10   choose from.  It does take time and it is hard to

11   find someone who can come all to Globe and deal with

12   this kind of claim.  So waiting to obtain counsel is

13   not what he did.  He sought me out as soon as he

14   could and I participated as soon as I could.  I

15   wasn't available today, but I moved things to be

16   here, family things and other court issues.

17                The statement that these witnesses

18   aren't going to help, that's not true.  That's

19   completely conclusionary.  How can you say a list of

20   names isn't going to help when, as it's been said,

21   we haven't identified yet what they're going to

22   testify to.  We need a chance to do that so that the

23   Commissioners can validly weigh whether or not those

24   are relevant folks that we need the testimony of so

25   we can make sure they're here.

1          The interest of justice in this

2   process outranks the interest of expediency.

3   Meaning, yes, Rule 12 talks about the desire to have

4   this done quickly, but the whole purpose is for the

5   individual employ to have their due process.  And

6   there is no due process if one side has a room

7   stacked with witnesses and the other side hasn't

8   been allowed to subpoena their witnesses yet.

9          To say that we didn't get

10  documentation in on time, there's clear records, we

11  have records that show that counsel received that

12  email from our system, from Google, that says that

13  it was not bounced back, that it was delivered.  So

14  if that's being contested, if this is all being

15  contested on whether or not that was timely, then we

16  need to get some evaluation, a forensic expert to

17  identify whether or not it was sent, because all of

18  my client's due process rights revolve around that.

19  If it was, then it was timely and we should be able

20  to get an extension today so that he can prepare his

21  case.

22          Beyond that I would say, of course,

23  FOIA requests do have a bearing when you're

24  requesting information from your employer that you

25  feel would directly prove or disprove allegations

1    that are being made.

2                    Thank you, Chairman.

3                    MS. DAL MOLIN-EAST:  Thank you, Mr.

4    Black and Ms. Scibelli for sharing and giving us

5    your perspective on the motion for continuance.

6                    At this point, Commissioners, we need

7    to have a discussion and make a determination.  We

8    can also determine if we need to go into executive

9    session if we need legal advice.

10                   I do want to make it clear, because I

11   failed to just reiterate it at the beginning of this

12   meeting, that this Commission only determines

13   whether or not the discipline, in this case it was

14   termination issued by the County, was arbitration

15   and capricious.  We do not determine at the end of

16   the day whether or not, for example, First Amendment

17   Rights were violated.  It is solely determining

18   whether or not the action or discipline was

19   arbitration and capricious.

20                   With that being said, any discussion?

21

22                   MR. LEETHAM:  I would request that we

23   move into executive session.

24                   MR. LAGUNAS:  I will second that.

25                   MS. DAL MOLIN-EAST:  A motion to move

1    into executive session has been made by Commissioner

2    Leetham and seconded by Commissioner Lagunas.

3                    All in favor say Aye.

4                    COMMISSIONERS:  Aye.

5                    MS. DAL MOLIN-EAST:  All opposed?

6                    Okay.  We will convene into executive

7    session.

8                    (All appropriate parties left the

9    room.)

10                    MS. DAL MOLIN-EAST:  Mr. State, just

11    a quick question of clarification for my mind. I

12    think this was covered in a previous hearing, but

13    our decision and his going through with this process

14    does not then preclude him from saying I want to go

15    to a higher court?

16                    MR. STATES:  Correct. I would

17    clarify, there's a fairly recent case about the

18    Phoenix Personnel Commission's scope over a First

19    Amendment challenge.  And it was a police officer's

20    Face Book post.  And in that instance, the Arizona

21    State Supreme Court found that the Phoenix Merit

22    Commission, based on the verbiage of their authority

23    or scope of authority, which is worded a little

24    differently than this Commission, and the challenge

25    was a little different.  So let me just take a step

1    back.  So in this instance there is a First
2    Amendment challenge, but we'll wait to see what he
3    says.  But the distinction that I'm anticipating is
4    I'm not sure he's going to be asking the Commission
5    to find that a county policy was unconstitutional,
6    to declare this county's policy is unconstitutional.
7    In the Phoenix case, that is what that police
8    officer was asking the Phoenix Personnel Board to
9    do.  And because of that particular argument and the
10   way the City of Phoenix's Merit Commission
11   authorizing the rules were worded, the State Supreme
12   Court found they did not have authority to declare a
13   county policy unconstitutional.  But the court --
14   and I'll just mention the case was Michael Gunbar v.
15   Phoenix Civil Service Board.  And that citation is
16   256 ARIZ 343.  It was decided in 2023, by the State
17   Supreme Court.  So what the State Supreme Court
18   found was while the Merit Commission, due to the way
19   that they're authorized and worded, they didn't have
20   the authority to declare a county policy
21   unconstitutional.
22           They could decide whether or not a
23   policy was applied in a way that may have violated
24   the person's Constitutional Rights and that
25   Personnel Board should have allowed the appellant to

1    present evidence and witnesses on that account, on

2    that particular basis of the challenge.  I'll read

3    you some excerpts of what the court said in that

4    case.  The court said, the Board essentially serves

5    as the community's conscious.  It is charged with

6    deciding whether the employer caused to discipline

7    the employee and whether the discipline imposed was

8    unwarranted or too severe.  That was a police

9    officer case, those have a slightly different view.

10   It can apply popular values and common sense on

11   deciding whether an employee was fairly disciplined.

12   Thus, the Board could have considered whether the

13   officer reasonably believed her speech was

14   Constitutionally protected.  It also could have

15   considered whether the imposed violation was

16   excusable because similarly situated employees were

17   treated differently, whether discipline was fairly

18   imposed in light of -- and it talks about Face Book

19   settings and things that -- we'll see what the

20   evidence will be in this case.

21                   But essentially, I did some research

22   on this in anticipation of the hearing, and if

23   either party were to raise arguments that this

24   Commission needs to decide whether or not a county

25   policy is unconstitutional, that would appear to be

1  outside the scope of authority for this Commission.

2  But the Commission could entertain arguments as far

3  as whether or not the policy was applied

4  appropriately or kind of in a discriminatory way,

5  like I'm the only one whose ever been disciplined

6  for this, or they disciplined me for this because

7  they don't like what I said or what I was talking

8  about, whatever.  But those would be things that

9  appear to be, in my opinion, within the scope of

10  authority for this Commission.  And the Commission

11  could take evidence from either party on that.  So

12  that's as far as Commissions going with the

13  authority of a First Amendment challenge.

14            MS. DAL MOLIN-EAST:  I think that

15  helps in part, like we're determining arbitrary and

16  capricious, we make that decision, because I don't

17  want them necessarily feeling that we are going to

18  make a determination on whether someone's First

19  Amendment or any other Amendment Rights have been

20  violated.  None of us have that training or the

21  expertise to be able to do that.

22            And so for me, that's important when

23  we're talking about the continuance.

24            MR. LEETHAM:  So if we deny the

25  request for a continuance, does the Commission have

1   to explain why they denied it?

2              MR. STATES:  You don't have to.  You

3   could if you wanted to.  That would be like a point

4   of personal privilege in an open meeting law, you

5   can say I want to explain the reason for my vote.

6   But you can just decide based on the arguments on

7   the record.

8              I also want to clarify, I have an

9   excerpt of Rule 12.6 that Ms. Scibelli was referring

10  to.  This is Gila County Merit System Rule 12,

11  subsection 12.6 governs appeal procedure.  Paragraph

12  G governs continuance of hearing.  Subparagraph 1

13  provides, either Respondent or Appellant may request

14  that a hearing set pursuant to these Rules be

15  continued.  Such a request must be submitted in

16  writing to the Clerk of the Commission 5 calendar

17  days prior to the date set for the hearing.  The

18  Clerk of the Commission must send copies to all

19  concerned parties, together with an order for

20  continuance, to be signed by a member of the

21  Commission so designated by the Commission to sign

22  such orders.

23             Also there's an excerpt of Merit

24  System Rule 2, subsection 2.9, service of notice.

25  Unless otherwise provided by law or these Rules,

 1  whenever any notice, paper or document is to be

 2  served upon any person, party or agency by the

 3  director, meaning the HR Director, such service may

 4  be accomplished by any of the following methods:

 5  Personal service, service by certified or registered

 6  mail, service by first class mail, service by any

 7  other method designated by the Director of HR by

 8  reasonable notice of the matter, such as electronic

 9  mail, service is complete when the recipient is

10  personally served, or 5 days after mailing or

11  sending to the recipient's last known address.

12            MR. LEETHAM:  Do we have an email or

13  correspondence to the HR Director to be valid?

14            MR. STATES:  So far we don't have an

15  evidence before us for or against that.

16            Also I'll just point out that Rule

17  2.9 is talking about service, notices and documents

18  coming from the Director to others.  But outside of

19  that, I didn't see anything else in the Commission's

20  rules that talk about service, valid methods and

21  presumed timing of service.  So in that instance,

22  the Commission might consider this to be not while

23  not controlling, perhaps persuasive as an example.

24  But again, that's kind of in the gray.  That would

25  be what you guys think would be reasonable under the

1    circumstances.

2              MS. DAL MOLIN-EAST:  And also our

3    clerk, Angelo, did not receive it, even though I

4    believe there was a good faith effort to send it?

5              MR. STATES:  I think we may want to

6    make a record of this after the executive session,

7    but Angelo informed me that sometimes the County's

8    email server will reject Gmails.  And I'm not sure,

9    but I thought I heard Mr. Johnston's attorney say he

10   was uses Google mail or Gmail.

11             THE CLERK:  We ran into this issue

12   just recently where a person kept saying, I sent it,

13   I sent it, I sent it.  So we contacted IT, and IT

14   informed us they've totally blocked all Gmails from

15   coming into the county.  So we can't receive Gmails.

16   So when he said he used Google server, or whatever

17   he said, that may explain why Jessica and I didn't

18   get it.  I can't find it in my email.

19             MR. STATES:  I received it and I saw

20   the list of addressees, so I assumed each person got

21   it.

22             But as to your point earlier, I don't

23   know whether or not the HR Director has authorized

24   email as a valid alternative method.

25   Notwithstanding that --

1          MR. LEETHAM:  But we wouldn't know

2    that until we asked them and had their testimony;

3    correct?

4          MR. STATES:  Correct.

5          MR. LEETHAM:  But we have this motion

6    in hand before we can even get into that.

7          MR. STATES:  Well, the Commission can

8    call a witness, if it needs to, to decide the motion

9    before -- so either party could, or the Commission

10   could say well, in reviewing the Rules, we saw that

11   there is this portion that talks about service under

12   the Merit Rules coming from the Director to others,

13   and while this was a notice coming from a party to

14   the Commission and the other parties, we want to

15   know under Rule 2.9 whether or not the Director has

16   previously or in this moment is authorizing email as

17   an appropriate alternative method.

18          MR. LEETHAM:  I think that --

19          MR. STATES:  That said, that email,

20   the testimony was that that email was sent on the

21   16th, but it wasn't received by Ms. Scibelli at all.

22   That was her statement.

23          With regard to the timing of service,

24   service is complete when the recipient is personally

25   served, so like they sent a process server, or five

1  days after mailing or sending to the recipient's
2  last known address.
3            So for example, doing the math, if a
4  motion to continue must be submitted five calendar
5  days prior to the date of the hearing, and it was
6  submitted, it was emailed on the 16th, if it's never
7  received, it's not deemed received until five days
8  later, which would be today, which that may make it
9  untimely, based on how you view this.  And the
10 extent to which you feel Rule 2.9 is persuasive,
11 although I'll tell you it's not -- that in my
12 reading of it, it's not directly governing this
13 instance, but it was the only portion in our Rules
14 that talked about method and timing of service.
15            MS. DAL MOLIN-EAST:  What was the
16 other thing that Ms. Scibelli said was -- we did not
17 have --
18            MR. LEETHAM:  The Board of
19 Supervisors set the policies and we have no
20 authority to change them.
21            MS. DAL MOLIN-EAST:  She mentioned a
22 specific thing that we couldn't change.
23            MR. LEETHAM:  The whole entire Merit
24 System is based off -- what my whole interpretation
25 of what she was saying, and she kept referencing

 1   Merit 12-something during it.  She said it was from
 2   the Board of Supervisors based, they are the
 3   authority, and that was not a gray area, that was
 4   black and white.
 5              MS. DAL MOLIN-EAST:  12.6, I would
 6   look at that.
 7              MR. STATES:  You can ask for
 8   clarification on that.
 9              I was making notes of their
10   arguments. Appellant's arguments were their First
11   Amendment arguments that it's a complicated area of
12   the law, they were recently retained and they needed
13   more time, they need their witnesses subpoenaed,
14   they need to confirm their witness list and they
15   need an opportunity to challenge the amended
16   disciplinary notice that they feel was untimely or
17   inappropriately served on the Appellant.
18              MS. DAL MOLIN-EAST:  It was about
19   their witness's though, she said they have to
20   provide a witness list --
21              MR. STATES:  Yes.
22              MS. DAL MOLIN-EAST:  -- and the
23   reason for the testimony, and that's not been
24   provided.
25              MR. LEETHAM:  She did he did attempt

1    like a template of it, like a rough draft.

2                    THE CLERK:  It's in your initial

3    appeal, he has a list. But that's all he has is a

4    list.

5                    MR. LEETHAM:  But it doesn't outline

6    what the witness is going to testify to.

7                    MR. STATES:  Right.  So if you look

8    in your packet.

9                    MR. LEETHAM:  In any part of this

10   Merit System, do they say a timeline so that

11   counsel -- if an Appellant doesn't retain counsel

12   until this time, does the Commission have to take

13   that into consideration?

14                   MR. STATES:  You don't have to.

15                   MR. LEETHAM:  Okay.

16                   MR. STATES:  Now, I just want to

17   point out a couple of things, particularly as we

18   have a new Commissioner, Rule 12.6A, has a provision

19   that discusses the Appellant's opportunity to

20   request witnesses to be subpoenaed.

21                   MR. LEETHAM:  I read that.

22                   MR. STATES:  Now, if you scroll down,

23   the portion says, within ten days of the hearing or

24   at the time when the witnesses are submitted for

25   subpoena.  So she was saying that ten day timeline

1   was not met, if I recall, something along the lines

2   of because they didn't say what the witnesses would

3   testify about.

4                   MR. LEETHAM:  So they got a rough

5   draft of the names, but not what they were going to

6   testify to.

7                   MR. STATES:  So, just to let you guys

8   see a copy of what I have.  So in this packet we

9   have his first letter of appeal to the first

10  discipline he was given.  But then the issue of a

11  subsequent notice of discipline.  And in the

12  Appellant's second letter of appeal on October

13  6th -- this unfortunately didn't make it into your

14  packet -- but he has a draft list of witnesses, and

15  at the bottom makes a statement about why he wants

16  the witnesses.  And when I counted it was 39.

17                  MR. LEETHAM:  And some don't work for

18  the county.

19                  MR. STATES:  And then Respondent's

20  list of witnesses, just for comparison as it relates

21  to tht Rule.

22                  And these are the filings that the

23  two parties have already submitted to the Commission

24  through the clerk.

25                  THE CLERK:  Correct.

1          MR. STATES:  You can see what they're

2    arguing about, because they raised his draft

3    subpoena list that the Appellant said he would need

4    to finalize.

5          MR. LEETHAM:  Are these people on his

6    witness list?

7          MR. STATES:  I think there may be

8    some that are overlap, but I haven't done a

9    side-by-side comparison.

10          MR. LEETHAM:  Every witness on the

11    Respondent's is on his list as well.  There is some

12    overlapping and then minus the 31 others.

13          MS. DAL MOLIN-EAST:  Okay.  Anything

14    else to discuss?

15          MR. LEETHAM:  I'm okay with going out

16    of executive session at this time.

17          MS. DAL MOLIN-EAST:  I think the

18    question comes down to do we feel it's in our

19    authority to grant an extension basically because he

20    needs more time.  Then we have the Rules that we

21    shouldn't bend or change.  I mean this is -- I wrote

22    it down -- in the interest of justice outweighs the

23    interest of expediency.  But Commission we also only

24    have certain authority.  We're given rules.

25          MR. LEETHAM:  They're outlined and

1    they're here to govern us.  It seems inappropriate

2    to ask for a continuance now, four days before you

3    want it.

4                    MR. LAGUNAS:  I think our hands are

5    tied in this one.

6                    MR. LEETHAM:  What is your feelings?

7                    MR. STATES:  So, you would not want

8    to refer to advise that I gave you.  If you wanted

9    to explain your reasons for voting one way or

10   another --

11                   MR. LEETHAM:  But while we're in

12   session, can we discuss our conversations with you

13   and --

14                   MR. STATES:  No, you don't want to

15   say how you think you're going to vote.  Just

16   discuss the factors that are weighing in your mind,

17   whether it's for or against.  Discuss those factors,

18   ask any questions you might have about those

19   factors, but don't discuss how you may or may not be

20   inclined to vote in any session.

21                   MS. DAL MOLIN-EAST:  Obviously, often

22   times many people want to be able to be heard, and

23   that's important. But with that being said, we are

24   not here to make people feel good.  Our job is a

25   very narrow focus on this.  I think sometimes in our

1  minds that can get muddy and I think often for the

2  Appellant that gets very confusing.  So sometimes

3  they want to widen the scope, but we have rules that

4  we follow.  We have committed to following those

5  rules and to use this Merit System as the structure

6  for how we operate.  And we don't get to change

7  those, no matter what we feel.  And for me, to

8  balance that out with our superhuman side with no,

9  we have a purpose, we have rules that the Board of

10 Supervisors have made for every county employee, not

11 just a couple, and we don't get to change those

12 rules.  I guess those are the things that I weigh.

13 So I guess you can tell which way I lean, which is

14 my duty.

15                 MR. LEETHAM:  I concur.

16                 MR. STATES:  Let's not discuss --

17 let's just if you have any further questions to be

18 settled.

19                 MR. LEETHAM:  I think that's it.

20                 MR. STATES:  I don't mean to cut you

21 off, I just want to keep us in line.

22                 MR. LEETHAM:  I make a motion that we

23 go back into regular session.

24                 MR. LAGUNAS:  I second it.

25                 MS. SCIBELLI:  All in favor?

1          ALL COMMISSIONERS:  Aye.

2          MS. DAL MOLIN-EAST:  Opposed?

3          Okay.  We'll go back into regular

4    session but we need to take a quick break.

5          (A recess was taken.)

6      (All parties are present in the room.)

7          MS. DAL MOLIN-EAST:  Commissioner

8    Leetham made a motion to reconvene into regular

9    session and Commissioner Laguna seconded it.

10          And we're still discussing the motion

11    for continuance made by the Appellant.  Any

12    discussion, Commissioners or is there a motion on

13    the table?

14          MR. LEETHAM:  I would make a motion

15    to deny the request for a continuance.

16          MR. LAGUNAS:  I will second the

17    motion.

18          MS. DAL MOLIN-EAST:  Any discussion?

19          Okay.  A motion is made by

20    Commissioner Leetham and seconded by Commissioner

21    Lagunas to deny the request for a continuance.  All

22    in favor say aye.

23          ALL COMMISSIONERS:  Aye.

24          MS. DAL MOLIN-EAST:  Any opposed?

25          Okay, that motion is denied.

1      So at this point we will move into

2  the hearing, unless there are other motions that

3  need to be considered?

4      MR. BLACK:  I would make a motion

5  then to sequester the witnesses, to have them

6  excluded so they are not together in the room

7  together and they're able to dialogue about their

8  testimony, under Rule 12.

9      MR. STATES:  So the Rules of Evidence

10  don't strictly apply in these hearings.  But the

11  Rules do provide for either party to make a motion

12  to exclude any witnesses, aside from the parties

13  themselves.  So that would be the representative on

14  the Respondent's side and the Appellant on the

15  Appellant's side.  They can still testify and they

16  sit through the whole hearing. But any other

17  witnesses cannot sit and watch the other witnesses

18  testify in this room during the hearing.  They can

19  only come in to testify and then leave.

20      As far as the Commission's authority

21  to sequester them and require them to all stay in

22  will separate locations outside of the room, the

23  Rules are silent on that.  The Commission may find

24  it prudent to admonish the witnesses that while they

25  are excluded, that they do not discuss the substance

```
 1  of the matter, if they do choose to be in the same
 2  place.  But really that would be at the Commission's
 3  discretion as far as sequestration, in addition to
 4  exclusion from the hearing room.
 5             MR. BLACK:  We would still request
 6  that the Commission separate them.  The idea of the
 7  exclusion, and it's not just the Rules of Evidence,
 8  but the Merit System Rules for Gila County, the idea
 9  is that one witness's testimony, we don't want it
10  tainted by anybody else's experience or remembrance.
11  And the concern is, we can say don't talk about
12  this, but we know there's a group of people chit
13  chatting and talking in the next room, and you'd be
14  denying human nature to say that for the many hours
15  that we'll be here today, that it's not likely that
16  one of them may say something that this Rule is
17  aimed to protect against.
18             MS. SCIBELLI:  Chariwoman, I have no
19  objection with having a witness be released and
20  leaving the building and not going back into that
21  room.
22             As far as separating them within your
23  building, that's at your discretion.
24             MS. DAL MOLIN-EAST:  Any discussion?
25             MR. LEETHAM:  I would make a motion
```

1    to separate them.

2                        MR. LAGUNAS:  I would second that.

3                        MS. DAL MOLIN-EAST:  The motion is

4    made to sequester each witness.  All in favor say

5    aye.

6                        ALL COMMISSIONERS:  Aye.

7                        MS. DAL MOLIN-EAST:  Any opposed?

8                        Okay.  With that being said, you can

9    sequester the witnesses.  Do we have room for that?

10                        THE CLERK:  While we're doing that,

11   since it's getting close, when do you want to break

12   for lunch?

13                        MS. DAL MOLIN-EAST:  12:00, 12:30.

14   Does that sound alright?

15                        MR. STATES:  Do we have a scheduled

16   ending time?

17                        THE CLERK:  5 o'clock.  We will take

18   care of moving the witnesses into different areas

19   while they're waiting. Then when they're done

20   testifying, they can leave the building?

21                        MS. DAL MOLIN-EAST:  Yes.

22                   (The Clerk left the hearing room.)

23                        MR. BLACK:  I'm sorry, Madame

24   Chairwoman, was there a ruling on the motion

25   regarding the second discipline, whether we're going

1    to be considering that today, or has that not been

2    ruled on?  The second termination notice?

3                    MR. STATES:  So let's wait until the

4    clerk gets back to make sure he is here.

5                    All right. The clerk is back, so

6    let's make the motion then.

7                    MR. BLACK:  Thank you.

8                    THE CLERK:  They have all been

9    separated.

10                    MR. STATES:  And we are all back.

11                    MR. BLACK:  I would like to make an

12    additional motion that the second notice of

13    termination not be considered during today's

14    hearing, as we believe it violates Gila County HR

15    Merit System Rule 12, specifically under 12.5.  Any

16    amendment has to come within ten days of this

17    termination notice, which did not happen, it

18    happened eleven days after.

19                    And what was said earlier today was

20    not entirely correct, or maybe I misunderstood what

21    opposing counsel was saying, but in the amended

22    notice, it's not because some new complaint came

23    out, the amended notice says that on September 10,

24    five days before he was terminated, these complaints

25    were made, which means that they should have and

1  could have been included in the original notice of

2  termination, the one that we appealed.

3           Separately, the second notice of

4  termination did not come with any appeal rights, as

5  required by the Rules.  It did not list -- it's a

6  single page and did not list how long we have to

7  appeal, what the appellate process is.  And again,

8  as the updated notice of termination, they have to

9  provide those appellate rights again in order to

10  trigger this process.

11           So, our position is that we can go

12  off of the claims made against my client in the

13  first notice of termination.

14           MS. DAL MOLIN-EAST:  Ms. Scibelli?

15           MS. SCIBELLI:  Yes, so under the

16  Rule, it is ten days after the request for the

17  action, the action is the appeal, not the

18  termination notice.  So it was within the allotted

19  timeframe.

20           I did want to point out to the

21  Commission there are clerical errors in the amended

22  termination notice.  It's just with a date, I

23  indicated that it was September 10th that the

24  termination was originally delivered to Robert, it

25  was actually September 15.  And that's the reason

1    for the confusion as far as when the sexual

2    harassment complaint was made.  It was definitely

3    made after his termination.

4                    So just pointing to the amended

5    termination notice, that second paragraph there, it

6    says on September 10, county employees --

7                    MS. DAL MOLIN-EAST:  I'm so sorry to

8    interrupt, but can we get a copy of that?

9                    MS. SCIBELLI:  I did provide it in

10   the Exhibits.

11                   MR. STATES:  Do you have exhibits for

12   this hearing?

13                   MS. SCIBELLI:  Yes, I do.

14                   MR. BLACK:  We never received any

15   exhibits for today's hearing.  That's another reason

16   we didn't think this would proceed today.

17                   MR. LEETHAM:  Mr. States, do we have

18   to vote on exhibits before they're handed out?

19                   MS. SCIBELLI:  Yes.  So there's two

20   exhibits in there that you've already been provided

21   with, which is Exhibit Number 2 and Exhibit Number

22   3.  It's the termination notice and then the amended

23   termination notice.  I just put them in there for

24   convenience so that you guys can refer to them

25   easily.  However, yes, all the other exhibits, I

1    would have to move to admit those.

2              Do you have an objection moving to

3    admit Exhibit 2 and Exhibit 3, which is the

4    termination notice and the amended termination

5    notice that they already have.

6              MR. BLACK:  Right now I'm going to

7    object to moving any Exhibits because I've never

8    seen them.

9              If they're already part of the

10   record, then I guess there's not an objection needed

11   for that.

12             MR. LEETHAM:  So it wouldn't be an

13   Exhibit if it's already included in our packet?

14             MR. STATES:  So if you look in your

15   packets, I believe you will find a timestamped

16   October 6, 2025, 1:20 p.m.  That is Appellant's

17   letter of appeal.

18             MR. LEETHAM:  I believe we have a

19   copy of the termination letters.

20             MR. STATES:  So --

21             MR. LEETHAM:  If the clerk can look

22   into getting that for us, you can continue.

23             MS. SCIBELLI:  Certainly, thank you.

24   So just for clarification, Merit Rule 12.5, it talks

25   about the matters that may be appealed.  It says

 1   that a regular status employee, except as otherwise

 2   provided in these Rules, may appeal an action

 3   resulting in dismissal, demotion, reduction in pay,

 4   suspension on the grounds of the alleged unlawful

 5   discrimination within 10 days of recept of the

 6   written notice of action.  The Respondent may serve

 7   the amended notice of disciplinary suspension,

 8   demotion, dismissal prior to the beginning of the

 9   appeal hearing.

10            So I was referring to the amended

11   termination notice.  I referenced September 10th.

12   That was a clerical error.  The September 10th was

13   the assassination of Charlie Kirk. That was also the

14   posting of Mr. Johnston's.  However, he was not

15   terminated until September 15th.  So that was my

16   mistake.  That date, again, is referenced at the end

17   of the letter referencing the allegations of

18   misconduct, including the original termination

19   notice on September 15th, are incorporated into this

20   notice.

21            So both notices were timely and when

22   we indicated that the original notice was

23   incorporated into this notice, he was again being

24   told of his appeal rights.

25            Again, he did file that amended

```
1   appeal notice, so I think we should proceed today
2   with both charges.  I don't see why we wouldn't.
3                MS. DAL MOLIN-EAST:  Mr. Black?
4                MR. BLACK:  I would say that this is
5   an issue that needs more briefing, because as we
6   read in the Merit System Rule 12.5A1, it was 10
7   calendar days and opposing counsel was outside of
8   that when they did their second notice of
9   termination, that was 11 days later.  And if we are
10  not counting our request for a continuance because
11  that might not have been here within one day, I
12  think it's very relevant that if we stick to that
13  standard and say, if this was not received in time,
14  then it should not be considered.  And if the 10th
15  date is incorrect, that didn't address whether the
16  complaints against my client were made on the 10th
17  or if that's also incorrect and that always should
18  be on the 15th.  But what we have heard is there's
19  clearly errors in this.  So it would even make sense
20  theoretically to have an amended notice of
21  termination that the government believes is correct
22  before we can proceed, because how can we proceed on
23  documents that have incorrect dates, with the
24  government's own admission, that they're going to
25  try to use to prove that my client did something
```

1  wrong?

2              MS. DAL MOLIN-EAST:  Was that date

3  verbal or was it in the written --

4              MS. SCIBELLI:  It's in the written

5  letter.  So I'll admit, I was unaware of the

6  original termination.  I was brought on board when

7  there was allegations of sexual harassment, at which

8  point we needed to send an amended termination

9  notice.  And when I heard the information, I

10  referenced September 10th, which was the

11  assassination date, not the date -- I assumed that

12  when he posted his comment on FaceBook, I assumed

13  that he was fired that day.  However, it was 5 days

14  later that the termination was sent to him.  So that

15  was my mistake.

16              So I did reference September 10th,

17  but again, it's a clerical error, it's supposed to

18  be September 15th.  However, Mr. Johnston was in

19  receipt of that original notice, he does know when

20  he was terminated, clearly it was just an error in

21  the date.

22              MR. BLACK:  And if I may, Ms.

23  Scibelli just stated on the record that she was

24  aware he was already terminated, he already had a

25  termination notice and that she wrote this one after

1  the fact.  That is in opposition to what the State

2  said earlier, that this is all one termination

3  notice.  He was terminated by a decision maker, they

4  issued this, it was appealed, and then another

5  government employee got involved and started the

6  process over, that's the second appeal.  And that is

7  not provided for in Rule 12.  You get one

8  termination.

9            MR. LEETHAM:  To me, 12.5A1 that they

10  are to receive written notice of the action.

11  Respondent may serve an amended notice.  So in 10

12  calendar days he received a written notice of the

13  action.  After that then the amended notice.  That

14  happened, correct, the amended notice happened?  You

15  were in receipt of an amended notice?

16            MR. BLACK:  We received a second

17  document that they say is now a termination letter,

18  yes, it's amended.

19            MR. LEETHAM:  It's an amended notice?

20            MR. BLACK:  Yes.

21            MR. LEETHAM:  So you're in receipt of

22  the first termination and then the amended.

23            MR. BLACK:  But not 10 days before

24  this hearing, and not within 10 days of the starting

25  of the proceeding.

1          MR. LEETHAM:  The first one was

2   within 10 days of the action; right?

3          MR. BLACK:  The first one was, yes.

4   And that's why we think, yes, the first one is

5   definitely valid and should be --

6          MR. LEETHAM:  And during that time

7   they amended?

8          MR. BLACK:  Yes, sir.

9          MR. LEETHAM:  Which it states here in

10  12.5A1, within 10 calendar days in receipt of one

11  termination letter.

12         MR. BLACK:  And within 10 calendar

13  days it may be amended, they have to serve that

14  amended notice is how I read it.

15         MR. STATES:  So just help us

16  understand your arguments.  You're saying that the

17  amended notice of appeal was not served within 10

18  calendar days?

19         MR. BLACK:  Right.

20         MR. STATES:  Okay. Do you want to

21  present any evidence to that affect?

22         MR. BLACK:  That's part of what we

23  would like to have a continuance to do, yes.

24         MR. STATES:  So you're raising a new

25  motion to continue, but it's for the purpose of

1  arguing whether or not the amended notice of

2  discipline was timely?

3              MS. SCIBELLI:  I'm not sure what

4  evidence there would be of that.  I mean, we have

5  the amended notice right with a date on there, as

6  well.

7              MR. LEETHAM:  We don't.

8              MS. DAL MOLIN-EAST:  We're still in

9  the dark.

10             MR. STATES:  The Commission does not

11  have these.

12             MR. LEETHAM:  Can we get those?

13             MR. STATES:  Not from me at this

14  time.

15             MR. LEETHAM:  Can the clerk get

16  those?

17             MR. STATES:  So in reviewing the

18  Rules, the Commission has what's been filed and

19  submitted before it.  So there's the Appellant's

20  first notice of appeal or appeal letter, second

21  letter of appeal with the attached draft witness

22  subpoena list, and we also have the Respondent's

23  witness list.  Neither party has previously filed or

24  submitted the notices of discipline prior to now.

25  So it would be up to the parties to move for those

59

1    to be submitted to the Commission for the

2    Commission's review and consideration.

3                    And if either party has anything to

4    clarify on that affect, I'm not trying to speak on

5    either of your behalves, just trying to clarify and

6    condense down to what the current debate is before

7    the Commission.

8                    MR. BLACK:  Thank you.

9                    MS. SCIBELLI:  So through the

10   testimony we'll be able to get those Exhibits to the

11   Commission.  I included the termination notice, as

12   well as the amended termination notice in those.

13                    MR. LEETHAM:  In your Exhibits?

14                    MS. SCIBELLI:  Yes, correct.  So

15   potentially you'll be able to view it.

16                    MS. DAL MOLIN-EAST:  I believe that I

17   would, and I apologize for this again, but I think

18   we need an executive session.

19                    MR. LAGUNAS:  I second that.

20                    MS. DAL MOLIN-EAST:  All in favor say

21   aye.

22                    ALL COMMISSIONERS:  Aye.

23                    MS. DAL MOLIN-EAST:  All opposed?

24                    We are going into executive session

25   again.

```
 1              (All relevant parties left the room.)
 2                    MR. STATES:  So they're discussing
 3    documents that you guys don't have yet.
 4                    MR. LEETHAM:  Why can't we have it?
 5                    MR. STATES:  The Rules don't provide
 6    for automatically these documents automatically --
 7                    MR. LEETHAM:  I'm not asking for the
 8    Exhibits, I'm asking for -- if we're here to discuss
 9    a termination, why is the termination letter not
10    included?
11                    MR. STATES:  Because the Appellant
12    did not include with the Appellant's letters of
13    appeal.
14                    MR. LEETHAM:  So it was up to the
15    Appellant, it's not up to the County to provide
16    that?  I'm confused because we're here and we're
17    here as an independent body because the Appellant
18    asked us to be here; correct?
19                    MR. STATES:  Correct.
20                    MR. LEETHAM:  So it was up to the
21    Appellant to then submit that to us.  So everything
22    we have in front of us is from the Appellant?
23                    MR. STATES:  With one expectation,
24    the Respondent is also required to submit a list of
25    witnesses and the reason for the list of witnesses.
```

1    The Respondent submitted that and you should at this

2    point have a copy of that?

3                    MR. BLACK:  Yes.

4                    MR. STATES:  It has the County

5    Attorney's heading on it?

6                    MR. LEETHAM:  Yes.

7                    MR. STATES:  The Respondent, meaning

8    the employer, the County Attorney's Office in this

9    case, they may file a response to the appeal, but

10   they're not required to and they didn't.

11                   MR. LEETHAM:  I think my confusion is

12   why were these not inside the packet you gave us?

13                   MR. STATES:  Correct. Those should

14   have been in there in the first place. It was a

15   clerical oversight.

16                   MR. LEETHAM:  Okay.

17                   MR. LAGUNAS:  But I'm confused too

18   because all the previous ones, both sides would give

19   the Exhibits ahead of time --

20                   MR. LEETHAM:  Before the motions?

21                   MR. LAGUNAS:  Before the beginning of

22   the hearing.

23                   MS. DAL MOLIN-EAST:  Right.

24                   MR. LAGUNAS:  That's why they were

25   not included, because that's just the way that --

1          MR. LEETHAM:  So until the motion for

2     these Exhibits to be included, we can't look at

3     them?

4          MR. STATES:  And while this got

5     muddied, my recollection was that Ms. Scibelli moved

6     for these to be introduced and --

7          MR. LEETHAM:  She didn't move to

8     us -- they talked amongst themselves.  She never

9     motioned to the Chair to do this.  She looked at him

10    and said, do you have any objection?  Rather than

11    asking the Chairwoman to do that.  That was between

12    them.

13         MS. DAL MOLIN-EAST:  And he said he

14    does object and we never received them.

15         MR. LEETHAM:  Again, that was between

16    them, talk amongst themselves, she didn't ask us.

17         MR. STATES:  Good point.

18         MS. DAL MOLIN-EAST:  I'm just looking

19    through 12.6 for the continuance. So do we have the

20    authority to say we would like a continuance of an

21    "x" number of days for both side to get their acts

22    together?

23         MR. STATES:  So to that point, I will

24    read you, if you want to turn to 12.6G1.  If you go

25    to the last line, so it's on page 5 of 7 of Rule

```
 1   12.G1.
 2                   MR. LEETHAM:  Let me ask first, when
 3   they come back in, can the Chairwoman then ask,
 4   we're here to discuss the motion of the two
 5   separations of the termination, whether we're going
 6   to include them both or not.  That being said, does
 7   any party have any Exhibits they would like to
 8   motion into the record at this time?
 9                   MR. STATES:  They need a foundation
10   before they can move to admit them.  They would need
11   some, essentially witness testimony regarding why --
12                   MR. LEETHAM:  So we need to hear this
13   motion?
14                   MR. STATES:  -- as to why Exhibits
15   would be relevant.
16                   MR. LAGUNAS:  Are these Exhibits?  I
17   do have everything in question here, we just don't
18   have copies of them.
19                   MR. STATES:  So there's what's before
20   the Commission under the Rules, without any parties
21   agreements or motions or approvals.  That would be
22   what the Rules provide for the parties to submit.
23   So the Appellant, just to get an appeal has to file
24   their notice of appeal, which the Appellant did.
25   Then the response to the original discipline, as
```

1    well as the amended discipline. The Rules do not

2    provide that either party shall also submit the

3    underlying disciplinary letters, that's why the

4    Commission doesn't have those before them.

5              The Rules also require the parties

6    submit witness lists and requests for subpoenas,

7    which the parties did in this case. So those are

8    the two forms of documents before the Commission at

9    this time. Appellant's notices of appeal and the

10   parties witness subpoena lists.

11             The disciplinary orders that they're

12   discussing the timeliness thereof, are not yet

13   before the Commission.

14             MR. LEETHAM: With that being said,

15   his motion is moot then because we're here to

16   discuss the totality of the entire thing. And

17   neither party has said whether this is this or

18   separate.

19             MR. STATES: The Commission --

20             MR. LEETHAM: If we need to try to

21   separate something, we don't know what we're trying

22   to separate. We're here to discuss the termination

23   as a whole, until they have submitted evidence that

24   there are two separate termination, how do we know

25   what they're talking about? So at that point, that

1   either of them brings it up inside of this hearing,

2   at that point can we say, we would make a motion

3   to --

4                MR. STATES:  Yeah, that's kind of

5   where my recommendation is going to be.  You could

6   deny it at this time, but let the parties know they

7   can still raise this later when the Commission may

8   have more evidence before it to consider the basis

9   for the motion.

10                MR. LEETHAM:  That's probably what

11  we'll be doing.

12                MR. STATES:  Now, Chair, you also

13  asked can the Commission on its own move for or

14  order a continuance?  So there's two places were

15  continuances are mentioned.  It's 12.6E, unless the

16  time is extended by mutual agreement, which we don't

17  have, the parties don't agree on a continuance, or

18  for other good cause as determined by the

19  Commission.  That can mean taking one side's

20  position over another or the Commission having its

21  own reasons that it feels are good, justified cause

22  to order a continuance.

23                So that is within your scope of

24  authority under 12.6E. The practical affects would

25  be not really whether this is relevant or not, I'm

1   pointing to authority.  The Respondent has stated

2   they're ready to go, they don't want the

3   continuance. Appellant does, whether it's for the

4   reasons that you might be considering or for some

5   other reasons.

6                   MS. DAL MOLIN-EAST:  And part of my

7   struggle is they're saying we don't have enough

8   information.  The only reason we could determination

9   that this was within our jurisdiction is because we

10  had a letter of appeal from the Appellant saying my

11  dismissal.  We got nothing from the County to even

12  tell us that he has been terminated, maybe he got

13  like -- I don't know, two demerits and is upset

14  about that. We don't know.  Because it's all this

15  guessing game because we've been provided nearly no

16  information.

17                  And so I understand she's saying the

18  County is ready to go, but are they?  Because we

19  certainly do not have anything.

20                  MR. STATES:  Well, what's in these

21  Exhibits --

22                  MR. LEETHAM:  I think it goes to what

23  I said, they're trying to put the motion before we

24  even know what they're talking about.  So in going

25  through this hearing, getting to that point, I think

1    that this motion was premature.  I think that we

2    don't know what we're hearing or going to be hearing

3    at that time.  Then if they want to say, now I want

4    to motion for a continuance based off of this

5    information that we now have.  Then it might be that

6    at that point, then we could hear the motion.  But I

7    think it's very premature for them to try to move

8    something apart, when he don't even know what the

9    two parts are.

10              The Appellant wanted us to hear this

11   based off whatever he said it was.  And they haven't

12   presented any of that.  And she hasn't rebutted to

13   that.

14              MS. DAL MOLIN-EAST:  I guess part of

15   my initial question is, I don't think either side is

16   ready.  At this point it feels like a royal waste of

17   time, because neither side -- like we don't have --

18   the County has termination documents we have that

19   were submitted ahead of time for us to be referring

20   to to even know if --

21              MR. STATES:  Without mentioning

22   what's in the Exhibits --

23              MS. DAL MOLIN-EAST:  If he didn't

24   submit this letter of appeal, we wouldn't have been

25   able to determine if it was even in our

1   jurisdiction.

2              MR. LEETHAM:  Its not up to

3   Respondent -- if I'm speaking correctly -- I don't

4   think it's up to the County to initiate the appeal,

5   it's up to the Appellant to initiate us to convene.

6   So at that point when we convene, it's whatever

7   evidence they want us to look at at that time.  So

8   whatever is in this packet, is based upon what the

9   Appellant wants us to look at, not what the County

10  wants us to look at.  The County can then come in

11  and justify their actions, based on the information

12  the Appellant gave us.  The County doesn't know what

13  the Appellant's given to us.

14             MR. STATES:  And the County cannot

15  just hand out documents that aren't already part of

16  the record without laying a foundation, and

17  typically you lay a foundation for a new piece of

18  evidence to come in through witness testimony.

19             MR. LEETHAM:  That's why different

20  appellants in different cases, like in the past

21  cases that guys have heard, the Appellants come

22  ready and --

23             MR. STATES:  The parties have already

24  talked.

25             MR. LEETHAM:  And understood where

```
 1   they were at --

 2              MR. STATES:  And stipulated to

 3   certain Exhibits.

 4              MR. LEETHAM:  And these two have not

 5   talked.

 6              MS. DAL MOLIN-EAST:  In the past

 7   we've had everything.

 8              MR. LEETHAM:  And I think it's on the

 9   Appellant, it's his due diligent to give us all the

10   information.  And so I think if we're going to

11   continue it, we need to understand that, that it is

12   based on what the Appellant has given us and not

13   what the County has provided, because the County is

14   not responsible to give us information until right

15   now.

16              MR. STATES:  Except their witness

17   list.

18              MR. LEETHAM:  Except their witness

19   list, which they have submitted and done.

20              MS. DAL MOLIN-EAST:  I'm thinking I'm

21   too busy to play these sorts of games, to be frank.

22              MR. LAGUNAS:  We weren't prepared, we

23   didn't have any information.  We talked about it

24   already. Generally we do have all this information

25   before us.
```

1          MR. STATES:  So, the parties can, in

2     your experience, typically have previously

3     stipulated to certain Exhibits that the Commission

4     can just start delving into right away.  That has

5     not happened in this case.  And as they discussed,

6     as you clarified, Commissioner Leetham, they did not

7     make in the form of a motion, they were discussing

8     entering the Respondent's Exhibits so the Commission

9     could view them, and it sounds like that was not

10    agreed to from respective counsel table.  The

11    Respondent is only obligated under the rules to

12    submit a witness list and the reasons for the

13    witness list 10 days before the hearing and then to

14    appear and make their arguments.  And so far

15    Respondent's counsel has represented they are

16    prepared to make.

17         But the Commission cannot yet view any

18    Exhibits from either party unless the parties both

19    agree initially or they bring in through witnesses

20    testimony something that is mentioned and then they

21    can move to have that Exhibits admit, once that

22    foundation for it has been laid.

23          MR. LEETHAM:  So even if we chose to

24    continue, we could be right back here again in the

25    same position if they don't agree again and again?

```
 1                    MR. STATES:  Right.

 2                    MR. LEETHAM:  So this could kind of

 3   become routine?

 4                    MR. STATES:  Correct.

 5                    MR. LEETHAM:  Until the Commission

 6   says enough?

 7                    MR. STATES:  Correct.

 8                    MS. DAL MOLIN-EAST:  Okay. Any

 9   motions?

10                    MR. LEETHAM:  I make a motion to go

11   back into regular session.

12                    MR. LAGUNAS:  I second it.

13                    MS. DAL MOLIN-EAST:  All in favor say

14   aye.

15                    ALL COMMISSIONERS:  Aye.

16                    MS. DAL MOLIN-EAST:  Any opposed?

17                    Then let's back into regular session.

18         (All parties are present in the room.)

19                    MS. DAL MOLIN-EAST:  Motion to

20   reconvene in regular session.

21                    MR. LEETHAM:  Motion made.

22                    MR. LAGUNAS:  Seconded.

23                    MS. DAL MOLIN-EAST:  A motion made to

24   reconvene and seconded, all in favor say aye.

25                    ALL COMMISSIONERS:  Aye.
```

1          MS. DAL MOLIN-EAST:  Opposed?

2          Okay.  We have a motion on the table

3  to separate the two termination notices and/or an

4  agreement to only focus on the first termination

5  notice.

6          Any discussion?

7          MR. LEETHAM:  I'd like to ask Mr.

8  Black, based on the information you provided to this

9  Commission, you have provided a request for a

10  continuance and an appeal letter.  During that time

11  you have not given the Commission any documentation

12  of termination, no documentation of two different

13  terminations.  This hearing can only be set based

14  off of the information that you give, and at that

15  point we make our jurisdictional decision.  Based

16  off of that information, I'm going to motion to deny

17  the request at this time.  And that it could be

18  heard at a different time, but I feel right now it's

19  premature to hear that.

20          MR. BLACK:  Mr. Commissioner, if I

21  may, I was just now retained.  I did not have time

22  to do all of that.  My client was searching for a

23  lawyer, as soon as I was retained, we started asking

24  for a continuance so that we could submit that.  And

25  I didn't even have acknowledgment of whether or not

1     I could appear telephonically, until I was already

2     in this room.  Meaning, I've done every due

3     diligence and effort to provide you with everything

4     you needed --

5                    MR. LEETHAM:  -- you're correct, Mr.

6     Black.

7                    MR. STATES:  And my client shouldn't

8     be --

9                    MR. LEETHAM:  Still, what we need is

10    still not inside of our packet, is not in the

11    information that was given us, whether you were

12    retained yesterday or today or 20 days ago.

13                    MR. BLACK:  But if I was retained

14    yesterday, I would not have been able to give it to

15    you because it has to be submitted multiple days

16    prior to the hearing.

17                    MR. LEETHAM:  Thank you.  I stand by

18    my motion.

19                    MS. DAL MOLIN-EAST:  I believe that I

20    simply just do not have enough information to be

21    able to proceed with the room full of requests.  As

22    more Exhibits are given to us, then the more can be

23    considered at that time.

24                    There is a motion, is there a second?

25                    MR. BLACK:  I would offer a point of

 1    information before you finalize your vote, the

 2    purpose of these proceedings is for you to have all

 3    of that before we start.  And if we're going to

 4    start each time discovering along the way, that's

 5    not providing for justice, that's going to make this

 6    whole thing appealable and it's going to have to be

 7    remanded.  Because we have to know as an employee

 8    what the accusation against us is.  And today, as

 9    we're talking, we're going to have to defend against

10    two separate sets of accusations, one which by the

11    policies of this County, is not allowed to be

12    considered.  So it's something that if the

13    Commission is not fully feeling prepared in

14    understanding the issues, I would reiterate my

15    motion for a continuance, even if it's a week, so

16    that we could prepare all of that so we could

17    provide it to the Commission and so that we could

18    have a decision before we get started on what it is

19    we're being accused of.  Because the two letters

20    accuse of two different things.

21              MS. DAL MOLIN-EAST:  And to be

22    honest, I'd like to get to a point where I could see

23    the letters to know that.  But I haven't been

24    personally, or the group as a whole, the Commission,

25    been provided with any information to be able to say

1    I agree or I disagree.

2             MR. BLACK:  That would be the burden

3    of the government to provide that, because they --

4             MS. SCIBELLI:  Chairwoman --

5             MR. LEETHAM:  If I could interrupt,

6    this appeal process only comes at the Appellant's

7    request.  During that time, the Appellant then is

8    responsible to give this Commission any information

9    it deems pertinent. It is the requirement of the

10   County to come at this to defendant whatever the

11   Appellant meets.

12             The County is to give us a witness

13   list, which they have provided inside of our packet,

14   and that's where we are right now currently.  And

15   it's for that reason that I make my motion to deny

16   at this your request.

17             MS. DAL MOLIN-EAST:  Ms. Scibelli?

18             MS. SCIBELLI:  Yes, that was my point

19   as well, is that the burden is on the Petitioner to

20   prove their case, but it was not a termination that

21   was arbitrary and capricious.  I did ask

22   Petitioner's counsel if they would agree to admit

23   those Exhibits that, my apologies, I thought was

24   already provided to the Commission, but he objected

25   to that --

1          MR. BLACK:  Because I don't know

2     which Exhibits they are. I haven't even looked at

3     them yet.  If you can tell me which of these they

4     are, I don't object to having the notice of

5     termination, that's critical to this proceeding.

6          MS. SCIBELLI:  At this point,

7     Chairwoman, I believe that the Commission has made

8     their decision and we would request that we proceed

9     with the hearing today.

10          MR. LEETHAM:  My motion stands.

11          MS. DAL MOLIN-EAST:  Any further

12     discussion?

13          I just want to reiterate, we don't

14     even see any termination documents to be able to go

15     either direction, so we need to see that so that we

16     can see termination documents to know what we're

17     making or deciding a motion on.

18          MR. LEETHAM:  At a later time we can

19     hear the motion.

20          MR. BLACK:  2 and 3, I believe, are

21     Ms. Scibelli's Exhibits. I would be happy to share

22     them with you, if you'd like to be able to see them.

23          MR. LEETHAM:  Is that a motion that

24     you're going to approve the Exhibits?

25          MR. BLACK:  She's already made the

1    motion that they be moved in by agreement, which I
2    am agreeing to right now.  I have no opposition to
3    Exhibits 2 and 3 being admitted.
4                    MR. STATES:  Is that your motion, Ms.
5    Scibelli?
6                    MS. SCIBELLI:  I made that motion
7    awhile ago.  I asked him to do that before we
8    recessed for the executive session.  It was prior to
9    us recessing for the executive session, I did ask
10   counsel if he would agree to admitting Exhibits 2
11   and 3 and he objected.  So at this point I have not
12   asked that again.
13                   MR. LEETHAM:  Let's move forward
14   then.
15                   MR. LAGUNAS:  I'll second that.
16                   MS. DAL MOLIN-EAST:  So a motion is
17   made to deny at this time the separation of the two
18   termination letters, the two disciplinary orders.
19                   Is there a second?
20                   MR. LAGUNAS:  I do.
21                   MS. DAL MOLIN-EAST:  I will call for
22   a vote.  All in favor say aye.
23                   ALL COMMISSIONERS:  Aye.
24                   Opposed?
25                   Okay.  We're going to proceed with

 1   the hearing at this point with opening statements

 2   made by both parties, unless both parties agree to

 3   waive openings --

 4                MR. STATES:  Either party can waive

 5   an opening statement, if you so choose.

 6                Ms. Scibelli, would you like to give

 7   an opening statement?

 8                MS. SCIBELLI:  Sure.

 9                MS. DAL MOLIN-EAST:  We're going to

10   take our lunch recess and then resume at 12:30.

11                (The lunch recess was taken.)

12                MS. DAL MOLIN-EAST:  The Commission

13   is now back in session.  Everybody is present.  We

14   are going to start with opening statements and we

15   are going to limit opening statements to no more

16   than 5 minutes.

17                MS. SCIBELLI:  Sure, I'll make it

18   brief.  Thank you, Chairwoman.  Commissioners, on

19   September 10, 2025, Mr. Johnston's regularly

20   scheduled work hours and while at work at the County

21   Attorney's Office, he posted on social media, on his

22   Face Book page, rot in hell, Charlie Kirk, right

23   after Charlie Kirk's assassination.

24                The County Attorney has a statutory

25   duty to prosecute heinous crimes with the support of

1   his staff.  As an elected official, the County

2   Attorney must have the trust of the public, knowing

3   that his office takes homicide seriously.

4              With the concerns of employees and

5   the risk to the public believing that Mr. Johnston's

6   derogatory post was the view of the County

7   Attorney's Office, Mr. Beauchamp and the HR

8   Department terminated Mr. Johnston.

9              Thereafter, the Chief Deputy County

10  Attorney received multiple reports regarding Mr.

11  Johnston.  Among those reports was a serious report

12  of sexual harassment.  Under BLSHRS001, section 3E,

13  sexual harassment, unwelcome sexual advances,

14  request for sexual favors and other communication or

15  physical conduct of a sexual nature are prohibited.

16             You will hear testimony today that

17  Mr. Johnston violated the rule on multiple occasions

18  prior to his termination.  This was all while

19  knowing that he could be immediately terminated for

20  engaging in acts of sexual harassment.  Due to the

21  seriousness of the sexual harassment report, the

22  County Attorney needed to send an amended

23  termination notice to document Mr. Johnston's

24  inappropriate and unacceptable behavior.  With both

25  charges against him, by no means was Mr. Johnston's

 1    termination arbitrary or capricious.  The Respondent
 2    ask that the Commission affirm Mr. Johnston's
 3    termination.  Thank you.
 4                    MS. DAL MOLIN-EAST:  Mr. Black?
 5                    MR. BLACK:  Thank you.  Thank you,
 6    Commissioners.  I appreciate your willingness to
 7    participate today and to give us the chance to
 8    explain our side of the story.
 9                    From our perspective this case is
10    about fairness, proportionality and Constitutional
11    Rights.  My client was fired specifically for saying
12    the words, rot in hell.  He didn't say it at work,
13    in the work place.  He didn't say it to a work
14    colleague. He didn't say it to a client or customer
15    of the organization.  He said it on his private Face
16    Book page, which is not open to the public, it is
17    private.  And he said this while he was, yes, at
18    work, but during a time when he was taking a break.
19    So, he did not violate and it's not been alleged
20    that he violated the social media policy.  It's not
21    being alleged that he violated the break policy.
22    All that's being alleged is that to say, rot in
23    hell, was a heinous crime, as we've heard, that has
24    to be dealt with.
25                    Heinous is not the appropriate level

1  of seriousness for the word, rot in hell. Heinous is

2  something that's shocking. Heinous is something that

3  goes beyond the bounds of any human decency.  Not

4  something that like minds or reasonable minds could

5  disagree about.  In fact, rot in hell is so not

6  shocking that it appears in PG13 movies.  The movie

7  rating authority of the United States says that rot

8  in hell is appropriate for families and children

9  over 13.  It shows up in movies like Ace Ventura,

10 which is a kid's movie, where they're told, the

11 quote in the movie is, Dan Marino, get gonorrhea and

12 rot in hell. Terrible thing to say, but nobody

13 boycotted the movie because of that.  That was

14 talking about someone who was alive, they were

15 wishing an STD on this person, and all of that is

16 understood in the text of this is not a work place,

17 this is movie, this is something society says is not

18 heinous. We can say it, it might be distasteful, but

19 it's not heinous.  In fact, it's been printed the

20 entire front page of the New York Daily News, rot in

21 hell, those exact words.

22              So is it course, yes.  Was it obscene

23 to the fact that it interfered with the agency's

24 ability to do their job?  And that is the standard,

25 is does this First Amendment speech interfere with

1    the agency's ability to carry out their mission?

2    And there's no proof of that at all.  It would be

3    ridiculous even to claim that Gila County could not

4    carry out its mission because one of its employees

5    posted, rot in hell, Charlie Kirk on their private

6    FaceBook.

7              This goes beyond just a normal issue

8    because this is a government employee.  First

9    Amendment protects individuals' speech when they're

10   employed by the government if they're speaking about

11   matters of public concern.  Charlie Kirk is a matter

12   of public concern.  My client has the right under

13   the First Amendment to voice his concerns and his

14   opinions, even if people don't like them, even if

15   they're distasteful, so long as he's not inciting

16   violence or calling people to violence, inciting

17   overthrow of the U.S. government, or otherwise

18   again, impairing the agency's operation in a real

19   and substantial way, impairing their mission as an

20   agency.

21              The Constitution prohibits the

22   discipline that my client was given.  And that's the

23   very reason that this second termination letter is

24   so important, because when that got brought to the

25   County's attention, they trumped up a new letter

```
 1    that had new allegations that had nothing to do with
 2    what was done before, nothing to do with what was
 3    said. Nobody's ever made a complaint about my client
 4    being a sexual harasser.  Nobody's ever said that up
 5    until this, up until he posted about Charlie Kirk.
 6    And at that time we now get, 11 days later, a new
 7    letter saying that there was some sexual harassment
 8    claims. I can tell you that sexual harassment is not
 9    what you're going to hear or see.  Sexual harassment
10    under the law is defined in two ways:  We have quid
11    pro quo sexual harassment and then we have pervasive
12    and continuous sexual harassment, hostile work
13    environment.
14              Quid pro quo is the easy one.  That
15    means, give me sex, I'll give you a promotion or go
16    on a date with me and I will give you weekends off.
17    Quid pro quo is when you're a boss and you have the
18    authority to make life better or worse for an
19    employee through sexual advances.
20              Sexual harassment harassment has to
21    do more than isolated incidents, words or
22    occurrences.  The Federal law says that sexual
23    harassment in the workplace, which is defined under
24    Title 7, says that this has to be pervasive and
25    continuous, such that no reasonable person would be
```

1  able to continue that employment under those

2  conditions.

3              That's not what we're going to hear

4  today.  A couple of comments here and there, at

5  best, do not qualify as legal sexual harassment.

6  And if the agency was concerned that they were

7  inappropriate, there's an entire procedure to take

8  care of that. There's discipline, there's written

9  warnings, there's everything and anything short of

10 terminating an employee.  Terminating an employee

11 without going through any of that process is

12 capacious.  And we're asking that that be

13 overturned.  Thank you.

14             MS. DAL MOLIN-EAST:  All right.

15 We'll begin with the Respondent presenting a

16 witness.

17             MS. SCIBELLI:  I would call Bradley

18 Beauchamp.

19

20             BRADLEY BEAUCHAMP,

21    Called as a witness herein, having been first

22 duly sworn, was examined and testified as follows:

23

24

25

```
 1                    DIRECT EXAMINATION
 2   BY MS. SCIBELLI:
 3        Q.   Will you state your name?
 4        A.   Bradley Beauchamp.
 5        Q.   And where do you work?
 6        A.   I work for the Gila County, for the Gila
 7   County Attorney's Office.
 8        Q.   And you're an elected official?
 9        A.   Yes, ma'am, I'm the elected County
10   Attorney.
11        Q.   As an elected official, what's your view
12   on heinous crimes, like homicide?
13        A.   Well, I'm the County Attorney, that's what
14   we do.  We have to prosecute heinous crimes.  We
15   prosecute all crime, but clearly the heinous ones
16   are the most sever, they're the ones that are going
17   to result in life in prison without parole, the
18   death penalty, things of that nature.
19        Q.   If you wouldn't mind turning your chair to
20   the screen, I'm going to show you a video clip of --
21        A.   -- is it easier if I just stand there?
22        Q.   Yeah, that's fine.  This is a video clip
23   of why we're here today and I'd like to get your
24   opinion about this?
25        A.   Okay.
```

```
 1              MR. BLACK:  Objection, we haven't
 2   seen this clip and don't know what the relevance is.
 3              MS. SCIBELLI:  Yes, this is a video
 4   prior to Mr. Johnston's FaceBook post in relation to
 5   his termination as to why the seriousness of his
 6   termination led to --
 7              MR. BLACK:  It's a video from his
 8   FaceBook?
 9              MS. SCIBELLI:  No, it was in
10   relastion to what he posted on FaceBook.
11              MR. BLACK:  But how has it been
12   authenticated?  Whose making the video, what is the
13   video of?  That's something that would have to be
14   shared before you can play it.
15              MS. SCIBELLI:  The evidence rules do
16   not apply here today.
17              MR. BLACK:  They do.  They're
18   relaxed, but they do apply.
19              MS. SCIBELLI:  That would be up to
20   the Chairwoman and the Commission.
21              MS. DAL MOLIN-EAST:  Can we get a at
22   least a verbal description?
23              MS. SCIBELLI:  Yes, so this was the
24   homicide of Charlie Kirk.  This happened prior to
25   Mr. Johnston's FaceBook post, in relation to why
```

1   we're here today.  His FaceBook post is the basis of

2   his termination and it relates to the seriousness of

3   why he was terminated.

4               MS. DAL MOLIN-EAST:  I'm going to

5   sustain the objection.

6               MS. SCIBELLI:  Okay.

7               MS. DAL MOLIN-EAST:  But we will note

8   that there was a homicide that occurred.  I don't

9   know that we need to see a video of that.

10              MS. SCIBELLI:  Sure.

11              MS. DAL MOLIN-EAST:  We know what the

12  homicide is, we know the homicide occurred, and we

13  can go from there.

14              MS. SCIBELLI:  Okay.  Have a seat.

15  Q.   BY MS. SCIBELLI:  So have you seen the video of

16  Charlie Kirk being assassinated?

17       A.   Yes, I have.

18       Q.   And was there a crime committed there?

19       A.   It's actually what would be determined as

20  first degree murder.  It's the murder of a human

21  being with premeditation, a plan. So when you sit in

22  a sniper's nest, waiting for somebody, that fulfills

23  the requirement of premeditation. And the homicide

24  portion is that your actions result in the death of

25  another human being, which is what happened to Mr.

1    Kirk on that day at that Utah University campus.

2        Q.    And your office handles first degree

3    murder and other homicides, you prosecute cases like

4    that?

5        A.    Correct, we prosecute all homicides in

6    Gila County, be it first degree murder, second

7    degree murder or manslaughter.  We do all of them.

8    In fact, we have a double homicide that's going to

9    trial in two weeks.

10        Q.    And after Charlie Kirk was assassinated,

11    you received a report about a FaceBook post; is that

12    correct?

13        A.    I did.  I received the actual FaceBook

14    post itself.  My assistant had sent it to me.  I was

15    at home when the assassination happened.  It was

16    kind of -- I was at home for lunch, watching the

17    news update because nobody knew what had happened.

18    It was shortly after they had said Mr. Kirk passed

19    away from his injuries that I received a text

20    message with a picture from my assistant that said,

21    this was just posted on FaceBook, like within the

22    last few minutes. It had to be between the time I

23    got the message to the time they declared him dead.

24    Which would have been a little before 2 o'clock in

25    the afternoon, I believe.  I usually go home for

1    lunch around, anywhere from 12:30 to 1:30, I try to

2    get back by 2:00, at the latest.  So it should have

3    been somewhere in that timeframe that I received it.

4         Q.   We have this FaceBook post marked as

5    Exhibit Number 1.  I would move to admit it.

6                   MR. BLACK:  No objection.

7                   MS. DAL MOLIN-EAST:  The record will

8    show Exhibit Number 1 is admitted.

9              (Exhibit Number 1 is admitted.)

10   Q.   BY MS. SCIBELLI:  Mr. Beauchamp, were you

11   friends with Robert Johnston on FaceBook?

12        A.   No.

13        Q.   But you did receive a screenshot of his

14   FaceBook post?

15        A.   That is correct.

16        Q.   And what are your concerns surrounding his

17   FaceBook post?

18        A.   Well, the FaceBook post itself, I think

19   you're looking at it right now, Exhibit Number 1, it

20   sort of condones, it almost celebrates the fact that

21   a person was assassinated in front of his wife and

22   his two children at an university in broad daylight.

23   And I believe the FaceBook post was, rot in hell,

24   Charlie Kirk, showing that you're happy.  The

25   feeling I got was this post was happy, yes, it was

1  almost like this was justified, if you don't like

2  what somebody says, by all means, get a rifle and

3  shoot them.  That's the feeling I got when I read

4  it.

5              The other feeling I got was it's pretty

6  despicable when somebody's murdered in front of

7  their family, to celebrate that on FaceBook.  It was

8  an upsetting post to see.  I was very disappointed

9  when I saw it.

10      Q.   So this wasn't a political concern, it

11  wasn't whether you were condoning Charlie Kirk as a

12  Republican or a Democrat, this had nothing to do

13  with politics; is that right?

14      A.   No, I have democrats, republicans and

15  independents and libertarians that all work in my

16  office.  I hire anybody as long as they can do the

17  job, I don't care.

18      Q.   So the issue was more so that it was a

19  matter of condoning murder?

20      A.   Correct.  It's a bad image for the Gila

21  County Attorney's Office to have an employee there

22  that celebrates a homicide while I practice, our job

23  is to prosecute people who commit homicides.  I felt

24  that it greatly reduced that faith that the

25  community has in our office that we take homicide

1    seriously, regardless of who the victim is.

2           As the chief law enforcement officer in

3    the County, I looked at that and determined, I can't

4    have somebody that works there whose the first

5    person people see when they walk in the Payson

6    office.  It's the person when you call in.  Mr.

7    Johnston is who answers the phone.  And my concern

8    was the public's going to think that I condone this

9    in some way and I can't and clearly I don't.  And it

10   wouldn't matter who the victim was, that was

11   irrelevant.

12   Q.   So before the termination, along with

13   answering the phone, was Mr. Johnston the face of

14   the Gila County Attorney's Office in Payson?

15   A.    I never heard him say that, but I

16   believe -- I was told that he did say that he's the

17   face.  And when I hire people to work the front,

18   they are the face of the office.  I hired a lady

19   whose in the same capacity.  Was Mr. Johnston was

20   the front, when people came in, but he also worked

21   for an attorney.  The lady that I have down here in

22   Globe, she did basically the same function, and I

23   told her, you're the face, when people come in to

24   see me, they're going to see you first.  When they

25   call, they're going to talk to you.  It's very

1    important that they get a very positive image of

2    that because then that gives a positive image of the

3    office.

4        Q.   If this was another employee, let's say at

5    the front receptionist at the Globe office, if they

6    did the same thing, would there be a comparable

7    outcome?

8        A.   Absolutely.

9        Q.   So it's just a matter of this verbiage is

10   not tolerated by staff?

11       A.   It's not tolerated by staff, it's not

12   tolerated because of the office.  It's because of

13   the job we do, it's because of the position we hold

14   with the public.  The position is that I prosecute

15   crime, that I prosecute criminals, and I can't have

16   people who are families of victims of homicide

17   wondering if we take it seriously or not, wondering,

18   oh my God, did my family member say something that

19   their office didn't like and maybe they're not going

20   to take it seriously with my case that I have

21   pending right now.  It's a pretty serious offense to

22   commit when you work for the chief law enforcement

23   officer in the county to make a statement like that

24   where you're supporting crime.  It would be like

25   somebody -- it would be like a fire chief saying,

1    yeah, arson's not a big deal.  You kind of can't do

2    that.  You're the fire chief, your job is to

3    actually try to contain that and to stop that from

4    happening.

5        Q.   So how do you see this speech, rot in hell

6    Charlie Kirk, how do you see that disrupting the

7    County Attorney's Office and impacting the morale of

8    the office?

9        A.   It did impact the morale, people were very

10   upset by it.  I wasn't a friend on FaceBook of Mr.

11   Johnston's, I'm not a friend with anybody in the

12   office on FaceBook, that's just not something I do.

13   But people in the office were friends with him on

14   FaceBook, people in the office were very upset about

15   it.  I looked at it from a position of, I have to

16   have faith in the community that we're doing the job

17   that I was elected to do, that the people told me we

18   need you to do this.  And I couldn't have it look

19   like we don't take crime seriously.

20           In addition to that, the morale in the

21   office was very low.  There were a lot of people who

22   were, quite honestly, disgusted by what they read.

23   When I got it, I was shocked when I looked at it and

24   read it and saw what was posted.  And it was very

25   troubling for me, as well.  But Mr. Johnston's --

1    it's unacceptable to be the face of the office or

2    anybody in my office and make a comment like that.

3        Q.    So as a result, Mr. Johnston was

4    terminated?

5        A.    That is correct.

6        Q.    And after his termination, there were

7    reports made to your chief deputy indicating acts of

8    sexual harassment?

9        A.    That's correct.

10            MR. BLACK:  I'm going to object that

11    that's hearsay.  We can call the chief deputy here

12    to hear what was said to him.

13            MS. SCIBELLI:  Yes, we will call the

14    chief deputy, however, Mr. Beauchamp is the County

15    Attorney, he is the head boss, and he is the one who

16    makes the decisions in the office.  So any report

17    made to the chief deputy would, in fact, be made to

18    the County Attorney himself.

19            MR. BLACK:  That's not accurate. Any

20    report made to the chief deputy was made to the

21    chief deputy.  If he then carried that information

22    to another party, then that's hearsay.  The correct

23    declarant would be the other witness who can testify

24    exactly what he said versus this witness that's

25    going to remember what someone else told him.

1          MS. SCIBELLI:  It's relevant into

2  getting --

3          MR. LEETHAM:  But the Rules of

4  Evidence don't apply --

5          MR. STATES:  The Rules of Evidence

6  don't strictly apply under the Commission's Rules.

7  The Commission's Rules do provide for the Commission

8  to exclude evidence that the Commission finds may be

9  immaterial, irrelevant or unnecessarily duplicative

10  of a matter.

11          MS. SCIBELLI:  Commission, we can

12  proceed.

13  Q.  BY MS. SCIBELLI:  So are employees trained

14  regarding sexual harassment?

15      A.    They are.

16      Q.    So I'm going to show you what is marked as

17  Exhibit Number 4 and Exhibit Number 5.

18          Exhibit Number 5 --

19          MR. STATES:  Are you just presenting

20  those to the witness at this point?

21          MS. SCIBELLI:  Yes, I am.

22  Q.  BY MS. SCIBELLI:  Exhibit Number 5, is that a

23  certification of completion of sexual harassment

24  training for Mr. Johnston?

25      A.    That is correct.  It reads, Certificate of

1  Completion, Gila County, Robert Johnston has

2  completed sexual harassment staff to staff, 2024

3  full course.  Training program requiring 35 minutes,

4  on December 16, 2024.  It appears it is signed down

5  here. I imagine it's an electronic signature with

6  the volume that they get, from the training

7  coordinator.

8      Q.   And what was that date?

9      A.   December 16, 2024.

10          MS. SCIBELLI:  I move to admit

11  Exhibit Number 5.

12          MR. BLACK:  No objection.

13          MS. DAL MOLIN-EAST:  5 will be

14  admitted.

15          (Exhibit Number 5 is admitted.)

16  Q.   BY MS. SCIBELLI:  And Exhibit Number 4, what is

17  that?

18      A.   This is a training acknowledgement form

19  that Mr. Johnston signed, indicating that all

20  employees, that he acknowledged receiving training

21  in the area of workplace discrimination and

22  harassment.  He put also he understands that

23  discriminatory or harassing comments or actions

24  practices by myself against those protected

25  categories identified by county policy and procedure

1   are offenses punishable by disciplinary action,

2   termination.  I've received a copy of the

3   above-named policy and procedure, understand my

4   responsibility to comply with the scope and intent

5   of the provisions provided.

6          Do I need to read the rest of this or can

7   the Commission read it?  I didn't know if you wanted

8   me to read it all.

9      Q.   No, that's fine.

10     A.   It was signed by -- do you want me to

11  finish?

12     Q.   No, just the date, please?

13     A.   His signature and it's dated August 22,

14  2023.

15     Q.   And last question, Mr. Beauchamp, if you

16  have an employee who is terminated and then you

17  receive complaints of sexual harassment, what would

18  you do at that point?

19     A.   Well, it would have to be documented.  I

20  can't get a complaint to sexual harassment, even

21  after somebody has already started the termination,

22  and then just do nothing.  So the idea that we had

23  was, well, we'll just add it, otherwise I would just

24  do an entirely new complaint.  But I think the Merit

25  Rules allowed for us to amend, and so it was amended

```
 1    at that time to add it into what we have today.
 2            Mr. Johnston's termination at that moment
 3    occurred because of his FaceBook post.  This came
 4    the day after he was removed from the office, when
 5    he cleaned up belongings and he left the office.
 6    The next day is when evidence of this occurred.
 7            MS. SCIBELLI:  No further questions
 8    for this witness at this time.
 9            MS. DAL MOLIN-EAST:  Mr. Black?
10
11            CROSS-EXAMINATION
12    BY MR. BLACK:
13       Q.   Hello, Mr. Beauchamp. Am I saying it
14    right?
15       A.   Actually you said it right.  You did it
16    the French way. I'm impressed.
17       Q.   I studied in Paris and I said Chantilly so
18    many times that I was embarrassed when I learned it
19    was Chantilly.
20       A.   You did it well. Good job.
21       Q.   Thank you, sir.  I have just some followup
22    questions based on your testimony.
23       A.   Yes.
24       Q.   First I would say, I appreciate obviously
25    what you do for the County, your job, I appreciate
```

 1    the position, and understand that it is a complex

 2    job and that it's a position of public trust.

 3              You mentioned that essentially that this

 4    was something that was so heinous, and if I'm

 5    misconstruing, but am I understanding your testimony

 6    correct that the reason that my client was fired was

 7    because that specific FaceBook post is so heinous

 8    that you feel that the public would lose confidence

 9    in your Department's ability to prosecute or?

10        A.    Heinous is a feeling.  What I feel would

11    be heinous, somebody else might not.  But what's

12    clear is what was stated and what was stated, I felt

13    will diminish the faith the community has, the

14    County has in the office they elected me to do the

15    job that we do, which is to take things like

16    homicide seriously.  The message that is conveyed

17    was it's okay to murder your political opponent if

18    you don't like what they say.

19        Q.    Is that what it conveyed or is that just

20    your opinion?

21        A.    No, that's what it conveys.  When somebody

22    is murdered for politics --

23        Q.    -- would you read it to me?

24        A.    -- I'm sorry, what?

25        Q.    If you don't mind, would you read it to

1  me, exactly what it says?

2     A.   It says rot in hell, Charlie Kirk.

3     Q.   So he didn't say to murder anybody, he

4  didn't applaud murder, right, he made a comment

5  about where he believes Mr. Kirk is in the

6  afterlife?  You would agree that is a difference;

7  would you not?

8     A.   I think that's a far-fetched difference,

9  but sure.

10     Q.   Well, far-fetched that you're trying to

11  make it something it's not.  All he said is, rot in

12  hell, Charlie Kirk.  What about that means that the

13  Gila County Courts are not going to pursue crimes

14  against murderers; what part of that says murdering

15  is okay by Gila County?

16     A.   It's the part where he says, rot in

17  hell -- nobody ever says, rot in hell and thinks

18  that it's not a good thing that that person is dead.

19  That's what --

20     Q.   -- but being good that he's dead is not --

21     A.   -- am I going to get to answer?

22     Q.   No, sir --

23     A.   You keep interrupting me --

24     Q.   This is cross-examination, you need to

25  answer my questions?

1        A.   I'm trying to answer it but --

2                    MS. SCIBELLI:  If the attorney could

3    please give my client an opportunity to respond to

4    his questions?

5                    MS. DAL MOLIN-EAST:  Let's keep

6    order.  Answer fully and let him answer, then ask

7    your question.

8                    THE WITNESS:  Thank you.  When

9    somebody says, rot in hell, when they find out

10   they've been politically assassinated in front of

11   their children, that indication is that yeah, I'm

12   happy that happened.  Good that that guy's gone.  He

13   should rot in hell.  Nobody ever tells their

14   favorite grandmother, she's rotting in hell.  That

15   doesn't happen.  You do that when you hate somebody

16   and you do that when you're happy that somebody is

17   gone.

18   Q.   BY MR. BLACK:  So is it your position, Mr.

19   Beauchamp, that if one of your employees believes

20   that someone should rot in hell, that that would

21   undermine the authority of your organizations that

22   they would also need to be fired?

23       A.   Under the context in which Mr. Kirk was

24   murdered?

25       Q.   Any murder, any murder, because the only

1   context you're adding is the political one, that's

2   the context.  Otherwise, he was murdered, which is

3   terrible, but my question is, if someone else said

4   rot in hell about a murder victim, would you fire

5   them from the County?

6        A.   Can I answer that because I was halfway

7   through my answer?

8        Q.   Please.

9        A.   They would be terminated from the County

10  when they're indicating, when you're telling a

11  murder victim to rot in hell.  That is a celebratory

12  statement that you're glad that the person was

13  murdered.  I cannot have people be glad that people

14  are being murdered because I have to uphold the law.

15           If somebody is murdered and they're a six

16  time convicted felon whose been in prison three

17  times, if they're still a victim of homicide, they

18  still have a family out there that is mourning their

19  loss.  You cannot have an office that celebrates or

20  diminishes a victim who was murdered by indicating,

21  rot in hell.

22       Q.   And that's your opinion?

23       A.   And I run the office and my opinion's the

24  one that matters.

25       Q.   What is your opinion about the First

1    Amendment rights of your employees?

2        A.    You have absolute right to freedom of

3    speech but you do not have a right to not suffer

4    consequences of that freedom of speech.  It's very

5    clear.  I can't walk into a movie theater and hell

6    fire.  -- I'm trying to answer your question, sir.

7        Q.    I'm not asking you about what happens at a

8    movie theater, I'm asking you, in your job, what is

9    your understanding of the First Amendment that

10   qualifies to your employees?

11               MS. SCIBELLI:  Objection,

12   Commissioner, we're not here to talk about the First

13   Amendment Right --

14               MR. BLACK:  We are --

15               MS. SCIBELLI:  Ms. Chairwoman, you

16   did indicate that we are here today to talk about

17   whether or not the termination was arbitrary or

18   capricious.

19               MR. BLACK:  And it's arbitrary and

20   capricious if it does not follow the requirements of

21   the U.S. Constitution.  What could be more

22   capricious and arbitrary?  We have a document that

23   defines everything we do in this nation when it

24   comes to government.  This gentleman made a decision

25   that violates that.  That is extremely relevant.

```
 1   That's the core nucleus of facts we have to get at.
 2              MS. SCIBELLI:  If he wants to bring a
 3   civil claim in relation to that, he certainly can,
 4   but that's not why we're here today.
 5              MR. BLACK:  That's incorrect,
 6   counsel.  We're here to determine if this was a
 7   capricious decision --
 8              MR. LEETHAM:  I want to make a motion
 9   to go into executive session to seek legal advice in
10   reference to the Merit System on what you are
11   presenting.
12              MS. DAL MOLIN-EAST:  Second?
13              MR. LAGUNAS:  I will second that.
14              MS. DAL MOLIN-EAST:  There is a
15   motion and a second to into executive session.
16              All in favor say aye.
17              ALL COMMISSIONERS:  Aye.
18              Opposed?
19              We will go into executive session and
20   then we'll return with this witness.
21     (All relevant parties and the witness left the
22                     room.)
23              MS. DAL MOLIN-EAST:  Let's go into
24   executive session.  I understand the First Amendment
25   rights to arbitrary and capricious.  We need to hear
```

 1   that from them --

 2              MR. LEETHAM:  We're here to look at

 3   whatever document they may or may not bring to us.

 4              MS. DAL MOLIN-EAST:  Which we still

 5   don't have --

 6              MR. LEETHAM:  Right, and they may not

 7   bring to us.  So they're arguing a First Amendment

 8   problem that we have no idea what the First

 9   Amendment problem is.

10              MS. DAL MOLIN-EAST:  We haven't seen

11   a termination record to even know what --

12              MR. STATES:  So what we have so far,

13   we have an Exhibit with a FaceBook post, that both

14   sides have represented as being at the crux of the

15   first disciplinary order that resulted in the

16   Appellant's termination.  And it was a FaceBook post

17   that said, rot in hell, Charlie Kirk, that has some

18   relation in time to Charlie Kirk's homicide.  Okay,

19   that's evidence before the Commission.

20              Now with that said, again referring

21   to the Phoenix civil service board case that I cited

22   earlier, in that case while that particular

23   personnel board lacked authority to declare a city

24   policy unconstitutional, the Arizona State Supreme

25   Court found that the personnel board in Phoenix

1  could consider or factor in whether or not the

2  constitutionality of the boss's interpretation as to

3  why they disciplined the employee plays a role;

4  okay?

5            MR. LEETHAM:  In the matter of this

6  hearing, whose interpretation? Are we interpretating

7  this merit at this point or are we taking it from

8  what they decided their interpretation was?  And at

9  that point, it's to them to determine that?

10           MS. DAL MOLIN-EAST:  I think we get

11 to determine whether their interpretation --

12           MR. LEETHAM:  -- represented --

13           MR. STATES:  By terminating Appellant

14 for what Appellant posted, did that violate

15 Appellant's First Amendment rights as applied in

16 that case?

17           MS. DAL MOLIN-EAST:  This court case

18 says that based if the commission believes that that

19 interpretation might have been in violation in ways,

20 as in our case as arbitrary and capricious --

21           MR. STATES:  Right.  I don't know

22 what the City of Phoenix Personnel Boards, whether

23 they were limited to arbitrary and capricious only,

24 but in my experience, the typical standard is the

25 evidence is by a preponderance, and the standard for

1    weighing the discipline is whether or not the

2    Commission it was or was not arbitrary and

3    capricious.  The Court said in that Phoenix First

4    Amendment termination case is, quote:  The Board

5    essentially serves as the community's conscious and

6    is charged with deciding whether the employer had

7    cause to discipline the employee and whether the

8    discipline imposed was warranted or too severe.  It

9    can apply popular values and common sense in

10   deciding whether an employee was fairly disciplined.

11            Thus, the Board could have considered

12   whether the employee reasonably believed her speech

13   was Constitutionally protected, it also could have

14   considered whether the posting violation was

15   excusable.  And it goes on into other circumstances

16   that were raised in that case which are not raised

17   here.

18            And then the ultimate holding in that

19   case was that civil service board could not declare

20   a city policy on its own unconstitutional, but it

21   could determine whether or not it was applied to a

22   certain circumstance that may have been

23   unconstitutionally applied to that employee, and it

24   also found that the employee was entitled to present

25   evidence on that account regarding the

1   constitutionality.

2                   MS. DAL MOLIN-EAST:  Does that help?

3                   MR. LEETHAM:  Yes.

4                   MR. STATES:  Just so you know, this

5   is not easy.  A lot of the legal research I did,

6   after it talks about the standards and tests that

7   get applied in these situations, it says, when you

8   read the text, it sounds so easy, but applying it in

9   real life is often very complicated.  And that often

10  is heightened by particularity divisive issues or

11  atmospheres that may exist at the time.

12                  MR. LEETHAM:  I want to remind them

13  to not talk over each other and blurt out arguments.

14                  MR. STATES:  Yes, you can use the

15  gavel and stop them.

16                  MR. LEETHAM:  They just keep arguing.

17                  MR. STATES:  You can remind a witness

18  to allow the attorney to finish asking a question.

19  You can ask either attorney to allow the witness to

20  finish answering the question.

21                  MR. LEETHAM:  I would motion we can

22  go back into regular session.

23                  MR. LAGUNAS:  I will second that.

24                  MS. DAL MOLIN-EAST:  All in favor to

25  going back to regular session say aye.

```
 1                    ALL COMMISSIONERS:  Aye.

 2                    Opposed?

 3                    We'll be back in regular session.

 4                    (All parties were brought back into

 5     the room.)

 6                    MS. DAL MOLIN-EAST:  We are

 7     reconvened in regular session.

 8                    We have decided that we will allow

 9     questions about the First Amendment, however, once

10     established, we do not need to continue to

11     establish, establish, establish.  So we have high

12     comprehension as a Commission and so this isn't a

13     scenario where we need to continue to reiterate the

14     same thing.

15                    I also want to remind the witness to

16     allow the attorney to completely finish asking

17     questions before responding, and the attorneys to

18     allow the witness to completely answer the questions

19     before interjecting.

20                    With that, Mr. Black?

21                    MR. BLACK:  Thank you, Madame

22     Chairwoman.

23     Q.   BY MR. BLACK:  Can you please tell me, sir,

24     what is your understanding of your employee's First

25     Amendment speech rights?
```

1     A.    The First Amendment speech rights apply to

2   everybody, but they have limitations.

3     Q.    Do they apply differently to government

4   employees versus private employees?

5     A.    They apply differently based on -- there

6   are numerous exceptions of it.  Where you work is a

7   huge exception to some of it.  But there are

8   limitations on the First Amendment when you work in

9   private companies and government.  Government is

10  probably a little more protective than private

11  companies would be.

12    Q.    Thank you.  What are the limits on that?

13  As someone who's the head of the agency, I imagine

14  you would know kind of this is what our agency has

15  determined goes beyond the level?

16    A.    It does.  I mean, a lot of it is pretty

17  basic. For example, if Mr. Johnston is working at

18  the front desk and a victim comes in who has been

19  sexually assaulted, and he was to tell her, well,

20  I'm glad that happened to you because, you know, you

21  got a reputation around town.  He has every First

22  Amendment right to say that.  He'll be terminated

23  immediately for that.  There are limitations when

24  you say things.  There are things you're allowed to

25  say and things you are not, based off of where you

1    work.

2            And so, in the public it would be yelling

3    fire in a theater. There's a limitation, you can't

4    say I'm going to kill the President, you get in

5    trouble for that.  There are limitations to freedom

6    of speech in the context of what it is you say.  You

7    can say whatever you want, but there are

8    consequences for those statements.

9        Q.   And the limitations as they apply to this

10   message, which part did it violate, because it says,

11   rot in hell, Charlie Kirk; did it violate because it

12   said rot in hell or was it the Charlie Kirk part?

13   How did it violate the policy of the County that you

14   decided he needed to be fired?

15       A.   It has nothing to do with Charlie Kirk. It

16   has nothing to do with -- it's not political, it's

17   what he said and it's the way that he said it.  The

18   assassination occurred and within a very short

19   period of time, while at work, we rush to FaceBook

20   to make a post that said, rot in hell, Charlie Kirk.

21   That to me is celebratory.  That's the way I view

22   it.  Nobody rushes to FaceBook to announce something

23   because it's just benign, they rush to FaceBook to

24   make their opinion known because they have an

25   emotional issue that they think needs to be heard.

```
1    And when I read that, it was that Mr. Johnston was
2    happy that somebody had been murdered.
3         Q.   Is that a violation of the First
4    Amendment, to express happiness?
5                   MS. DAL MOLIN-EAST:  I would remind
6    you to let him finish before you ask your next
7    question.
8                   MR. BLACK:  Chairwoman, from what I
9    know, we have limited time, and some of the answers
10   are going beyond what I think is responsive.  I'm
11   just trying to keep it tight so that we don't go
12   down a road --
13                  THE WITNESS:  I'm trying to answer an
14   open-ended question.  He's framing these questions
15   that way for me to give my opinions on these things,
16   I'm just trying to do that.
17                  MR. BLACK:  I can restate the
18   question.
19                  MS. DAL MOLIN-EAST:  Please, restate
20   your question.
21   Q.   BY MR. BLACK:  What about this post do you
22   believe is taking it outside of First Amendment
23   protection?  What specifically, what words in the
24   post make it not protected by First Amendment
25   rights?
```

1          A.    The harm that it does to my office.  The

2    harm in the faith that the community has in my

3    office that we take homicides seriously.  When an

4    individual rushes to FaceBook minutes after

5    somebody's murdered and celebrates it with, rot in

6    hell.

7          Q.    So have you seen evidence of this harm?

8          A.    Yes.

9          Q.    Can you share that with us; what was the

10   harm your agency --

11         A.    I had an individual who worked for me that

12   approached her attorney -- are you going to let

13   hearsay, are we going to do this, because they

14   didn't approach me directly?

15         Q.    You can say what you specifically noticed

16   or have seen, not what someone else told you.

17         A.    Okay. She approached me and said my

18   biggest concern was now that public is going to

19   think that you support murdering somebody in front

20   of their kids because your employee said, rot in

21   hell and rushed to FaceBook to celebrate the murder

22   of a human being.  So it has happened.

23         Q.    Okay.  And that person, were they making a

24   First Amendment analysis or was that just somebody

25   complaining that they were uncomfortable?

1    A.    No, that was somebody complaining and

2    telling me that this is going to undermine the faith

3    the public has because they believe the public is

4    going to think that I don't take it seriously

5    because clearly I have an employee that doesn't.

6    Q.    Was there any less serious discipline,

7    progressive discipline you could have taken in this

8    matter to show that you didn't agree?

9    A.    I if had a different job, yes.  If I was

10    the County Assessor or the County recorder or the

11    County Treasurer, yes.  The fact that I'm the chief

12    law enforcement officer, this was the appropriate --

13    I would expect the same type of discipline from say

14    the County Sheriff.  Because we work in law

15    enforcement and because we deal with crime and the

16    public has to understand that we are here to protect

17    and punish people who commit crime, it is the very

18    nature of this post related to what the job is that

19    I have that he works for, that made it.

20         I actually explained that to Mr. Johnston

21    the day that he was terminated.  I said, it's not

22    just what you said, it's what you said because of

23    where you work because that undermines the faith the

24    public has in the office.

25    Q.    Did he tag you or the agency in that post?

1      A.    He did not -- not that I'm aware of.  I

2   don't know because we're not friends, so I don't

3   know.

4      Q.    Did he make that posting aware to the

5   general population of the County that you serve?

6      A.    Well, clearly he did because I got it.

7      Q.    Well, if I'm understanding correctly, you

8   testified earlier that you did not have authority to

9   view it, but you got it from somebody else, correct,

10  who had authority to view it?

11     A.    That's correct.

12     Q.    So it wasn't disseminated widely, somebody

13  took it and took something that was limited to a

14  private group and shared it publically with you?

15     A.    Correct.  And once you share something

16  with a public group and that public group decides to

17  share it with everybody else, that is the very

18  definition of making it public.

19     Q.    But it doesn't change the First Amendment

20  protections that that statement would have; correct?

21     A.    There are limitation to your First

22  Amendment protections, and I believe that he

23  exceeded those limitations.

24     Q.    Sir, you mentioned limitations about

25  screaming fire in public, which would cause people

1   to theoretically run and get hurt.  Talking about

2   murder, that you're going to murder someone, I

3   believe you said?

4        A.   The president, that's actually a crime.

5        Q.   The president, okay.  Rot in hell on a

6   private FaceBook message, those are on the same

7   level to you?  That the United States Constitution

8   provides you the same authority to say you dislike

9   this, rot in hell, the same as those heinous things?

10            MS. SCIBELLI:  Objection,

11  Commissioner, asked and answered.

12            MR. BLACK:  I have not heard the

13  answer then, if that's the case.

14            MS. SCIBELLI:  You're just rephrasing

15  the question.  You've asked him the same thing

16  multiple times.

17            MR. BLACK:  Which question is that?

18            MS. SCIBELLI:  What you just asked.

19            MR. BLACK:  Can you tell me the

20  question?  I'm literally telling you I do not know

21  what you're saying he's already answered.  So if you

22  can tell me what question I am continuing to ask.

23            MS. DAL MOLIN-EAST:  If I may, it has

24  been asked and answered many times on whether or not

25  it rises to the same level as murder and rot in

```
 1    hell.  This has been asked --
 2                    MR. BLACK:  But it hasn't been
 3    answered --
 4                    MS. DAL MOLIN-EAST:  -- multiple
 5    times --
 6                    MR. BLACK:  -- has the witness said
 7    yes, it does?  Because I haven't heard an answer,
 8    I've only heard him go off on the other tangents,
 9    not say yes or no.
10                    MS. DAL MOLIN-EAST:  From my
11    understanding, he has stated multiple times that in
12    his role, he believes that rose to the level of
13    termination, which is the question at hand for this
14    Commission.  So I sustain the objection.
15                    MR. BLACK:  Thank you.
16    Q.   BY MR. BLACK:  If it had come to your attention
17    that employees under your employee were, rather than
18    making a comment about Charlie Kirk, let's say
19    making a derogatory sexual comments about women,
20    would that be something that you would also take
21    this level of discipline to?
22         A.   Nothing like that was ever brought to my
23    attention, so I don't know.
24         Q.   Have you ever heard of the word hoo-ha
25    being used?
```

```
 1              MS. SCIBELLI:  Objection,
 2    Commissioner, relevance.
 3              MR. BLACK:  It's extremely relevant,
 4    it goes exactly to the question of sexual
 5    harassment.  Hoo-ha is a term for a woman's vagina
 6    and one that is used commonly in this office.  And
 7    in fact, there was --
 8              MS. SCIBELLI:  -- Commissioner, there
 9    wasn't --
10              MR. STATES:  Just to be clear,
11    counsel, I don't believe we have any testimony or
12    evidence to that affect.  Is counsel testifying to
13    that?
14              MR. BLACK:  We have text messages
15    that we can introduce, if we're allowed to ask the
16    questions to do so.
17              MR. STATES:  If you want to lay a
18    foundation for any evidence or Exhibits to then go
19    into that.
20              MR. BLACK:  This is the foundation
21    that these are statements that have been said that
22    we believe this witness is aware of, and so we would
23    like to get his opinion on whether those are also
24    inappropriate or if those are okay?
25              MS. SCIBELLI:  I still object.  There
```

1  has been nothing presented by the Respondent in

2  regard to hoo-ha comments made within the office.

3  The sexual harassment allegations are directed at

4  one female and it has nothing to do with a hoo-ha.

5  We haven't yet presented that, and if wants to ask

6  his questions, he can do so once that testimony is

7  given before the Commission.

8           MR. BLACK:  It's not questions for

9  that witness, it's questions for the decision maker

10  and whether or not he's aware of misconduct that

11  goes on in his office.  That's directly relevant

12  because it then goes to weigh how he punishes that

13  conduct.

14           MR. STATES:  So, you can decide to

15  allow in or exclude evidence that in your discretion

16  you not be relevant to the discipline in the matters

17  at hand.

18           MS. DAL MOLIN-EAST:  Well, wouldn't

19  it be lovely if we knew what the discipline was, but

20  we still, at this point, do not have termination

21  records or any disciplinary records to know --

22           MR. BLACK:  Those were moved into

23  evidence already.

24           MR. LEETHAM:  No, they were not.

25           MR. STATES:  There was a motion that

```
1   was not granted, you objected, and then it was not

2   decided.

3              MR. BLACK:  Did you not request those

4   be moved in?

5              MS. SCIBELLI:  I did request that

6   they be moved in.  I did prior to and you did make

7   an objection to that and I did not make any

8   additional motion.

9              MR. BLACK:  Then I guess I would make

10  a motion to admit them as uncontested because I'm

11  not contesting those Exhibits.  I'd like them to be

12  seen.

13             MS. SCIBELLI:  They're not his

14  Exhibits to admit.

15             MR. BLACK:  That doesn't matter,

16  either party can use any party's Exhibits that have

17  been presented, clearly, for this proceeding.

18             MR. STATES:  Does the Respondent

19  object to the motion to introduce Exhibits 2 and 3?

20             MS. SCIBELLI:  We're getting so far

21  away from the issue at hand.  He's trying to

22  question the witness as to a hoo-ha.  There is no

23  testimony or allegations that Mr. Johnston ever

24  referenced a hoo-ha.

25             So my objection, again, was for
```

1  relevance. And I'd like the Commission to make a

2  ruling on whether or not his question is relevant or

3  not.

4            MS. DAL MOLIN-EAST:  So I will

5  sustain the objection until we have any basis at

6  this point for sexual harassment or hoo-ha's.

7            I believe you have another motion

8  that you were making, Mr. Black?

9            MR. BLACK:  I would make a motion

10  then for a recess so that we can get those printed

11  out and share those Exhibits.  It's directly

12  relevant to this witness's testimony.

13            MR. LEETHAM:  Can we finish this?

14            MS. DAL MOLIN-EAST:  So you have a

15  motion to put Exhibits 2 and 3, which are the two

16  termination letters --

17            MR. BLACK:  Yes, that is my

18  understanding of the motion.

19            MS. DAL MOLIN-EAST:  You, I believe,

20  made an objection because it's not theirs to put in?

21            MS. SCIBELLI:  Correct. And he hasn't

22  laid the foundation for those.

23            You were in the middle of talking

24  about a hoo-ha and now you're trying to admit a

25  termination notice.

1              MR. BLACK:  Because we're being told

2      by the Commission that they need that for

3      understanding to know what the termination is

4      related to, that's directly relevant.

5              MS. DAL MOLIN-EAST:  Thank you for

6      the discussion.  We will accept Exhibits 2 and 3

7      into the record, because earlier we said it was his

8      responsibility to put them in.

9              MS. SCIBELLI:  Very well.

10             MS. DAL MOLIN-EAST:  And then you

11     said nope, it's not his.  But it is his. So let's

12     get those entered as Exhibits so we all know what

13     you're all talking about.

14          (Exhibits 2 and 3 are admitted.)

15             MS. DAL MOLIN-EAST:  You may proceed,

16     Mr. Black?

17     Q.   BY MR. BLACK:  Sir, have you personally made

18     disparaging comments about trans people in the

19     office?

20          A.   No, not that I'm aware of.

21          Q.   If we were to tell you that there was a

22     witness that could verify that you have, would that

23     change your testimony?

24             MS. DAL MOLIN-EAST:  I'm sorry, he's

25     not on trial.

```
 1              MS. SCIBELLI:  Yes, thank you.
 2   Again, objection to relevance. I'm not sure why keep
 3   deflecting away from Mr. Johnston's act.  We're here
 4   for his termination.
 5              MR. BLACK:  It's not deflection, it's
 6   direct relevant to the process.  If the signer of
 7   the termination is saying he did something so bad,
 8   we have to be able to show what the decider thinks
 9   is okay.  Because there's a lot of things that we
10   contest the decider thinks were perfectly fine that
11   were much worse than saying rot in hell.
12              MS. SCIBELLI:  And condoning a murder
13   is very different --
14              MR. BLACK:  It's not condoning a
15   murder.
16              MS. SCIBELLI:  -- from any statements
17   regarding a transgender.  That is completely
18   irrelevant.
19              MR. STATES:  Not for any other
20   purpose, but just so that the court reporter can
21   accurately record all of the conversation, if you
22   wouldn't mind just allowing each person to finish
23   and then you can all make your arguments.
24              MS. SCIBELLI:  So I made an objection
25   as to relevance.  I don't think it's pertinent to be
```

 1    talking about statements regarding a transgender

 2    when we're here to talk about the termination after

 3    somebody condoned a murder.

 4              MS. DAL MOLIN-EAST:  I will sustain

 5    the objection as far as that being relevant.  We

 6    don't need to go through a litany of things that may

 7    or may not be acceptable and not acceptable for

 8    what -- there is a tolerance for what has been

 9    tolerated in the office.

10              If you're trying to establish that

11    inconsistencies have happened with discipline,

12    etcetera, you may question the witness on very

13    specific incidents or say, have you ever allowed

14    that without terminating?  But let's be specific and

15    let's not cast a wide net and just prolong this,

16    hoping we catch something.

17    Q.   BY MR. BLACK:  My specific question was:  Were

18    you aware of your officers using the term hoo-ha in

19    court as a game, trying to see if they could get

20    that on the record?

21              MS. SCIBELLI:  Again objection,

22    relevance.  We're not here to talk about hoo-ha's,

23    we're here to talk about the termination of Mr.

24    Johnston.

25              MS. DAL MOLIN-EAST:  What I was just

1    attempting to say --

2                    MR. BLACK:  And that's what I was

3    doing.

4                    MS. DAL MOLIN-EAST:  Tie it to

5    disciplinary action and what has been tolerated

6    specifically, not casting a wide net on words that

7    may or may not be used.

8                    MR. BLACK:  My question, and I

9    apologize if I'm not phrasing it clearly, Madame

10   Chairwoman, is what discipline did those individuals

11   receive, if he's aware of that?

12                   MS. SCIBELLI:  Objection, relevance.

13   We're here to talk about Mr. Johnston's termination,

14   we're not here to talk about the possibility of

15   other individuals referencing a hoo-ha.

16                   MR. BLACK:  It would directly show if

17   it's capricious that one individual gets terminated

18   for something and another not, when it's also an

19   inappropriate situation.

20                   MS. SCIBELLI:  I don't think even

21   referencing a hoo-ha is the same as asking a woman

22   to take advantage of you on a couch.

23                   MR. BLACK:  Objection, that's not

24   been determined.

25                   MS. SCIBELLI:  That's where you're

1    trying to go, so if you want to have relevance

2    conversations, let's talk about that.

3              MS. DAL MOLIN-EAST:  So we're going

4    to focus this and we're going to focus it quickly.

5    There can be questions asked if it directly ties to

6    other disciplinary actions given by the witness to

7    employees for the same violations listed in

8    termination records.

9              MR. BLACK:  Can you verify for me

10   which violation --

11             MS. DAL MOLIN-EAST:  You need to look

12   in those records and know what violations he was

13   terminated for.

14             MR. BLACK:  And our contention was he

15   was not terminated based on the Rules, as they allow

16   Rule 11 --

17             MS. DAL MOLIN-EAST:  -- but we're not

18   going to get into everything that a human employee

19   may have done in a hundred years of the County.

20             MR. LEETHAM:  You have talked

21   immensely about what was said, why it was said,

22   First Amendment, you have made no remarks as to

23   where you're going with the term hoo-ha.  And the

24   term of what the Chairwoman has said, keeping it in

25   this very small scope.  So again, if you could keep

```
 1   your questions very pointed into that scope and what

 2   you are trying to do, as it relates to this right

 3   now, not as it relates to a broad net of being in a

 4   courtroom, being where you are, but what we're doing

 5   right now.

 6               MR. BLACK:  Thank you, sir.

 7               MR. STATES:  Do you want to restate

 8   your objection?

 9               MS. SCIBELLI:  Yes, relevance.

10               MS. DAL MOLIN-EAST:  The objection is

11   sustained as to relevance.

12               It appears he was terminated for a

13   violation of Merit System Rule 11.  You may ask,

14   have you terminated other employees for Merit System

15   Rule 11?  What were those terminations?

16               MR. BLACK:  Thank you, Commissioner.

17   Q.  BY MR. BLACK:  Sir, have you terminated other

18   employees for Rule 11 violations?

19        A.   I would have -- I could have -- if I did,

20   Human Resources would have records of it.  I

21   can't -- I've been in the office now for almost 13

22   years.

23               MR. BLACK:  If I may approach the

24   witness, I can give him a copy of the Rule.  It may

25   help.
```

```
 1              MS. DAL MOLIN-EAST:  That's fine.
 2   Q.   BY MR. BLACK:  This is Rule 11.  That's my
 3   copy, it just has highlights as to what causes may
 4   be valid for termination.
 5        A.   You just want these ones that are
 6   highlighted?
 7        Q.   Any part of Rule 11?
 8        A.   So is your question have I gotten rid of
 9   anybody for violating anything in Rule 11, because
10   you just indicated it's for sexual harassment, but
11   anything in Rule 11?
12        Q.   Right, anything in Rule 11?
13        A.   There's one, two. I can think of two off
14   the top of my head on here that they were
15   immediately dismissed from service.
16        Q.   Can you tell us which bullet points?
17        A.   It was the one being under the influence
18   of alcohol, narcotic, barbiturate, marijuana,
19   tranquilizing or hallucinogenic drug or other
20   controlled substance on duty except in accordance
21   with medical authorization.
22              And the other the one that I can see off
23   the top of my head that I can remember was the
24   revocation, suspension or loss of Arizona driving
25   privileges, was for an individual who received a DUI
```

1    and she was in a capacity where she had to travel
2    for the County.  There was no other way to do her
3    job, she had to do it.  I've had other people -- I
4    have one other person who received a DUI, but the
5    job did not require them to drive.  So they were
6    disciplined and they went through the court system,
7    the criminal justice system, took care of it, our
8    office obviously did not handle that.  And she
9    was -- part of it was she was suspended, she
10   couldn't drive a vehicle, so I remember I told her,
11   I don't care if you're sitting in the front seat of
12   somebody else's vehicle eating lunch, if I see you
13   in the front seat of a vehicle during this time of
14   this, I will fire you.  And she said, roger that.
15   And she did not conduct herself in any way other
16   than to do everything she had to do, and she was and
17   still continues to be a very valuable employee in
18   the office.
19        Q.   So was there progressive discipline
20   specifically that was taken with her?
21        A.   For that DUI?
22        Q.   Yes?
23        A.   No.
24        Q.   I'm sorry, not for the DUI, for the
25   individual who ultimately did stay and she's a

1   successful employee?

2       A.   That was the DUI -- no, she was another

3   person, she didn't get terminated.

4       Q.   Did she get other less severe discipline?

5       A.   She got disciplined, I think she may have

6   gotten demoted from a senior position to a regular

7   legal secretary position.  I can't remember.  It

8   was -- it had to have been at least eight years ago.

9   I've had a lot of things that have come up in that

10  time, as you can probably understand.

11      Q.   Of course.

12      A.   Some of them jump off the page to me.  I

13  can remember that one who I terminated for the DUI

14  because I actually drove to the Pinal County Jail

15  and informed her at that moment it had be that.

16  When you do something that's completely unacceptable

17  and there's absolutely no way you can do your job

18  now as a result of that, I terminate immediately.

19  And I actually went with my chief detective and met

20  with her at the Pinal County Jail and let her know

21  that she was no longer going to be employed.  I felt

22  like that needed to be done in person, not by a

23  letter or anything like that, so I drove there.

24      Q.   I notice you didn't mention anything about

25  firing anyone for speech before; do you remember,

 1    have you had to let someone go for something they

 2    said?

 3         A.   I don't think I've ever -- I don't think

 4    I've ever had anybody up until now that has said

 5    something, or in this case, posted something but

 6    expressed themselves in something that was just

 7    offensive beyond the pale.

 8         Q.   It sounds like this might be the first

 9    time you've experienced this?

10         A.   I don't think I have, but again, I don't

11    have the Human Resources records.  Obviously Human

12    Resource will have a record of everything when

13    people get terminated. I don't have those in front

14    of me.  So I guess I can't, I can't say I have or I

15    haven't, I don't really recall, but I don't think

16    so.  But I'm not sure.

17                   MR. BLACK:  Could I have just a

18    moment?

19                   MS. DAL MOLIN-EAST:  Sure.

20    Q.   BY MR. BLACK:  I have a few questions related

21    to the claims in the second notice of termination,

22    relating to sexual harassment?

23         A.   Okay.

24         Q.   Can you tell, is that -- what

25    investigation did you conduct there?

1      A.    That was all done by my chief deputy. For

2  me to speak on any of the topics of Mr. Johnston's

3  alleged actions when it comes to the sexual

4  harassment, it was brought to me and said, this is

5  it, this is what we came up with, boom, and I said,

6  okay.  So that was that. So I didn't do any of the

7  investigation.

8      Q.    So that was not -- it is safe to say that

9  was not part your termination decision then, if that

10 was something separate --

11     A.    It was added to what we already had

12 because I can't not document when somebody says I

13 think there was sexual harassment.  So it had to be

14 documented.  And my thinking was, I can't document

15 it into a file that somebody's already been

16 terminated.  I didn't make sense for that to come in

17 any other way, other than to add it to the final

18 document, which would be in his file, which would be

19 the termination.  And I believe the Merit Rules

20 allowed us to amend, so I think that's why we did it

21 that way.

22     Q.    And do you know whether you amended within

23 the 10 days required by the Merit Rules?

24     A.    I just know that I signed it when it came

25 in.

1          MR. BLACK:  No further questions.

2     Thank you very much.

3          MS. DAL MOLIN-EAST:  Do you have any

4     other questions?

5          MS. SCIBELLI:  I do.

6

7               REDIRECT EXAMINATION

8     BY MS. SCIBELLI

9          Q.   So with Payson and Globe being small

10    towns, do you think that a FaceBook post that Mr.

11    Johnston has made would be damaging to the

12    reputation of the County Attorney's Office?

13         A.   It is. As much as people think I only have

14    one or two friends on FaceBook, you don't.  The

15    minute you put something on the internet, you run

16    the risk of it being published.  That's why I don't

17    have any friends on my FaceBook page that live

18    anywhere in this county. There's a reason for that,

19    because you keep that separate.

20              So yes, when that was done, it concerned

21    me greatly. It concerned me because I got it, and

22    the person who sent it to me wasn't friends with Mr.

23    Johnston.  So now it's already gone through a couple

24    of people, and then it came to me and then it just

25    continues to be disseminated.  So anything you put

1    online is -- none of it is really private, people

2    can get it and in this case it got passed around.

3        Q.   And do you think it's important for the

4    County Attorney's Office to maintain a positive

5    reputation among the community?

6        A.   It's vital because you have the trust of

7    the public that you're going to do the job they

8    really elected you to do in the office that you're

9    supposed to run.  So it is vital to have that trust.

10       Q.   So really it's the only way that you can

11   function properly and do your job properly is to

12   have that community trust, and the fact that you're

13   going to prosecute heinous crimes such as the one

14   that took place?

15       A.   That's correct. If you look at today, when

16   you look at law enforcement agencies where the

17   public doesn't have any trust that people are going

18   to be arrested or that people are going to be

19   prosecuted, and we're seeing this in certain parts

20   of the country, it does have a detrimental affect on

21   the public, that laws aren't being enforced and that

22   people aren't taking their job seriously and that

23   things are not being handled.

24            But I couldn't think of anything worse

25   than to be a surviving victim of a homicide victim,

135

1    a surviving family member, and wonder is this office

2    going to take my kid's case seriously because maybe

3    their kid believed in what Mr. Kirk believed or

4    maybe they're just like them or wow, they think

5    this.  So I had to immediately sever ties with the

6    individual who brought that potentially to the

7    public and eroded that faith.

8        Q.   And in order for the County Attorney's

9    Office to properly serve the public affectively, do

10   you believe that as a government employer, you have

11   to have a certain degree of control over your

12   employees' words and actions?

13       A.   There absolutely has to be.  It's not just

14   me, every government has control over their -- every

15   government agency has control over certain things

16   that their people are allowed to say or not allowed

17   to say, the conduct they're allowed to engage in.

18            We talk about the Constitution being, it

19   just givees us this right absolutely, it doesn't.  I

20   have to the right to keep and on bare arms but I

21   can't carry this gun into a bank, I can't carry this

22   gun into a nuclear facility, I can't carry it into a

23   bar.  The government can say you can't carry it into

24   this building, I'm allowed because I'm the chief law

25   enforcement officer.  So there are limitations on

1   all of your Constitutional freedoms.  The Supreme

2   Court -- we all did Constitutional law, that's the

3   whole class, is how the Supreme Court has carved out

4   exceptions to what the Constitution allows or

5   doesn't allow.

6        Q.   So you're only enforcing speech

7   restrictions that are absolutely necessary for your

8   office to operate affectively and efficiently?

9        A.   That's correct.  I have no problem with

10  Mr. Johnston at all until this happened, then I had

11  to unfortunately let him go.  But I didn't have any

12  issues with him.

13       Q.   And if you were the County Recorder or the

14  Assessor, as you indicated, would this result in the

15  same outcome after somebody presented that same

16  FaceBook post to you?

17       A.   No, I probably would have suspended him

18  though, probably would have been something without

19  pay.  Because when you're the County Recorder, the

20  public doesn't really need to know what your

21  position is on homicide.  They just need to know

22  you're going to record their document.  They just

23  need to know things like that.

24            Now, in that setting, if somebody were to

25  have said, you're going to record this document and

1    I'm not going to do it, I'm going to throw it in the

2    shredder, then I'd fire you for that because the

3    faith they have is you're going to take their

4    document and record it.  So freedom of speech can --

5    different speech can result in termination or

6    non-termination based off what job capacity you hold

7    at the time.  And in this case, we're in law

8    enforcement, in fact, I'm the chief law enforcement

9    officer in the County.

10        Q.    Now, you said you were on lunch when you

11   learned about Charlie Kirk's assassination and then

12   you went back to the office; how quick did you

13   receive notice of this FaceBook post?

14        A.    I was still at home when I got it.

15        Q.    On your lunch?

16        A.    So I received it as a text on my

17   cellphone.  I received it when I was still at home.

18   It had just come out that he died and it had to have

19   been within minutes, 10, 15 minutes tops, and then I

20   got the post.  But it was very recent after they had

21   announced it.  Now, I don't know how long anybody

22   knew, but I found out watching them announce it.  I

23   was still at home when I received it.  I drove into

24   the office after having received it.

25        Q.    Does that heighten your concerns with the

1   FaceBook post in itself?

2       A.   The fact that it was done during work

3   hours, yeah.

4       Q.   And that it happened so quickly?

5       A.   Sure.   That's what -- as much as we think

6   that doesn't mean that you're celebrating, that's

7   exactly what that is.   You're rush to tell everybody

8   how happy you are that this guy, rot in hell,

9   because he died.

10          If he wouldn't have had any emotional

11  feeling towards it whatsoever, you'd posted it at

12  7:00, 8:00 o'clock at night, or maybe not at all.

13  But when you're posting something shortly after

14  somebody's brutally murdered and it's that type of a

15  post, that conveyed to me that they were incredibly

16  happy that that happened, that they supported it,

17  and I can't have somebody supporting homicide and

18  work for the County Attorney's Office.

19          MS. SCIBELLI:  No further questions,

20  Commissioners.

21          Could this witness please be excused?

22          MS. DAL MOLIN-EAST:  Yes, thank you.

23  Can we maybe motion for a 30 minute recess?

24          MR. LEETHAM:  Motion made.

25          MR. LAGUNAS:  I Second it.

1          MS. DAL MOLIN-EAST:  All in favor?

2          ALL COMMISSIONERS:  Aye.

3          Opposed?

4          THE WITNESS:  I just want to clarify,

5     I'm not going to, but the sequester is still in

6     place, even after people have testified, so I can't

7     hang out with all the people that are going to be

8     witnesses and talk to them; is that right?

9          MS. DAL MOLIN-EAST:  Correct.

10          THE WITNESS:  I just wanted to make

11     sure that everybody is aware of that.  Some people

12     sitting here aren't lawyers, so everybody needs to

13     be aware of that when they leave that they're not to

14     talk to anybody.

15          MS. SCIBELLI:  Just to note, Mr.

16     Beauchamp has the ability to stay if he desires, as

17     the Respondent's designee.

18          MR. STATES:  Yes, according to the

19     Merit Rules, he can.

20          THE WITNESS:  I have no desire to.  I

21     have work to do.  Thank you very much.

22          MS. DAL MOLIN-EAST:  Okay.  We will

23     come back at 2:00 p.m.

24               (A recess was taken.)

25          MS. DAL MOLIN-EAST:   We are back in

1    session.  It is 2:05 p.m.  Do I have a motion to

2    reconvene in general session?

3                    MR. LEETHAM:  I make the motion.

4                    MR. LAGUNAS:  I second it.

5                    MS. DAL MOLIN-EAST:  All in favor say

6    aye.

7                    ALL COMMISSIONERS:  Aye.

8                    MS. DAL MOLIN-EAST:  Opposed? Hearing

9    none, we will continue with this hearing.

10                   You can call your next witness.

11                   MS. SCIBELLI:  I am going to call

12   Joseph Collins.

13

14                        JOSEPH COLLINS,

15       Called as a witness herein, having been first

16   duly sworn, was examined and testified as follows:

17

18                      DIRECT EXAMINATION

19   BY MS. SCIBELLI

20        Q.   Would you state your name, please?

21        A.   Joseph Collins.

22        Q.   And you work for the County Attorney's

23   Office?

24        A.   I do.

25        Q.   What's your position there?

1    A.    Chief Deputy County Attorney.

2    Q.    And did you have knowledge of Mr.

3 Johnston's FaceBook post?

4    A.    Yes.

5    Q.    And what was your opinion of that post?

6    A.    I was not a fan.

7    Q.    Not a fan?

8    A.    Didn't like it.  My opinion varied.  I

9 didn't like the post because to me it showed support

10 of criminal activity.  And we're the number one law

11 enforcement agency in Gila County.  That's not

12 beneficial to our office in supporting that type of

13 behavior.  I didn't like it from that aspect at all.

14        And also I heard about it from two

15 different people once the post was there.  Mr. Price

16 had texted me a screenshot of it and Tanner Beckwith

17 came and told me about it.

18    Q.    And when you found out about that post, do

19 you know about how long after lunch it was?

20    A.    I want to say 2:00 or 3 o'clock in the

21 afternoon.

22    Q.    Is when that arrived to you?

23    A.    Yes, and I went back and looked at it.

24 That's about when the post was made.

25    Q.    So it looks like we did admit it.  It is

```
 1    marked as one hour ago.  So did you know Mr.

 2    Johnston's whereabouts when he posted that?

 3         A.   Yes.  That afternoon we had a meeting

 4    regarding misdemeanor prosecutions and processing, I

 5    was trying to address some issues with him and

 6    Ms. Moody regarding some deficiencies, and so

 7    shortly after I saw him sitting at his desk. He was

 8    on his phone.  I don't know where he was minute by

 9    minute after that meeting, but I had passed through

10    his area, my office is in the back, his desk is at

11    the front door, so the only way in and out of the

12    building is by his desk. And if I go back to see the

13    other prosecutors, I have to pass his desk to go

14    talk to a couple of others, as well as one of my

15    detectives.  So I passed through that area a couple

16    of times and saw Mr. Johnston at his desk.  I also

17    at one point saw him on his phone, which is not

18    uncommon or prohibited, he can be on his phone, as

19    long as the work gets done, I don't get too worked

20    up about it. But I don't ever remember seeing him

21    leave the office.  Mr. Johnston has a -- from what I

22    would call a habit or practice, he would do lunch,

23    he would go to the bathroom after lunch and I'd

24    commonly see him with his ziplock bag and his

25    toothbrush and stuff and he'd go to the bathroom.
```

1   And then after lunch he generally -- I don't

2   remember, but again, I'm not in front with him all

3   the time as to whether he goes later in the

4   afternoon.

5       Q.   Your impression was that he was sitting at

6   his desk while he made that FaceBook post?

7       A.   I can't be for certain, but it coincides

8   with the time I had passed by that the FaceBook post

9   was, roughly at that time.

10      Q.   And how did that post interfere with the

11  operations of the County Attorney's Office and the

12  morale there?

13      A.   It wasn't just that post, but that again

14  Tanner Beckwith brought it to my attention.  He was

15  very surprised and a bit incredulous that he would

16  make that post.  And again, I heard it from Misty

17  Price, who is our office manager in Globe.  Later in

18  the evening I looked and Ray Hernandez, who is also

19  in our office, had made some comments and there were

20  some conversations back and forth about the post.

21  So it was not well-received nor positively received.

22      Q.   And it was common to have political

23  conversations in the office prior to this post?

24      A.   Oh, yes.

25      Q.   And so you were aware that Mr. Johnston

144

 1    had opposing political views than yourself and

 2    others in the office?

 3        A.    Yes.  It got bad, that's the short

 4    explanation. A staff meeting after the post, I think

 5    it was a Thursday, I basically said, no more.  I

 6    don't want anymore political conversations in the

 7    office.  Mr. Johnston and I shared some beliefs and

 8    others we don't.  I sat through many lunches where

 9    there were heated discussions and debate where it

10    felt like I had to defuse the situation and calm

11    things down because of political views.  He had an

12    article posted on the wall right behind his desk, it

13    was poster size, it was a New York Times article and

14    I think he was proud of it because he's quoted in

15    it, but when I looked at it, it was an anti-Trump or

16    an anti-Republican article in the New York Times.

17    And I felt, and this is my personal feeling, that it

18    was kind of a screw you to the rest of the office

19    because most of the people in the office are

20    conservative.  So he posted it there because again

21    it was anti-Republican and anti-conservative and he

22    just wanted everybody to know like he's quoted

23    criticizing Trump and his administration.  So it was

24    an article about UPS drivers and OSHA and the

25    regulations.

145

1      Q.   How long was that hanging in the office?

2      A.   I don't know, about a month probably.

3      Q.   And it was taken down due to him being

4  terminated?

5      A.   He took it when he was terminated, yes.

6      Q.   And he was not fired or terminated due to

7  that.

8      A.   I didn't make the decision to terminate

9  him, but it's my understanding he was not terminated

10  because of that.

11          In my Thursday meeting before -- when I

12  had noticed, I printed out the policy on politics,

13  the County has a policy on politics.  I had it at

14  the meeting, I had it on the desk and I said, I

15  don't want anymore conversations, I want to make

16  sure we have a good working environment, if anybody

17  has any issues with that or somebody violates that,

18  they can come and talk to me about it in private. I

19  didn't want there to be further problems or issues

20  because somebody was trying to call someone else

21  out.  Look, this can be a very heated, political

22  environment.  People can get very violent in

23  protection of their briefs.  I believe in the First

24  Amendment, I believe in people's right to free

25  speech and political association.  When I drive down

1   the street in Payson on the weekends and they're

2   protesting, I usually look out the window and I go,

3   that's great free speech.  I don't have a problem

4   with it. I think that's how we're supposed to work.

5   But I do believe in the government's ability to

6   regulate time, place and manner when it comes to

7   freedom of speech.  I don't want it to cause

8   controversy or confrontation in the office.  Being

9   lawyers, we tend to have a tendency to be fairly

10  strongly opinionated about our beliefs and opinions.

11  And many times we will vigorously advocate those

12  political beliefs.  And that's why I had sat in on a

13  couple of conversations where I felt like I had to

14  kind of diffuse the situation, and that's why I said

15  I don't want anymore in the office, that's it, no

16  more.  So at the end of the meeting, I did notice

17  Mr. Johnston pick up the policy and going into the

18  other room with it, so he had a copy of it.

19      Q.   And just to clarify as far as timeline

20  goes, there was political conversations taking place

21  in the office, however, once Mr. Johnston made that

22  FaceBook post, you then called a meeting to forbid

23  political conversations; is that right?

24      A.   Well, yes and no.  There were

25  conversations.  I already had the meeting scheduled,

1    it was kind of a staff meeting just to touch base

2    with everybody, kind of see what they're doing, what

3    they need, what they don't need, just kind of an

4    informal, how are things going?  This came up in the

5    interim between the time I had scheduled it and the

6    time the meeting occurred. I wanted to reinforce the

7    County's policy.  I had been fairly lenient on

8    enforcing the policy about no political

9    conversations and things like that in the work

10   place.  And again, I haven't read the policy in a

11   minute, but I wanted to make sure that we weren't

12   having a continued issue or that it would escalate

13   even further than it already had.

14        Q.   Now I want to talk about the complaints

15   that were submitted regarding Robert Johnston.

16   Prior to his termination, was there a complaint

17   reported in regard to an inappropriate statement

18   made to a female?

19        A.   There was a report after our staff

20   meeting.  Ms. Tinsdale came to that Friday --

21        Q.   -- no, I'm sorry.

22        A.   Are you talking about something else?

23        Q.   I'm referring to prior to his termination,

24   prior to his FaceBook post.

25        A.   Oh, I had witnessed him make an

1    inappropriate comment towards a Payson Police

2    Department officer at one point.

3        Q.   Oh, okay, so you were a witness to that

4    statement?

5        A.   Yes.  As a matter of fact, I don't

6    remember the exact terminology, but it was an

7    inappropriate sexual comment to a female with, I

8    think at the time she was a Community Service Aid

9    Officer, she later became a certified officer.  And

10   I pulled Robert aside and I said, that's

11   inappropriate, don't make comments like that ever

12   again.

13       Q.   So you gave him a verbal reprimand at that

14   time?

15       A.   I did.

16       Q.   Now, after his termination, you received

17   more complaints regarding allegations of

18   inappropriate speech to women?

19       A.   Yes.

20       Q.   And could you expand on that?

21       A.   So again, after the staff meeting, it was

22   Friday, Ms. Tinsdale came and talked to me.  I told

23   everyone at the meeting that if anything

24   inappropriate had occurred and you want to come talk

25   to me privately, please do so.  And she came in that

1    Friday and spoke to me.  And it specifically was

2    reference my statement that I want to hear about

3    problems if there are any.  She expressed fear and

4    concern about going public or speaking about it

5    openly.

6        Q.  And the report that she had made to you

7    was talking about her leaving her husband so that

8    she could be with Mr. Johnston?

9        A.  Well, basically she said Mr. Johnston

10   had -- was in her office, there was a couch in her

11   office and he said, you can take me any time you

12   want on this couch.

13       Q.  And was her report regarding separate

14   dates; were there multiple incidents?

15       A.  There were a few other comments that he

16   had made.  Single people, do whatever you want.  Ms.

17   Tinsdale's married and that has to mean something,

18   and making a comment like that to a married woman,

19   in my mind, is sexual harassment, period.  Welcome

20   or unwelcome, it shouldn't be made in the office.

21   There were other comments, and I don't have the

22   specific phrases in my mind, you'll have to talk to

23   Ms. Tinsdale.  I went back after Mr. Johnston had

24   terminated to clarify dates, times and places, I

25   made some notes and I believe that's what ended up

1   being in the amended notice of termination.

2        Q.   Was she reporting to you that if she ever

3   left her husband, that Mr. Johnston would be her

4   sugar daddy?

5        A.   She made some reference to that as well,

6   yes.

7        Q.   And that Mr. Johnston said that she should

8   leave her husband and that she should be with him?

9        A.   Yes.  As a matter of fact, after Ms.

10  Tinsdale came to me, I spoke to everyone in the

11  office.  I had to know the depth of the problem,

12  what the issue was.  So I had spoken with a number

13  of other people, as well as others in the County,

14  inappropriate comments made to the Court

15  Administrator of the Justice Court, there was an

16  inappropriate comment through text messages, going

17  back and forth between people.  Mr. Johnston has a

18  reputation of being a man whore in the office.

19                 MR. BLACK:  I object.

20                 MS. SCIBELLI:  No further questions

21  at this time.

22                 MS. DAL MOLIN-EAST:  Mr.  Black?

23

24

25

```
 1                    CROSS-EXAMINATION
 2   BY MR. BLACK:
 3        Q.   Thank you for being with us, sir.  I have
 4   just a few followup questions, if I may?
 5        A.   Sure.
 6        Q.   During your testimony, you stated that my
 7   client made inappropriate comments to a Community
 8   Service Officer; what exactly was it that was
 9   inappropriate?
10        A.   It was a sexual comment.  I don't remember
11   the exact wording, but I felt it was inappropriate
12   and I told him not to make comments like that again.
13   It was when he started working and he was in
14   training, so I know that -- I think Christian was
15   training him in misdemeanors and she was there.  So
16   it's been at the beginning of his tenor with the
17   Gila County Attorney's Office.  I don't remember the
18   specific terminology.  I remember calling Ms. Price
19   and letting her know that I had heard the comment
20   and had verbally told Mr. Johnston not to make
21   comments like that again.
22        Q.   So if I'm understanding correctly, it's
23   your position that comments like that, or whatever
24   it was, that comments sexually related about women
25   should not be made in the workplace?
```

1    A.    Yes.

2    Q.    Do you mind explaining to us the bet that

3  you had with Tanner Beckwith regarding using the

4  word hoo-ha on the record in court?

5    A.    Oh, you bet.  So as a trial attorney we

6  sometimes play games or talk about little things.

7  And I had made a comment that during closing

8  arguments that we would sometimes work in phrases

9  into our arguments.  And Tanner had bet me, because

10  I had -- one of our defendants had put drugs in her

11  vagina, and so I made the comment that she had drugs

12  in her hoo-ha, and he said, I bet you won't say that

13  in court. I said, I bet you a hundred bucks I will,

14  and I did, I made it in an argument to Judge

15  Chambers in the Candace Lopez case a couple of

16  months back.

17    Q.    Do you believe that that's appropriate to

18  talk about a constituent of this County that way, to

19  refer to her as having a hoo-ha to make a derogatory

20  comment about her vagina during closing arguments?

21        MS. SCIBELLI:  Objection, relevance,

22  I believe the statement he said was that she put

23  drugs in her vagina, and rather than using the

24  phrase vagina, he used hoo-ha in court, on the

25  record.

1          MR. BLACK:  Based on a bet because it

2   would be funny because that is not a legal or

3   medical term, that is a derogatory term.

4          THE WITNESS:  It is, I didn't know

5   that.  Where does it come by as a derogatory?

6   Q.   BY MR. BLACK:  Is it your testimony today on

7   the record, sir, that you did not know that --

8          MR. LEETHAM:  Point of order, point

9   of order, point of order.  We are here for the

10   Appellant to ask questions and an objection is on

11   the table and the Chairwoman has not given an answer

12   yet.

13          MS. DAL MOLIN-EAST:  I will sustain

14   the objection for relevance in that we are talking

15   sexual harassment.  You gave a definition of sexual

16   harassment in the opening comments and that was only

17   a word --

18          MR. BLACK:  -- and that's not what

19   I'm asking this witness.  What I'm asking this

20   witness, Chairwoman, is whether or not he makes

21   comments as well of a sexual nature in the

22   workplace, because that's directly relevant to

23   whether the comments accused of my client are

24   something that would be extraordinary and outside

25   the bounds of what is normal, or whether it would be

 1    arbitrary and capricious.
 2                    MS. SCIBELLI:  My objection was
 3    sustained. If you could please move on with your
 4    questioning.
 5                    MR. BLACK:  I'm not addressing you,
 6    I'm addressing Madame Chairwoman.
 7                    MS. DAL MOLIN-EAST:  The objection is
 8    still sustained.  You can tie it directly to the
 9    same sort of comments that your client is accused of
10    stating, which is more than a derogatory term.
11                    MR. BLACK:  Sugar baby and being on a
12    couch is what I've heard he's accused of so far;
13    correct?
14                    MR. LEETHAM:  It's in your Exhibit.
15                    MR. BLACK:  Because that's directly
16    relevant to whether calling a woman's vagina a
17    hoo-ha is part of the culture of what's accepted. If
18    that's what's accepted by the boss --
19                    MR. LEETHAM:  As that question that
20    you just stated. There's no reason to go into what
21    is hoo-ha versus --
22    Q.  BY MR. BLACK:  Is it appropriate to use the
23    word hoo-ha in a court proceeding?
24        A.   Judge didn't object.  He didn't do
25    anything about it.

1          MR. BLACK:  All right.  No further

2     questions.  Thank you.

3          MS. DAL MOLIN-EAST:  Any other

4     questions?

5          MS. SCIBELLI:  I do.

6

7               REDIRECT EXAMINATION

8     BY MS. SCIBELLI:

9        Q.   When you said that Christian was at the

10    office training, do you know if she heard that

11    comment as well?

12       A.   She was not present when the comment was

13    made.

14       Q.   Do you know if she made any sort of

15    reports to anyone in the office regarding Mr.

16    Johnston?

17          MR. BLACK:  Objection, relevance. if

18    we're going to stick to relevance, how is that

19    relevant?

20          MS. DAL MOLIN-EAST:  Sustained.

21          MS. SCIBELLI:  I have no further

22    questions.

23          May he be excused?

24          MS. DAL MOLIN-EAST:  You may.  Thank

25    you.  We would ask that you not speak to any other

1  witnesses that are waiting to come into the room.

2              THE WITNESS:  When we're done, I

3  assume we can talk about it, I'm assuming. I have to

4  take a few of them home.

5              MS. DAL MOLIN-EAST:  Yes, if we

6  conclude.  You can talk about other things, too.

7              THE WITNESS:  Okay.  Thank you.

8              MS. SCIBELLI:  So next I'll call Lisa

9  King.

10

11                    LISA KING,

12      Called as a witness herein, having been first

13  duly sworn, was examined and testified as follows:

14

15                  DIRECT EXAMINATION

16  BY MS. SCIBELLI:

17      Q.   Hi, Lisa.

18      A.   Hi.

19      Q.   Could you please state your name for the

20  record?

21      A.   Lisa King.

22      Q.   And you work for the County Attorney's

23  Office?

24      A.   I do.

25      Q.   How long have you been wit the County

1    Attorney's Office?

2        A.    I think 13 years.

3        Q.    And you personally viewed Robert

4    Johnston's FaceBook post after the Charlie Kirk

5    assassination?

6        A.    I did.

7        Q.    And what were your concerns surrounding

8    that post?

9        A.    My concerns were a man was murdered in

10    front of several witnesses and working at the County

11    Attorney's Office, I feel we are held to a higher

12    standard.  I was told that when I was hired on the

13    County and to me that means 24/7, like not just

14    during work hours.  And it was offensive because I

15    thought it looked bad on the office, as well.  I was

16    worried about Brad's constituents maybe coming up to

17    him when he didn't know anything about it.  It

18    concerned me.

19        Q.    And is that why you reported it?

20        A.    That is why I reported it.

21        Q.    And so the screenshot that you had taken,

22    we have Exhibit Number 2, this is the screenshot

23    that Ms. King has taken from Mr. Johnston's FaceBook

24    post.  It does indicate that the post happened one

25    hour prior to.  In looking at your screenshot, what

158

1    time did you take that screenshot?

2        A.   I believe it was 3:16 in the afternoon.

3        Q.   And that was on September 10th?

4        A.   I believe so. It was the day that it

5    happened, that Charlie Kirk was killed.

6        Q.   When you say that the employees are held

7    to a higher standard, are you referring to the type

8    of statements that they could make on or off the

9    clock?

10       A.   Yes.

11       Q.   And this post, rot in hell, Charlie Kirk,

12   it was concerning to you particularly because?

13       A.   Because I just feel like it's poor

14   judgment to do that to someone that was killed and

15   left a young family behind.  And it was very

16   offensive to me because -- I don't know, I just

17   thought it was poor judgment.

18       Q.   And after you had seen the post, did you

19   delete Robert Johnston as a friend on FaceBook?

20       A.   I gave him time to take it down.  I didn't

21   say anything or make any comments on it.  But that

22   evening I deleted him.

23       Q.   Why?

24       A.   I blocked him because I didn't want to see

25   those kinds of comments anymore.

1      Q.   You found it offensive?

2      A.   Yes.

3      Q.   And do you think that your concern for

4  Brad, you said that you didn't want constituents to

5  think that it was the view of the office; is that

6  what you said?

7      A.   Yes.

8      Q.   And is that because we prosecute murder?

9      A.   Yes, we do prosecute murders and I don't

10  feel that there is a place for an employee to do

11  that kind of thing, when we're trying to put people

12  in jail for that, prison, we are actually

13  prosecuting them.

14           MS. SCIBELLI:  No further questions

15  at this time.

16

17           CROSS-EXAMINATION

18  BY MR. BLACK:

19      Q.   Hello, ma'ma, I just have a couple quick

20  questions.  Did you work in the Payson office with

21  Robert?

22      A.   No.

23      Q.   In your interactions that you did have

24  with him in the workplace, was there ever anything

25  that he did in the workplace specifically that

1    offended you?

2        A.   No, I didn't work with him much.  I talked

3    to him on the phone once in awhile.

4        Q.   Okay. Did you ever witness him harassing

5    or in any way mistreating anyone else in the times

6    you saw him?

7        A.   No.

8        Q.   Thank you.

9            MS. SCIBELLI:  No redirect.  May she

10   be excused?

11           MS. DAL MOLIN-EAST:  She may. I would

12   ask you to not speak to any of the other witnesses

13   waiting to testify, until this hearing is done.

14           THE WITNESS:  Yes.  Thank you.

15           MS. SCIBELLI:  I will call Ray

16   Hernandez.

17

18                TODD BATY,

19       Called as a witness herein, having been first

20   duly sworn, was examined and testified as follows.

21

22              DIRECT EXAMINATION

23   BY MS. SCIBELLI:

24       Q.   Would you state your name for the record?

25       A.   Todd Baty, B-a-t-y.

1        Q.    And do you work for the County Attorney's
2    Office?
3        A.    Yes, ma'am.
4        Q.    And what do you do there?
5        A.    I'm a detective.
6        Q.    And how long have been with the County
7    Attorney's Office?
8        A.    Since May of 2014.
9        Q.    And do you have knowledge of Mr.
10   Johnston's FaceBook post?
11       A.    I have knowledge, I never saw it, at least
12   not while it was live on FaceBook.
13       Q.    And is that because you were not friends
14   with Mr. Johnston on FaceBook at the time?
15       A.    Yes.
16       Q.    And did another person show you the
17   FaceBook post?
18       A.    I'm almost certain that I saw it.
19       Q.    Did you indicate that Ray -- are you
20   saying there's a possibility that you were told what
21   that FaceBook post says and you may not have viewed
22   it?
23       A.    Ray Hernandez told me about it and I'm
24   pretty certain he showed me some kind of a
25   screenshot of it.  However, I don't recall what it

1    looked like.

2         Q.   I see.  But you do know what it said?

3         A.   I'm aware of what he told me it said.

4         Q.   Right and that was, rot in hell, Charlie

5    Kirk?

6         A.   Or Charlie Kirk, rot in hell, one or the

7    other, I don't remember which phrase was first.

8         Q.   After you had knowledge about it, how did

9    it make you feel?

10        A.   Well, initially I was taken back.  When I

11   hear the phrase, rot in hell, I think of it as

12   pretty significant.  But then through religious

13   beliefs, I believe in hell.  I'm aware that Robert

14   is an atheist and he doesn't believe in hell.

15   Whether or not that could have any type of

16   significance, I don't know.

17        Q.   Did you feel that was a wise thing for

18   somebody to post while they were working for the

19   County Attorney's Office?

20        A.   No.

21        Q.   Did you find it offensive to the

22   reasonable person within the community?

23        A.   I know from the fallout that everything

24   resulted in -- from everything of similar natures

25   resulting, yes, I understand a lot of people would

163

 1    be offended.

 2        Q.    And does that concern have anything to do

 3    with the day of the times right now, in regard to

 4    possible assassination attempts towards Trump?

 5        A.    Yes.

 6        Q.    And could you expand on that?

 7        A.    Things are a hotter, emotional topic than

 8    they used to be.  I recall times in which political

 9    figures have been posted, say with crosshairs on

10    them or something like that, and at the time nobody

11    thought much about it because there hadn't been any

12    such thing since the 1960's.

13        Q.    And with the assassination attempts on

14    Trump, you believe that it was a hot time for

15    somebody to condone an assassination attempt on a

16    supporter of Trump?

17        A.    It would be a hot time to condone an

18    assassination or an act of violence against anybody.

19        Q.    Were you ever friends with Robert Johnston

20    on FaceBook?

21        A.    Yes.

22        Q.    And what happened, why did you not view

23    that post yourself?

24        A.    Well, Robert and I were able to banter

25    back and forth some with our political differences.

1    But after receiving at least one complaint from

2    another friend on FaceBook, who they got into an

3    argument on, which I wasn't monitoring, reasoned

4    that it would just be better just to delete him so

5    that that wouldn't occur anymore.

6        Q.   So just for clarification, you had posted

7    something on FaceBook and people were commenting on

8    something that you had posted; is that what you're

9    saying?

10       A.   Yes.

11       Q.   And there were cyberarguments going on on

12   your page and to avoid them, you just blocked

13   Robert?

14       A.   I figured that was the easiest route.

15       Q.   And even though he was blocked at the time

16   and you couldn't view his FaceBook post, you still

17   have knowledge of his FaceBook post regarding

18   Charlie Kirk?

19       A.   Yeah, I have knowledge of it, yes.

20            MS. SCIBELLI:  No further questions

21   at this time.

22            MS. DAL MOLIN-EAST:  Mr. Black?

23

24

25

```
 1                    CROSS-EXAMINATION

 2   BY MR. BLACK:

 3        Q.   Thank you for being here today, sir.  I

 4   just have a few followup questions.

 5        A.   Sure.

 6        Q.   It's your testimony today that you would

 7   post political postings on FaceBook; correct?

 8        A.   I've done that numerous times, yes.

 9        Q.   And so it's not your position that there's

10   anything inherently wrong with that; correct?

11        A.   With posting political viewpoints, no.

12        Q.   Is it your position that there's anything

13   inherently wrong with making a FaceBook post at

14   work, regardless of the post?

15        A.   Not necessarily.

16        Q.   And outside of those political

17   disagreements that you're talking about, have you

18   ever witnessed a posting or any activity of my

19   client where he was saying something disparaging to

20   somebody or treating them in a harassing manner?

21        A.   No.

22             MR. BLACK:  No further questions.

23   Thank you.

24             MS. SCIBELLI:  No redirect.  May this

25   witness be excused?
```

```
 1              MS. DAL MOLIN-EAST:  Yes. And we
 2   would ask that you not talk to the other witnesses
 3   waiting to testify.
 4              THE WITNESS:  Sure.
 5              MS. SCIBELLI:  I would call Ray
 6   Hernandez.
 7                   RAMON HERNANDEZ,
 8      Called as a witness herein, having been first
 9   duly sworn, was examined and testified as follows:
10
11                   DIRECT EXAMINATION
12   BY MS. SCIBELLI:
13      Q.   What's your name?
14      A.   My name is Ramon Hernandez.
15      Q.   And where do you work?
16      A.   I work for the County Attorney's Office up
17   in Payson, in the diversion office.
18      Q.   How long have you been there?
19      A.   Currently, almost five years.
20      Q.   And did you see Mr. Johnston's FaceBook
21   post on September 10th, regarding Charlie Kirk?
22      A.   Yes, I did.
23      Q.   And what was your opinion about that post?
24      A.   I found that it lacked taste, considering
25   that me and Mr. Johnston had discussed issues about
```

1   gun control and gun safety, and we had our

2   agreements and disagreements on gun control.  And

3   one of them was always that people with mental

4   illnesses shouldn't possess guns.

5              MS. DAL MOLIN-EAST:  I'm sorry, do

6   you go by Ray?

7              THE WITNESS:  I go by Ray.

8              MS. DAL MOLIN-EAST:  Thank you.

9   Q.   BY MS. SCIBELLI:  Thank you.  So did this

10  FaceBook post upset you?

11       A.   It upset me.  I didn't take a screenshot

12  of it immediately.  I did ask Todd if he had seen

13  the post.  And he told me that he was no longer

14  friends with Robert and I didn't know that.  So

15  later that night, because I couldn't find it and

16  then I found it again later, and I took a screenshot

17  of it and then showed it to him the next day.

18       Q.   And do you believe that that FaceBook post

19  has an impact on the County Attorney's Office?

20       A.   Yes, we're an office that prosecutes

21  people that do gun violence, creates homicides, and

22  you know, we can't condone that kind of behavior of

23  somebody being happy about somebody being killed.

24       Q.   And do you believe that with that post,

25  Mr. Johnston was saying that it's okay to do that?

1      A.    Absolutely, yes.

2      Q.    That was your interpretation of it?

3      A.    Yes.

4      Q.    And do you believe that it would be

5    difficult to work with him moving forward after

6    viewing a post like that?

7      A.    Yes, we work in an office where we

8    prosecute people for doing that kind of violence, it

9    would be difficult for us to have somebody in our

10   office that condones that kind of behavior.

11            MS. SCIBELLI:  No further questions

12   for this witness at this time.

13

14                   CROSS-EXAMINATION

15   BY MR. BLACK:

16     Q.    Ray, did my client ever tell you that he

17   condoned violence?

18     A.    No.  Well, yes he did, actually he did,

19   when I responded to that later that night because he

20   did post a thing about Che Guevara right afterwards

21   on the same post, talking about Che Guevara, some

22   quote from Che Guevara, who's a Marxist that was

23   part of the Cuban revolution.

24     Q.    And you found that to be --

25     A.    No, because --

169

1       Q.    -- Marxist or --

2       A.    No, because I made a point to respond to

3    him and tell him that Che Guevara was a murderer.

4    He had murdered hundreds of people during the

5    revolution, and he said, they were just traitors and

6    stuff.

7       Q.    So it sounds like it was a political

8    difference?

9       A.    It's not a political difference, he

10   thought it was okay -- Che Guevara was okay to kill

11   traitors and murder traitors.

12      Q.    Okay.  Do you ever express political

13   opinions at work?

14      A.    I have on my breaktime, yes.

15      Q.    Have you made FaceBook posts during work

16   hours?

17      A.    I have on my breaktimes, yes.

18      Q.    And have you ever had conversations with

19   Robert about women and previous relationships that

20   the two of you have had been in romantically?

21      A.    Yes, we've discussed that numerous times

22   because he was going through a divorce and I had

23   just previously went through a divorce, so we have

24   discussed that numerous times, how difficult it was

25   with relationships with different women.  So yes, we

1    have.

2        Q.    Knowing from what we heard today that you

3    wouldn't really be comfortable working with him and

4    you don't approve of the things that he said about

5    Charlie Kirk, setting that aside, was there ever any

6    comments that he made to you or that you witnessed

7    him make that you would say are misogynistic or

8    where he harassed someone in the workplace?

9        A.    When it comes to that, no, he never has.

10                MR. BLACK:    I have no further

11    questions.    Thank you.

12                MS. SCIBELLI:    No redirect.    May this

13    witness be excused?

14                MS. DAL MOLIN-EAST:    Yes.    We would

15    ask that you not speak to any of the other witnesses

16    until this hearing is over.

17                THE WITNESS: Yes.

18

19                CORRIE TINSDALE,

20        Called as a witness herein, having been first

21    duly sworn, was examined and testified as follows:

22

23                DIRECT EXAMINATION

24    BY MS. SCIBELLI:

25        Q.    Would you please state your name?

1       A.    My name is Corrie Tinsdale.

2       Q.    And where do you work?

3       A.    I work at the Gila County Attorney's

4  Office.

5       Q.    How long have you been employed there?

6       A.    Like four or six months.

7       Q.    Fairly new?

8       A.    Fairly new, yes.

9       Q.    And so during the week of August 4th of

10  this year, did Mr. Robert Johnston make comments to

11  you about leaving your husband to be with him?

12      A.    Yes.

13      Q.    And on or about August 13 or 14, of this

14  year, did Mr. Johnston tell you that if you ever

15  leave your husband, that he'll be your sugar daddy?

16      A.    Yes.

17      Q.    And on or about August 27 or 28, while Mr.

18  Johnston was standing in your office, did he say to

19  you, if you ever want to take advantage of me on

20  that couch, you know where to find me?

21      A.    Yes.

22      Q.    And when he made these statements to you,

23  were you alone with Mr. Johnston?

24      A.    Yes.

25      Q.    And after he made those statements, did

```
 1    you tell anybody about them?

 2        A.   Yes.

 3        Q.   Did you tell your husband?

 4        A.   I did.

 5        Q.   And did you tell Tanner Beckwith?

 6        A.   I did.

 7        Q.   And did you make a report to your

 8    supervisor after Robert was terminated?

 9        A.   Yes.

10             MS. SCIBELLI:  I have no further

11    questions for her at this time.

12             MS. DAL MOLIN-EAST:  Mr. Black?

13

14                  CROSS-EXAMINATION

15    BY MR. BLACK:

16        Q.   Thank you for being here today, ma'am.  If

17    you could give me just a moment.

18             Did you participate in a group chat with

19    other members of your work place?

20             MS. SCIBELLI:  Objection, Your Honor,

21    relevance.

22             MR. BLACK:  It's relevant, it goes to

23    statements that were made in that group chat that

24    relate to sexual harassment.

25             MS. SCIBELLI:  I believe comments in
```

```
 1   a group chat are not -- they don't have any bearing
 2   as to statements that Mr. Johnston made in an alone
 3   setting with Mrs. Tinsdale in the office.
 4                MS. DAL MOLIN-EAST:  I will overrule
 5   the objection.  But you have like two questions to
 6   make it directly relatable before she can object
 7   again.
 8   Q.   BY MR. BLACK:  Isn't it correct that in a group
 9   text with your coworkers that you made a comment
10   about your nipples being hard?
11                MS. SCIBELLI:  Objection, Your Honor,
12   again relevance.
13                MR. BLACK:  It directly relevant,
14   Madame Chairwoman, because that would show what
15   conversation is acceptable to this individual if
16   they're talking about their own nipples being hard
17   in a work chat, then that makes it directly relevant
18   how we analyze what he said about being a sugar
19   daddy, for instance.
20                MS. SCIBELLI:  And who was involved
21   in this group text message?
22                MR. BLACK:  You're not asking the
23   questions, I'm asking the question of the witness
24   and we have an overruled objection.
25                MS. DAL MOLIN-EAST:  I did overrule
```

1    it.  You have one more question to make this

2    relevant, including establishing why this group chat

3    is important and why we are talking about sexual

4    harassment or alleged sexual harassment?  You're not

5    talking about whether or not something unwanted.

6                    MR. BLACK:  They absolutely are.

7                    MS. DAL MOLIN-EAST:  Because when

8    comments made about one's self does not give

9    somebody else the right to make unwanted comments.

10   So you need to tie it in back in, or again, I will

11   sustain the relevance.

12   Q.   BY MR. BLACK:  I guess that's a yes or no

13   question then for the witness.  We're just waiting

14   for an answer.  Did you make comments about your

15   hard nipples in a group work chat?

16       A.   There's a whole lot more context to that,

17   but yes.

18                    MR. BLACK:  No further questions.

19                    MS. DAL MOLIN-EAST:  Redirect?

20                    MS. SCIBELLI:  Yes.

21

22                    REDIRECT EXAMINATION

23   BY MS. SCIBELLI:

24       Q.   Yes.  Mrs. Tinsdale, is he referring to a

25   group text message where your husband was involved

1    in that group text message?

2        A.    Yes.

3        Q.    And do you care to put that into context?

4    You don't have to, it's your choice.

5        A.    I'm fine with that, yes.

6        Q.    Okay.

7        A.    It was a group text with friends that we

8    all work for Gila County but in different areas, and

9    it was a long thing about it was cold outside and

10   one of the other parties in the group text said

11   something -- said that, and I replied with yes, they

12   could cut glass.  That's what it was.

13       Q.    And in this group text message, was there

14   some point where Mr. Johnston was referring to 23

15   year olds and nothing that a 23-year-old couldn't

16   solve?

17       A.    Yes.

18       Q.    And was he also referring to himself as a

19   vindictive person?

20       A.    Yes.

21       Q.    Was he also saying that someone's mother

22   went to hell?

23       A.    Yes.

24            MS. SCIBELLI:  No further questions.

25   Thank you.  May this witness be excused?

1          MR. BLACK:  I have one followup based

2    on the new testimony that was elicited.

3          MS. SCIBELLI:  I'm sorry, I don't

4    know if there's an opportunity for that.  It was my

5    witness, I had the redirect.

6          MR. BLACK:  I would like to ask my

7    question.

8          MR. STATES:  The Commission can allow

9    recross.  That's up to you if you.

10          MS. SCIBELLI:  I would just argue

11    that our victim, she's answered enough questions, I

12    don't want to make her uncomfortable. I don't think

13    that it's necessary or relevant to dive into any of

14    that.

15          MS. DAL MOLIN-EAST:  What was it you

16    called it?

17          MR. STATES:  It was a motion for

18    recross.

19          MS. DAL MOLIN-EAST:  So the motion is

20    overruled.  If there was anything new, you an

21    discuss that with Mr. Johnston.

22          MR. BLACK:  Then I would ask that the

23    Commission reserve this witness because during our

24    direct, I would like to ask her additional questions

25    based on what came up in that last segment.  I have

```
 1   one question, and I can hold it until we get to our
 2   case.
 3                 MS. SCIBELLI:  I would just move to
 4   strike my followup questions.
 5                 MR. BLACK:  The cat's already out of
 6   the bag, she's already stated stuff. She's opened
 7   the door now, we get to go through it with
 8   evidentiary and talk about it.
 9                 MR. STATES:  So you would excuse her
10   now and he would be able to recall her later.
11                 MS. DAL MOLIN-EAST:  Go ahead and ask
12   your question, Mr. Black.
13
14                 RECROSS-EXAMINATION
15   BY MR. BLACK:
16       Q.   Ma'am, my question is did you report the
17   person in that chat that made the comment about your
18   nipples?  Because you said it wasn't you, someone
19   else did it.  Did you speak up about that?
20       A.   No.
21                 MR. BLACK:  Thank you.  No further
22   questions.
23                 MS. SCIBELLI:  Do I have an
24   opportunity?
25                 MS. DAL MOLIN-EAST:  Yes.
```

```
 1                 RE-REDIRECT EXAMINATION

 2   BY MS. SCIBELLI:

 3       Q.   Did that happen while you were at work?

 4       A.   I don't recall.  I don't remember the

 5   time.  No, it was a chat with my friends and my

 6   husband.

 7             MS. SCIBELLI:  No further questions.

 8   May this witness be excused, please?

 9             MS. DAL MOLIN-EAST:  Yes.  Please do

10   not talk with any of the other witnesses until this

11   hearing is done.

12             MS. SCIBELLI:  I will call Garrett

13   Tinsdale.

14

15                 GARRETT TINSDALE,

16       Called as a witness herein, having been first

17   duly sworn, was examined and testified as follows:

18

19                 DIRECT EXAMINATION

20   BY MS. SCIBELLI:

21       Q.   Hi. Would you please state your name?

22       A.   Garrett Tinsdale.

23       Q.   And are you Corrie Tinsdale's husband?

24       A.   Correct, yes.

25       Q.   And are you aware of the sexual harassment
```

1    statements that Mr. Johnston made to her?

2        A.    Yes.

3        Q.    When she did she tell you about those

4    statements?

5        A.    Probably two months ago.  I don't remember

6    the exact date, September timeframe.

7        Q.    Okay.

8              MS. SCIBELLI:  No further questions

9    at this time.

10             MR. BLACK:  No questions for this

11   witness.

12             MS. SCIBELLI:  May he be excused?

13             MS. DAL MOLIN-EAST:  You may be

14   excused. Please do not talk to any of the other

15   witnesses until this hearing is concluded.

16             MS. SCIBELLI:  I will call Tanner

17   Beckwith.

18

19                   TANNER BECKWITH,

20       Called as a witness herein, having been first

21   duly sworn, was examined and testified as follows:

22

23                   DIRECT EXAMINATION

24   BY MS. SCIBELLI:

25       Q.    Would you state your name?

180

1     A.   My name is Tanner Beckwith.

2     Q.   And where do you work?

3     A.   I'm a prosecutor with the Gila County

4 Attorney's Office.

5     Q.   And are you aware of Robert Johnston's

6 FaceBook post regarding Charlie Kirk?

7     A.   I am.

8     Q.   And is that because you were friends with

9 him on FaceBook?

10    A.   No, I don't have FaceBook.

11    Q.   Okay.  So you became aware of it even

12 though you're not on FaceBook?

13    A.   That's correct, yes.  It made its way

14 around the office.

15    Q.   And how did that post make you feel?

16    A.   I thought I didn't agree with it.

17    Q.   What's that?

18    A.   I didn't agree with it.  I thought it was

19 a little aggressive.

20    Q.   And do you think that if Mr. Johnston was

21 not terminated at the time, if it would have

22 impacted the County Attorney's Office in some way?

23    A.   There were people who had very strong

24 feelings in the office about it, so yes.

25    Q.   You think it would have been difficult or

1   awkward for them to work with him?

2        A.   Yes.

3        Q.   And Mr. Johnston's position at the office,

4   he worked in the front; is that correct?

5        A.   Yes.

6        Q.   And so did he make comments that he was

7   the face of Gila County Attorney's Office?

8        A.   Yes.  Yes, I heard comments about that.

9        Q.   Was he proud of that?

10       A.   I think so, you're the person that

11  everyone sees, so yes.

12       Q.   And the sexual harassment statements made

13  by Mr. Johnston to Mrs. Tinsdale, were you aware of

14  those comments; did she report those to you?

15       A.   She told me what was said, yes, so I was

16  aware of the comment.

17       Q.   When did she tell you about those

18  statements being made?

19       A.   So, we moved from the Longhorn building we

20  were in back into our regular office after it was

21  renovated in July, and I believe just right after

22  that, shortly after that, end of July or like August

23  is when a couch got moved into her office.  It was

24  during that time.

25       Q.   She told you about the couch comment of

182

1  him telling her she could take advantage of him on

2  that couch if she wanted to?

3      A.    She told me, yes.

4      Q.    And you're saying that timeframe was

5  around the end of July or August?

6      A.    Yes, to the best of my memory, because we

7  moved the couch in there right when -- not long

8  after we moved back from the temporary building we

9  were in, and that was in July.  So it was like

10  within a month of that.

11      Q.    I see.

12              MS. SCIBELLI:  I have no further

13  questions at this time.

14              MR. BLACK:  I don't know that we have

15  any questions, but would the Chairwoman give me a

16  brief minute to discuss with my client before we

17  release the witness?

18              MS. DAL MOLIN-EAST:  Of course.

19              MR. BLACK:  We have no questions for

20  the witness.

21              MS. DAL MOLIN-EAST:  Thank you.

22              You may be excused. We would ask that

23  you not speak to any other witnesses for the

24  duration of this hearing.

25              THE WITNESS:  Yes.  Thank you.

```
 1                    MS. SCIBELLI:  I rest.

 2                    MS. DAL MOLIN-EAST:  Mr. Black?

 3                    MR. BLACK:  Yes, thank you.  Your

 4    Honor, I'd like to call my client to the stand, if I

 5    may.

 6                    ROBERT JOHNSTON,

 7        Called as a witness herein, having been first

 8    duly sworn, was examined and testified as follows:

 9

10                    DIRECT EXAMINATION

11    BY MR. BLACK:

12        Q.    I appreciate you also joining us today.

13        A.    Can I ask that that be turned off because

14    I can't hear you?

15        Q.    I'll talk louder, too.

16        A.    Okay.

17        Q.    Obviously we've heard a lot of testimony

18    today from individuals who work coworkers of yours,

19    specifically about this post, and I want to address

20    that first.

21             Can you walk me through your view of that

22    post and what your intent was?

23        A.    It's really simply, that post is exact

24    opposite of rest in peace.  Rot in hell, rest in

25    peace.  Simple, that's it.  No more, no less.
```

```
 1   Anyone who attaches anything more to that is really
 2   has to answer to themselves.
 3         So actually Charlie Kirk is not someone
 4   high on my radar.  I have differences with him as
 5   far as how he feels about gun control, because my
 6   views of gun control have completely flip-flopped
 7   from years ago, to where I don't like seeing kids
 8   being killed.  I really don't. And I'm willing to
 9   see some of my Constitutional Rights be restricted
10   to prevent one child from not being killed.  And he
11   was, in fact, opposite of that.  In fact, he said
12   that we should tolerate murders of some children in
13   school because of our second amendment rights.  Now,
14   I'm a very educated person.  I've had a lot of
15   Constitutional law courses.  I believe in the
16   Constitution.  I believe in the second amendment, I
17   think it's important.  But I don't like kids being
18   killed and I think we could do something about it.
19         And someone like that, that makes those
20   statements, that's -- what happened to him was
21   ironic that it happened at that time.  And I don't
22   feel -- I feel he should be judged by the souls of
23   the children that died due to his advocacy for
24   allowing guns in schools.
25         Q.   Were you advocating any kind of violence
```

1  against Charlie Kirk in your post?

2      A.  Absolutely not.  One, he's already dead,

3  so okay, and I've never advocated violence for

4  anyone.  It was mentioned earlier that I quoted Che

5  Guevara.  Che Guevara made a statement that as long

6  as there's a political solution for your problems,

7  you cannot -- violence, revolution is not possible.

8  And I believe that a hundred percent.  We have a

9  political system here of differences.  We have a

10  voting, we have elections coming up in November and

11  we have more elections coming up in the 2026

12  elections, 2028 elections.  We have a political

13  system that's still working.  So we have solutions

14  to our problems outside of violence.  There should

15  have been nobody attacking the Capital on January

16  6th because they didn't like the result.  That's a

17  horrid thing.  So no, I don't advocate violence.  It

18  doesn't solve anything.  Violence in school,

19  violence anywhere doesn't solve it. We talk about

20  things, we argue, that's what I do, I argue.

21      Q.  Isn't it true that your FaceBook profile

22  is private so that typical citizens can't easily

23  find that?

24      A.  Absolutely.  Not only is it private, it's

25  hard to search for it.  I had at the time 250

1    friends, a very limited audience, mostly people that
2    agree with me.  I allowed some people from this
3    office onto my FaceBook page.  It's very easy to see
4    what my political views are on my Facebook page.
5    And if you don't like them, you're welcome to come
6    on there and tell me what you think of me and of
7    what I think.  And I'll respond accordingly.  But I
8    never restrict anyone from saying anything they feel
9    what I said -- Ray even mentioned it when we talked
10   about going back and forth over this post.  That's
11   acceptable to me.  If you disagree with me,
12   disagree, make your argument, let's hear it.  Maybe
13   you'll change my mind, maybe you won't.  But it's
14   not something that's there for anyone else to
15   disseminate unless they want to.
16           And the way FaceBook works, if you're
17   friends with someone on Facebook and you want to see
18   what they say, then if you keep interacting with
19   them, you will see it.  But you can be friends with
20   someone on FaceBook and not have to see what they
21   say. All you do is you go to their page and it says
22   follow, unclick it, unfollow.  Now you're still
23   friends but you won't ever see what they say.  It's
24   a choice to see what somebody says.  If I want to
25   see what you say, I have to go there and find you.

1    I don't request people, they request me. So you

2    don't like me, fine, don't have to like me.

3        Q.   Do you believe that your First Amendment

4    right was violated by the termination, since this is

5    related to Charlie Kirk, who is a public figure?

6        A.   A hundred percent. I made a comment on a

7    matter of public concern, which has been directly

8    addressed by the Supreme Court in Rankin vs.

9    McPherson and sustained, and it has been written

10   that comments like that have to be allowed by

11   government employees unless they substantially

12   affect the workplace.  And we have heard no

13   testimony today that I have substantially affected

14   the workplace.

15           I prosecute misdemeanors, okay?  I don't

16   have any authority whatsoever to do anything.  I

17   can't sign a paper, I can't file a motion, I can't

18   dismiss your DUI, I can't slow roll it.  I can't do

19   anything to affect any kind of prosecution because

20   the prosecutions that I help with, that I assist

21   with, are misdemeanor crimes, not heinous crimes,

22   not murders, not anything like that.  I can open the

23   door for you if you come up there. That's all I can

24   do.  If you don't want to talk to me when you call

25   the office, there are other extensions that anyone

1    can call, they don't have to talk to me.  I have

2    zero affect on anything whatsoever.  I used to say

3    the only authority I have in the office was the

4    bathroom key for somebody that came to visit, and

5    very few people visit Payson because one, they don't

6    really know where we are and don't even have a sign

7    on the door there, so they don't know where to go.

8            So to say that I have substantially

9    affected the office, that my rights as a person to

10   say on my personal FaceBook page what I think about

11   something because I'm a government employee, to me

12   is absolutely wrong.  We still go by the

13   Constitution in this country.

14       Q.   Moving on a little bit.  There was

15   allegations made about comments relating to a couch.

16   Can you tell me in your own words what that

17   conversation was and what you said?

18       A.   The conversation never happened.  I

19   don't -- I couldn't tell you -- I know she has a

20   couch in her office, I'm aware of that.  I don't

21   know when it was moved into the office.  I know

22   there was discussions about taking naps on it. I

23   believe Tanner and Joe Collins took naps on the

24   couch.  I would not take a nap at work.  As you can

25   see, I'm a high-energy person most of the time. So I

1  don't know anything about the couch, what color it

2  is, what size it is, or something, and I would

3  certainly never say anything, anything like you can

4  take advantage of me on a couch.  Are you serious?

5  I work in a County Attorney's Office, why would I

6  say that, why would I do that?  It's absurd to me.

7      Q.   What about the allegations of messages,

8  some message that said sugar daddy or sugar baby, is

9  that --

10     A.   There was no messages, I never had any

11 conversations with Corrie about being a sugar daddy

12 or a sugar baby; okay?  I have done well for myself.

13 I do not -- a sugar baby is someone who is half your

14 age; okay?  And I would not, even if I had that kind

15 of money, take someone on. I've been divorced three

16 times and I've paid them very little.  And they have

17 all been my age; okay?  So I don't look for younger

18 woman and try to make them my sugar baby, nor do I

19 offer to be anyone's sugar daddy.  Even knowing what

20 sugar baby and sugar daddy mean, a sugar daddy is

21 someone that pays for companionship.  You heard

22 testimony that I'm sort of man whore; okay, so I

23 don't have a problem apparently getting female

24 companionship whenever I want, but I need to offer

25 someone that I'm going to be a sugar daddy? I don't

190

```
 1    believe so.
 2         Q.  So why do you believe that she made those
 3    allegations against you?
 4         A.  Those allegations came in -- the letter
 5    that they defectively sent and apparently the County
 6    Attorney can't get their dates straight, all those
 7    allegations came in after I made my appeal to the
 8    first termination, which is completely
 9    unconstitutional.  I believe Joe Collins went to
10    Corrie and I believe that he got her -- because
11    she's still on probation, she testified she's been
12    there six months, she has not been there six months,
13    she didn't accept the job until June 18th. When
14    you're on probation you can be terminated at any
15    time for any reason and they don't have to say.  So
16    that's the person you want to make those allegations
17    because they're going to do what you say so that
18    they keep their job.  So that's my take on all that.
19         Q.  So your take is that the claims of what's
20    being called sexual harassment, that that's just
21    pretext because they really wanted to get rid of you
22    for the Charlie Kirk comment?
23         A.  If you read my appeal letter, you know why
24    the first charge is so unconstitutional.  And that
25    is all me, I wrote all that, I went through it.  I'm
```

1  at ASU law right now so I know what I'm talking

2  about.  I know they don't have a leg to stand on on

3  that charge.  They know it too, so they want to

4  muddy the waters and come up with a sexual

5  harassment charge, knowing it's hard for me to

6  defend.

7          The thing is, it's hard for men in this

8  day and age to defend against those sorts of

9  charges, and anyone can make them.  But these

10 charges are lame on their face.  And I wish you

11 would look at them and just think about that.  Think

12 about why I would make these absurd statements and

13 what I would expect to get out of it.

14     Q.  Have you ever been disciplined in your

15 professional career, so going back to, I know you

16 were a truck driver we talked about; ever since you

17 started working, have you ever been disciplined for

18 sexual harassment at work?

19     A.  No, never, never talked to, never any

20 discipline.

21              MR. BLACK:  No further questions at

22 this time.

23              MS. DAL MOLIN-EAST:  I have no

24 questions.

25              MS. DAL MOLIN-EAST:  Okay. Do you

```
 1    have another witness?
 2                    MR. BLACK:  No. I think just doing
 3    our closings, but otherwise we would rest.
 4                    MR. LEETHAM:  I would move to take a
 5    recess.
 6                    MS. DAL MOLIN-EAST:  Do we have a
 7    second for a recess?
 8                    MR. LAGUNAS:  I would second it.
 9                    MS. DAL MOLIN-EAST:  All in favor say
10    aye.
11                    ALL COMMISSIONERS:  Aye.
12                    MS. DAL MOLIN-EAST:  Opposed?
13                    We will take a 10 minute recess.
14                      (A recess was taken.)
15                    MS. DAL MOLIN-EAST:  We have
16    reconvened for our hearing and it is time for
17    closing arguments.
18                    We will limit closing arguments to no
19    more than seven minutes.
20                    Ms. Scibelli, as a point of
21    clarification, earlier I believe when Mr. Beauchamp
22    was speaking, there was a reference to Exhibits 4
23    and 5.  Exhibit 5 was brought into evidence, Exhibit
24    4 never was.  So I just want to make sure that it's
25    clear that Exhibit Number 4 has not been given to
```

 1    the Commission as part of the evidence.  If it's

 2    supposed to be, then we need to take the appropriate

 3    steps.

 4            MS. SCIBELLI:  Mr. Beauchamp read the

 5    relevant parts, I don't need you to take it in if

 6    counsel is opposed to admitting it.

 7            MR. BLACK:  I don't see a reason to

 8    admit it unless it's something that you need.

 9            MS. DAL MOLIN-EAST:  Then it sounds

10    like both parties are in agreement that it does not

11    need to be part of the evidence.

12            MS. SCIBELLI:  Just to clarify, do

13    you object to it being admitted?

14            MR. BLACK:  I guess object or not, I

15    would need a statement of what the purpose of the

16    admission is for, is it to prove the truth of what's

17    contained in the document?

18            MS. SCIBELLI:  Yes.

19            MR. BLACK:  I have no problem with

20    it.  It's a form document.  I have no objection to

21    admitting it. It can be admitted.

22            MS. SCIBELLI:  Thank you.

23            MR. STATES:  So she moved, he did not

24    object.

25            MS. SCIBELLI:  So it's admitted.

1          MS. DAL MOLIN-EAST:  So Exhibit

2    Number 4 is admitted into evidence.

3               (Exhibit Number 4 is admitted.)

4               And with that, we will transition to

5    closing arguments.  We will limit it to seven

6    minutes for each party. We will have the Respondent

7    go first.

8               MS. SCIBELLI:  Sure.  Thank you,

9    Commissioner.  You are now in receipt of Exhibit

10   Number 1, which shows that on September 10, 2025,

11   Mr. Johnston posted on FaceBook, rot in hell,

12   Charlie Kirk, during his regular scheduled work

13   hours, while employed at the County Attorney's

14   Office.  As you can see, the screenshot was taken at

15   3:16 p.m.  It was taken, according to the post, one

16   hour after it was posted.  So this would reference

17   the time of posting around 2:16 p.m.

18               This would have been immediately

19   after the assassination of Charlie Kirk.  You did

20   hear testimony from the County Attorney, who

21   indicated that he does have a duty to prosecute

22   heinous crimes such as this, and that it could not

23   be behavior of employees to participate in comments

24   like that because he needs the support of his staff,

25   regardless of whether or not they're prosecuting

1    crimes.  There was testimony here today that Robert
2    Johnston is the face of the County Attorney's Office
3    in Payson.  If anybody comes in from the public or
4    an officer, the first person they see was Mr.
5    Johnston.  If you're calling the County Attorney's
6    Office in Payson, the person who is answering the
7    phone is Mr. Johnston.  Again, it was the face of
8    the County Attorney's Office.  And he actually raved
9    about that.
10             As the elected official, the County
11   Attorney, he needed to make a determination and he
12   decided to terminate his employment, and that's
13   because he was concerned about what his constituents
14   would think.  As far as the trust, it was very
15   important for him to have the public trust him and
16   the office, because again, he prosecutes heinous
17   crimes and the public needs to know that crimes like
18   that are taken very seriously.
19             You heard employees testify that they
20   felt the same.  They were concerned what the
21   constituents would think.  Risking the public view,
22   believing that Mr. Johnston's derogatory post was
23   the view of the County Attorney.  And it simply was
24   not.
25             The Count Attorney testified today

196

1    that if he was the Recorder or if this was another

2    department, that he would not have terminated Mr.

3    Johnston.  The sole reason for him being terminated

4    was not because of his political view, but because

5    it was an act of condoning murder.

6              You also heard testimony that

7    numerous employees deleted or blocked Mr. Johnston

8    for his offensive comments on FaceBook.  Ms. King

9    testified that she didn't want to see anything else

10   like that. She gave him time to take down the post,

11   he didn't, so she just went ahead and blocked him.

12   She found it super offensive.  Again, she was

13   concerned about the reputation of the County

14   Attorney's Office.

15             The Deputy County Attorney, he

16   testified today that there were political statements

17   often made inside the office.  However, after this

18   post, he made it a point to tell his employes that

19   they were no longer allowed to talk about politics

20   because this comments was over the top.

21             In regards to the post and Mr.

22   Johnston's FaceBook being private, well in this day

23   and age, that's not a thing.  If somebody has a

24   private profile, let's say hundreds of friends, at

25   some point it's going to reach somebody in the

1    public.  There's actually case law on that.  You

2    heard testimony today that multiple individuals saw

3    the post and/or heard about the post, even though

4    they're not friends with Mr. Johnston on FaceBook.

5              After Mr. Johnston was terminated,

6    there was an official report made to the County

7    Attorney Chief Deputy regarding a sexual harassment

8    allegation.  You did see Ms. Tinsdale in here

9    referring to the comments that Mr. Johnston made to

10   her.  I just find it appalling that Mr. Johnston

11   would deny that those comments ever took place.  And

12   he's alleging that the County Attorney is actually

13   plotting against him and they're forcing a

14   probationary employee to lie under oath.  And he's

15   alleging that my Chief Deputy is lying under oath,

16   indicating that the report was made to him rather

17   than he's forcing the employee to make these

18   allegations due to some sort of conspiracy against

19   Mr. Johnston.

20             However, you heard testimony from Mr.

21   Tinsdale, as well as Tanner Beckwith, who indicated

22   that after the allegations -- after Mr. Johnston

23   made those comments to Ms. Tinsdale, she immediately

24   told them.  And you heard them say that that

25   happened at the end of July or in August.  I didn't

1  happen after Mr. Johnston was terminated.  It

2  happened two months prior to.

3              You did see Exhibit Numbers 4 and 5,

4  where Mr. Johnston received training in regard to

5  sexual harassment.  And he also signed a document

6  indicating that he received training and that the

7  offenses of sexual harassment will be punishable by

8  disciplinary action and termination.  He was

9  well-aware of that.  So his defense here today, he

10  knows that there's no defense to sexual harassment

11  allegations, and so rather than admitting the

12  statements that he made to Ms. Tinsdale, he's again

13  alleging that there's some conspiracy against him

14  from the County Attorney's Office, which is just

15  insane.

16              With both charge one and charge two

17  against Mr. Johnston, his termination was not

18  arbitrary and capricious.  We're asking that this

19  Commission affirm Mr. Johnston's termination.  Thank

20  you.

21              MS. DAL MOLIN-EAST:  Mr. Black?

22              MR. BLACK:  Thank you.  First of all,

23  I appreciate the Commission hearing us today, giving

24  me grace many times as I've tried to advocate the

25  best that I can for my client in this situation.

1            What we've been presented with today

2    is an initial termination letter that said that my

3    client was terminated for a post, rot in hell,

4    Charlie Kirk.  No evidence has been admitted today,

5    no testimony was given today to show that a single

6    member of the public was made aware of this post or

7    complained about this post.  So the hypothetical

8    that a lone paralegal, on his personal FaceBook

9    page, who works in misdemeanors, may have a direct

10   tarnishing on the leader of the organization's

11   reputation.  There's has to be casual connection.

12   We have to show -- the law doesn't say it could, the

13   law says if there is a direct and -- it says, if the

14   agency's operations are impaired in a substantial

15   way, which is a high burden.  We've not shown that

16   they've been impaired.  The closest to that is we

17   heard testimony from a few folks who said they

18   didn't like this.  They thought it was bad, it was a

19   terrible thing to say.  And we could probably almost

20   all in the room agree, that's not a nice thing to

21   say. It wasn't nice.  But we have grace to be human

22   beings and to have emotions and to say things when

23   we are in our own private place, like FaceBook.

24   Even when we're in the workplace, if we're

25   government employees and we're talking about an

1    issue of government concern.  The burden that would

2    have to be shown here to make this not capricious,

3    would be that the First Amendment does not apply

4    because there was, in fact, already a substantial

5    impairment to the agency's operations. And we

6    haven't again heard that even a single member of the

7    public who's not a part of this organization, ever

8    even knew about this post.

9                    Mr. Beauchamp testified that he made

10   the decision to terminate solely on the Kirk

11   comment.  That was the reason and the basis when he

12   gave the first termination notice.  Well, the first

13   termination notice that he gave, he lists Rule 11 as

14   the basis for that termination.  And that is you in

15   the Exhibits that we've looked at today.  But Rule

16   11 says that there's a specific list of causes that

17   can lead to termination, and this was not one of

18   them.

19                   If we're going to say we're going to

20   include the second letter that was made 11 days

21   later, that does have now one of those listed items;

22   sexual harassment would be something that is

23   prohibited under Rule 11.  However, that should not

24   be considered, first off, because they didn't meet

25   their timeline.  Just like if we're out there

1    prosecuting criminals, we've got a timeline to do

2    it.  There's things called statutes of limitations

3    and if we don't do it in time, even though a bad

4    thing happened, we don't get to go and violate the

5    rules and still go after that person.  Same thing

6    here, the rules are very clear.  Rule 12 says once

7    the termination action happens, the agency has up to

8    10 days to amend.  That's it, up to 10 days.  They

9    amended on the 11th day.  That didn't follow the

10   rules.  And if we're talking about the rules and

11   whether or not someone's getting terminated for not

12   follow rules, then I think it's very relevant to say

13   that we have to make the employer follow the rules

14   too, and that would mean that we can't consider that

15   second letter.  We should only be looking at the

16   First Amendment.

17              You may disagree with me, and if you

18   do, then I would point out the fact that the

19   testimony that was given today was not testimony of

20   sexual harassment.  There was no testimony given of

21   quid pro quo, meaning that there was a sexual favor

22   asked for in exchange for any benefit at work.  And

23   there was also no demonstration of a continuous,

24   ongoing, hostile pattern of unwanted conduct.  There

25   was no indication that my client had ever been told

1   by this individual, yeah, I'm not interested in
2   having a dating conversation with you.  She didn't
3   say I spoke up to him and he didn't stop.  She
4   didn't say that she spoke up many in times.  In
5   fact, she didn't have a whole lot to say other than
6   these comments were made.  And again, coincidently,
7   11 days after the first charge.  That's not hostile,
8   that's not continuous.  Even taking those to be
9   true, which we don't because we have two witnesses,
10  one said that did not happen, one said it did.  So
11  taking it with the fact that there was no other
12  supporting documentation, no witnesses were provided
13  to corroborate that.  We have to look at it as
14  whether or not those actions constitute sexual
15  harassment, and under the law they just do not.
16              Are they inappropriate, potentially?
17  Is there progressive discipline to deal with
18  inappropriate things?  Absolutely.  That's the whole
19  point of progressive discipline, is that if someone
20  is making others uncomfortable, they're not
21  following policy, they're not doing something and
22  there's a chance that we can correct that, we give a
23  can chance to correct that.
24              That didn't happen here.  There was no
25  speaking to, there was no chance to correct.  In

1   fact, we didn't even know about these until the

2   16th, 11 days after we were terminated.  So it's our

3   position that the decision to terminate is

4   capricious.  It's capricious because we have a set

5   of rules to follow and if we choose not to follow

6   those rules, then we're being capricious, we're

7   throwing caution to the wind, we're saying I'm going

8   to not rely on what my predecessors before me have

9   established as valid policy and I'm going to make my

10  own decision.  And that is not something that the

11  Commission should agree with today.  The Commission

12  should not agree to allow the agency to just decide

13  that they don't have to employ people who say things

14  they don't like.  Because that's clear law already.

15  The Supreme Court, since the 1960's, had said you

16  can be KKK and talk about it.  We don't have to like

17  you, we can think you're a scumbag, but we can't

18  take away your job or your First Amendment speech if

19  you're a government employee, unless again, that has

20  caused ome harm in the workplace that's

21  demonstrable. Our position would be that that has

22  not happened and that my client should be returned

23  to his job with back pay. Thank you very much.

24              MS. DAL MOLIN-EAST:  Thank you.

25              After hearing closing arguments, t

1    this point the Commission will need to discuss and

2    come to a determination.  Again, with the focus on

3    whether or not the action taken against the

4    Appellant was arbitration and capricious.

5            We do have the right to go to

6    executive session for legal counsel.  So with that,

7    let's discuss.

8            MR. LAGUNAS:  So I would move that we

9    go into executive session.

10            MR. LEETHAM:  Do you want to go to

11    executive session, or she wants to discuss -- we can

12    do either.

13            MS. DAL MOLIN-EAST:  We can do

14    either.

15            MR. LEETHAM:  I second the motion for

16    executive session.

17            MS. DAL MOLIN-EAST:  A motion has

18    been made and seconded to go into executive session.

19    All in favor say aye.

20            ALL COMMISSIONERS:  Aye.

21            MS. DAL MOLIN-EAST:  Opposed?  All

22    right, we will go into executive session at this

23    time.

24        (All necessary parties left the room.)

25            MR. LAGUNAS:  Just looking at the

1  policy based off the evidence and how it pertains to

2  his termination based off the evidence we got --

3          MR. STATES:  So, there's different

4  ways you can view it.  Rule 11 is, I believe, the

5  only Rule that's mentioned on the County Attorney's

6  disciplinary orders that were provided to the

7  Appellant.  There's also been discussion of sexual

8  harassment allegations, and Appellant has also

9  discussed what is and is not sexual harassment.  So

10 while those were not mentioned in the County

11 Attorney's disciplinary orders, in a sense, the

12 Appellant has somewhat opened the door for if there

13 were any questions about whether or not something

14 rose to the level and established an P act of

15 prohibited sexual harassment, then the Commission

16 could consider looking to the County's sexual

17 harassment policies.

18          I know, not a super clear answer.  So

19 you could view it the strict way and say, we're just

20 going to look at the Rule that was listed on the

21 County Attorney's disciplinary orders, which would

22 be Merit Rule 11, or do we have any questions about

23 sexual harassment and do we want to look to the

24 County policy on that?

25          MR. LAGUNAS:  Being that this is my

1   first time doing this, how does this Commission

2   discuss in front of the parties, amongst ourselves

3   or to the interested parties?

4             MR. STATES:  So discussion would be

5   in front of the parties.  There's a few ways you can

6   do it.  If one Commissioner felt like, I think I

7   know where this is going, I want to see whose going

8   to vote the same way as me, that Commissioner can

9   make a motion, and then the Commission can entertain

10  discussion on that motion.  Or no discussion, right,

11  it's up to the Commission's pleasure.  But

12  discussion, deliberation, I believe would be in the

13  open meeting.

14            MS. DAL MOLIN-EAST:  So I do not have

15  the experience.

16            MR. LAGUNAS:  And the way we've done

17  it before, if we were to uphold the County's

18  decision, they can appeal to a higher entity?

19            MR. STATES:  Correct.  And I will

20  mention, so you're looking at the evidence before

21  you, preponderance of the evidence standard, is it

22  more likely than not true on any given matter?

23  You're also looking at whether or not the discipline

24  was arbitrary or capricious under the circumstances.

25  And then your options are to uphold the discipline

 1   as issued, modify the discipline to something else,

 2   or reverse the discipline.

 3            Modification or reversal of a

 4   termination would involve reinstatement and back

 5   pay, because any modification of termination would

 6   be to something less than termination.

 7            MS. DAL MOLIN-EAST:  And that gets to

 8   my question:  So if we feel that there should be a

 9   decision other than upholding the County's decision,

10   as the Commission, then we determine what the next

11   steps are, being reinstatement, and/or back pay,

12   and/or demotion, or is it just we reverse the

13   decision and then the County determines what that

14   looks like?  Do you know what I'm saying?

15            MR. STATES:  Yes, if you're going to

16   modify it or --

17            MR. LEETHAM:  So in our motion, if we

18   were planning to modify it, we could then state this

19   is what my motion is?

20            MR. STATES:  It would need to be

21   something --

22            MR. LEETHAM:  I move to modify this

23   based off of blah, blah, blah, and then whatever

24   that Commissioner thought at that time?

25            MR. STATES:  Correct.  I would not

1    recommend a generic modification.  I would recommend

2    something specific, if anyone were inclined to make

3    that motion.  I move to modify the discipline issued

4    from termination to --

5              MR. LEETHAM:  And during that

6    discussion, after that, that could die for a lack of

7    a second, and then another motion could clarify

8    during that discussion?

9              MR. STATES:  Yeah, any of those are

10   options.  There could be discussion on the motion on

11   the floor, and then if there was no second, it would

12   die on the floor.  If there were a second, then it

13   would go to a vote.  And then if it failed at the

14   vote, then we would be open to any new motions.

15             MS. DAL MOLIN-EAST:  Just to make

16   sure I am still clear on the First Amendment

17   portion.  Because really, on that one, based on the

18   new Arizona Supreme Court ruling that you shared,

19   we're not just looking at whether or not the

20   discipline of the FaceBook post was arbitrary and

21   capricious, now may have a responsibility, if you

22   will, to attempt to make sure that the

23   interpretation of the alleged action isn't in

24   violation of the First Amendment?  I just want to

25   get very clear.

1          MR. STATES:  If I can clarify?

2          MS. DAL MOLIN-EAST:  Please.

3          MR. STATES:  Your determination is

4    still going to be on that arbitrary and capricious

5    basis, but you could factor in whether or not this

6    person's Constitutional Rights, if they applied in

7    this situation, whether or not that made the

8    discipline less appropriate, or in other words,

9    undermines its basis, that would be like arbitrary

10   and capricious where it lacks a sufficient basis.

11          So I don't know that you have to

12   declare that this was unconstitutional, per se, but

13   if any Commissioner felt like the --

14          MR. LEETHAM:  -- I don't think that

15   should be part of the motion.

16          MR. STATES:  But if anyone felt like,

17   well, if someone says this, I thought we would have

18   the right to say this.  Maybe I wouldn't have

19   expected this as a result under the circumstances.

20   Then the allegation of his Constitutional Rights

21   possibly being involved could be a factor in whether

22   or not that undermines the basis for the discipline

23   that was issued.

24          MR. LEETHAM:  During our

25   deliberations, can we ask the interested parties

1   questions?

2                   MR. STATES:  You can.  Just be

3   prepared for argument to possibly ensue.  This is a

4   less formal type of hearing, unlike a court

5   proceeding.

6                   Angelo, in your time here have you

7   had Commissioners ask any clarifying questions?

8                   THE CLERK:  Yes, we have.

9                   MR. LEETHAM:  So can they modify it

10  or is it only reversing --

11                  MR. STATES:  Let me point out why I

12  mentioned the modification.  So the County's Merit

13  Rules say uphold or reverse.  The County's Merit

14  Rules as it relates to non-law enforcement

15  personnel, so we're not talking about peace officer

16  Bill of Rights, the County's Merit Rules rely on a

17  set of statutes in Title 11, which governs counties.

18                  ARS 11-356, is the statute that

19  provides for the merit appeal.  Dismissal,

20  suspension or reduction in rank of employee's

21  appeals hearings.  Subparagraph G, follow the

22  hearing, conclusions.  The Commission shall either

23  affirm, modify, or revoke the order.  And the order

24  being the disciplinary order.  So the question that

25  I had to consider when mentioning modification,

```
 1   while the County Merit Rules only mention affirming
 2   or revoking the order, the statute provides that the
 3   Commission is authorized to modify.  So could the
 4   County's Rules supercede the statute upon which
 5   they're based?  Typically the statute would govern.
 6   If the statute says, and it goes both way, if the
 7   statute says you do not have authority to consider
 8   constitutional questions, then even if our merit
 9   rules are silent on it or our merit rules said, we
10   love the constitutional questions, the statute said,
11   you can't, usually a state statute that authorizes
12   the Commission in the first place and gives Counties
13   the ability to have such a Commission would control.
14           MS. DAL MOLIN-EAST:  Anyone else need
15   legal advice?
16           MR. LEETHAM:  When they come back, I
17   guess if I can just make a statement, then I can
18   make a motion, I just need clarification of that
19   fact?  So anytime we can make a motion, at anytime
20   we can make a statement as to what we think, where
21   we're at and then talk amongst ourselves in front of
22   them?
23           MR. STATES:  Correct.  So you would
24   address the Chair and ask the Chair, may I direct a
25   question to the Appellant?  There's a matter I would
```

1    like some clarification or Respondent, etcetera, and

2    then whoever that question was directed to, the

3    other party may have something to say, to add to

4    that or to counter it, and then you can consider

5    that.

6               MR. LEETHAM:  I only have one

7    question I want to ask him.

8               MS. DAL MOLIN-EAST:  But we can have

9    discussion without it being under the umbrella of an

10   actual motion on the table; right?

11              MR. STATES:  Right.

12              MR. STATES:  So I think you could

13   discuss your view on it, whether there is a standing

14   motion or not.  I think -- it's pros and cons;

15   right?  If there is a motion on the floor, I can

16   kind of direct the discussion.

17              MR. LEETHAM:  That's fine.  I can

18   direct it that way.

19              MR. LAGUNAS:  It's hard to do it in

20   front of the parties, having a discussion and maybe

21   needing legal guidance.

22              MR. STATES:  My concern with not in

23   front of them would be under the open meeting law,

24   we can discuss the legal advice and your legal

25   questions, I can give you advice so that that's

1   privileged and that privilege is maintained outside

2   of this relationship.

3                    But the hearing itself is a public

4   meeting and you're a public body, so that's why I

5   think drawing the line there is probably

6   appropriate.

7                    MR. LEETHAM:  Okay.

8                    MR. LAGUNAS:  Motion to reconvene.

9                    MR. LEETHAM:  Second.

10                    MS. DAL MOLIN-EAST:  All in favor?

11                    ALL COMMISSIONERS:  Aye.

12                    MS. DAL MOLIN-EAST:  Opposed?

13                    Let's reconvene.

14          (All parties are present in the room.)

15                    MS. DAL MOLIN-EAST:  So we are back

16   in regular session.  With that, we've sought legal

17   advice in executive session and we are ready to

18   proceed with discussion in regular session and

19   motions and potentially a decision.

20                    MR. LEETHAM:  I have a question for

21   Mr. Johnston.

22                    MS. DAL MOLIN-EAST:  Go ahead.

23                    MR. LEETHAM:  When you were hired

24   with the County, you acknowledged what was expected

25   of you, correct, in regards to what HR had outlined?

1           MR. JOHNSTON:  I signed a bunch of

2    documents during orientation that were like conveyor

3    belt fed to us, without any sort of a discussion.

4    Extremely brief I would describe it.

5           MR. LEETHAM:  And if I could

6    followup.  How long have you worked for the County?

7    I didn't catch that?

8           MR. JOHNSTON:  It would be two years

9    in two months, July 31, of 2023.

10          MR. LEETHAM:  Thank you. That's all I

11    have.

12          MS. DAL MOLIN-EAST:  I do have one

13    point of clarification to make sure that I have it

14    straight in my mind.  Did we hear from one or more

15    of the witnesses that Ms. Tinsdale reported the

16    alleged comments in July or August to a few of the

17    witnesses at that time?

18          MS. SCIBELLI:  Correct.

19          MS. DAL MOLIN-EAST:  Is that correct?

20          MS. SCIBELLI:  Yes.  So, to clarify,

21    we had Mr. Tinsdale, Garrett Tinsdale, testify and

22    he indicated that it was July or August that she

23    told him about the comments.

24          And then Tanner Beckwith, he was

25    works at the County Attorney's Office as a

1 prosector, she also told him and he indicated he

2 knows that it was when they went back to the County

3 Attorney's Office, so it was around the beginning of

4 August when she told him about that.

5     MS. DAL MOLIN-EAST:  Thank you.

6     So then I now have a followup

7 question for Mr. Johnston.

8     Mr. Johnston, In August-ish were you

9 spoken to about these comments that were reported to

10 the prosecutor?

11     MR. JOHNSTON:  Absolutely not.

12     MS. SCIBELLI:  Just to clarify.  So

13 that was her friend, she did not report it at the

14 time to a supervisor.  She reported it to the Deputy

15 County Attorney once he was terminated.  She simply

16 told her friend and her husband about the statements

17 when they happened, but then told the supervisor

18 once he was already out of the office.

19     MS. DAL MOLIN-EAST:  The friend and

20 the husband, both of whom work in the same office?

21     MS. SCIBELLI:  Garrett does not work

22 there. Garrett works for the courts.  Her husband

23 works for the courts, he does not work in the County

24 Attorney's Office.

25     MS. DAL MOLIN-EAST:  Thank you.  I

1    just needed to clarify the timeline.  Thank you
2    both.
3              Would we like to have a discussion or
4    do we have a motion and then we can discuss?
5              MR. LEETHAM:  I'll make a statement
6    before I make my motion.  Mr. Collins stated that
7    he's allowed some behavior unbecoming of certain
8    County employees within that Department.  And I
9    believe that until the County Attorney was made
10   aware of that statement and what had happened,
11   that's when the Chief Deputy County Attorney decided
12   to ensure HR policy was upheld.  Nothwithstanding, I
13   believe every employee, regardless of their
14   supervisor allowing this behavior, knows what is
15   expected and what is the proper way to conduct one's
16   self.
17             And whether that was conveyor belt
18   fed or not, in two years you have the obligation to
19   understand what you signed.  If you didn't sign it,
20   I believe you have that option to tell HR, I don't
21   understand what I'm signing or not signing all
22   together.  That should be the standard, regardless
23   of what you might be able to get away with within
24   your department.
25             So with that, I would make a motion

1    to uphold this finding, as I believe it was not

2    arbitrary or capricious.

3                    MR. LAGUNAS:  I'll second it.

4                    MS. DAL MOLIN-EAST:  Okay.  Any

5    discussion at all on that?  I will tell you that I

6    am struggling a little bit in that, I think there's

7    no question that if those statements were made, the

8    alleged sexual harassment statement, they are

9    inappropriate and absolutely unacceptable in the

10   workplace.

11                   FaceBook comment, again, why?  Yes,

12   we all can do what we want privately, but why?  It's

13   not appropriate probably, either.

14                   The question though is not level of

15   appropriateness, the question becomes arbitrary and

16   capricious.  And I'm disappointed that I didn't hear

17   anything put forth from the County that establishes

18   consistency, that establishes that other employees

19   have been treated in a similar manner for similar

20   offenses.  Nobody spoke to the fact that other

21   employees have had sexual harassment allegations and

22   that they have been handled at any level, or that

23   they have not been.  But you can't be existence as

24   long as the County and not probably having some form

25   of other discipline that could have been brought

```
1   into evidence to help us know that it's not
2   arbitrary and capricious, that these is an
3   established and acceptable practice within the
4   County for how it operates within its rules.  And
5   none of that was brought forth for us today to know
6   that Mr. Johnston was treated consistently with
7   other employees.
8               MR. LEETHAM:  I guess within my
9   motion I have that part, that part that there is a
10  standard that everyone conducts themselves and that
11  is the standard, whether you signed it or not, you
12  have the obligation as an employee to understand
13  what you're signing.
14              And for that matter, it's based off
15  of what is the standard right now, not what the
16  previous standard was, but what it is now, what's
17  current.  And neither party did a great job of
18  explaining that, but all we have is what is in front
19  of us.
20              MS. DAL MOLIN-EAST:  Yes. I agree.
21              MR. LAGUNAS:  I feel the same way,
22  unprepared, we didn't really know what we were going
23  into.
24              MS. DAL MOLIN-EAST:  The comments on
25  the sexual harassment that are alleged are
```

1  unacceptable, but it wasn't necessarily established

2  either that it was unwanted.  I'm assuming it was

3  unwanted, because who would want that? But it wasn't

4  established that it was unwanted or addressed or

5  that he was told if he's doing this, yeah, that's

6  not a joke, I don't like it.  And I'm going to speak

7  frankly, I know it's on the record, we have a Deputy

8  County Attorney referring to somebody as a man

9  whore.  Might not be the best environment in that

10  office.

11          MR. LEETHAM:  I was just about to go

12  down that list.  We have a Deputy County Attorney

13  whose made a bet to try get the term hoo-ha into a

14  closing statement as if it's a joke, the courts are

15  a joke.  That sets a precedence for where we are.

16  And that's why I said, this behavior happened and it

17  probably continues.  I think it was the beginning of

18  the behavior, but what you've brought to us, the

19  behavior and the culture within the department.

20          I don't know why this sexual

21  misconduct alleged, anyways, was not brought up

22  during July or August during that time.  Whether or

23  not that was her supervisor, they work in the same

24  office and I believe everybody has a duty to report

25  what they hear, especially if it's in that nature,

1    to report it to HR and let them know there's a

2    problem, so it doesn't rise to this level.

3                    With that being said, would the Chair

4    feel about amending my motion?

5                    CHAIRPERSON EAST:  We have a second

6    on that motion, so I believe at this point we would

7    need a new motion if were going to amend, since it's

8    been seconded.

9                    MR. STATE:  Yes.

10                   CHAIRPERSON EAST?  If you wanted to

11   change your amended motion, we would have to vote

12   and then change it.

13                   I do want to make it clear that as

14   the Commission, none of us are trained legally, so I

15   don't believe that legally we can truly weigh in on

16   the question of constitutionality.  We're looking at

17   this policy specifically.  So I want to make that

18   very, very clear.  I haven't had a constitutional

19   law class, that's not my profession.  So I don't

20   want any of our comments to be misinterpreted as us

21   weighing one way or another on constitutionality,

22   when really we're trying to keep it to what the

23   policies are and in interpretation of why the action

24   was taken, and then the arbitrary and capricious

25   question.

```
 1                    So we do have more to discussion,
 2   should we take a vote --
 3                    COMMISSIONER LEETHAM:  No, I've made
 4   my motion.
 5                    COMMISSIONER LAGUNAS:  Yes,
 6   seconded.
 7                    CHAIRPERSON EAST:  So the motion
 8   has been made by Commissioner Leetham and seconded
 9   by Commissioner Lagunas, to uphold the decision to
10   terminate Mr. Johnston based upon the evidence.
11                    We had discussion so it's time to
12   vote.
13                    All in favor?
14                    Any opposed?
15                    Commissioner Leetham:  Aye.
16                    Commissioner Lagunas:  Aye.
17                    Chairperson East:  Aye.
18                    CHAIRPERSON EAST:  Motion does not
19   pass.
20                    I will put it in the record that
21   we can get back to that motion if our discussion
22   takes us back to that.
23                    Do we have -- I know,
24   Commissioner Leetham, you mentioned an amended
25   motion?
```

222

```
 1              COMMISSIONER LEETHAM:  It's my
 2   understanding that while we can go into amending
 3   what this matter was, what would that look like?
 4              MR. STATE:  Well, for the record,
 5   so just for the record, the merit rules provide that
 6   the personnel commission can uphold or revoke the
 7   disciplinary order.  However, ARS 11-356, which
 8   governs county merit commissions, also authorizes
 9   that a commission may uphold, modify or amend, or
10   revoke the discipline.
11              Now, that said, as far as if the
12   commissioner were considering amending the
13   discipline, or in other words, making a
14   recommendation to the appropriate authority to amend
15   the discipline, then the commission would look at
16   Merit System Rule 11, disciplinary actions, which
17   lists the different forms of discipline provided for
18   under to merit rules.  System Rule 11(b) discusses
19   types of disciplinary action, those include:  1.
20   Verbal warning; 2. Written reprimand; 3. Suspension;
21   4. Demotion; or 5. Dismissal.
22              MS. SCIBELLI:  Mr. States,
23   Chairperson East, it sounds like there was some
24   concern with charge two.  Do they have the ability
25   to just look at charge one, the initial termination?
```

1          MR. STATE:  So I don't want to

2    put words in your mouth, so you can clarify, I

3    believe both disciplinary orders are before the

4    commission because earlier in the hearing, I believe

5    we had a motion to exclude the second disciplinary

6    order and that motion was denied at the time.

7          So up until now, at least it's

8    my understanding, these Commissioners can confirm,

9    that both bases for the disciplinary are before the

10   commission.  There's the FaceBook post and the

11   evidence they received on that and the sexual

12   harassment and the evidence they received on that.

13          Does that answer your question?

14          MS. SCIBELLI:  Yes.  So, would

15   they have the ability to make the motion that the

16   first charge was not arbitrary and capricious?

17          COMMISSIONER LEETHAM:  While not

18   weighing on the second; is that what you're saying?

19          MS. SCIBELLI:  Correct.

20          COMMISSIONER LEETHAM: If I can

21   speak to that point?  Mr. Black made that motion

22   before and we said at that time that we would not

23   remove it, we would keep them together because we

24   don't know all the facts.  And the Commission had

25   that time had stated that it was too early in the

1  procedure, that we didn't don't know what we were

2  talking about.  Now here we are.

3              MR. BLACK: Is the government

4  agreeing to separate the two and say we're only

5  going to rely on the first?  Because I think we

6  would still be in agreement to that.  I mean, that's

7  ultimately our position is that the other is time

8  barred.  So if that's what you're asking, can they?

9              MS. SCIBELLI:  Yes.  Just base

10  your decision on charge one.

11              MR. STATE:  The FaceBook post?

12              MS. SCIBELLI:  Correct.

13              MR. BLACK:  So you're making a

14  motion to separate the two or just limiting the

15  scope to charge one?

16              MS. SCIBELLI:  Correct.

17              MR. STATE: So termination on the

18  basis of the FaceBook post and the evidence and

19  arguments received on that account; is that

20  accurate?

21              MS. SCRIBELLI:  Correct.

22              MR. STATE: And the parties are

23  stipulating to that modification?

24              MR. BLACK:  We are agreeable to

25  that, yes.

```
 1                    CHAIRPERSON EAST:  So, it sounds
 2   like both appellant and respondent agree to have the
 3   commission make a decision only on the original
 4   termination letter, which is the Face Book post;
 5   correct?
 6                    MS. SCIBELLI:  Correct.
 7                    MR. BLACK:  Correct.
 8                    CHAIRPERSON EAST:  So that
 9   motion is granted and we will no longer discuss the
10   sexual harassment, only the FaceBook post.
11                    Let me ask another question, sir,
12   what is your exact job title, Mr. Johnston?
13                    MR. JOHNSTON:  My job title is legal
14   secretary senior and it's underlined or underfilled,
15   as they call it.  So I was told specifically the
16   senior means nothing.
17                    CHAIRPERSON EAST:  So are you a
18   nonexempt employee?
19                    MR. JOHNSTON: Meaning eligible for
20   overtime?
21                    CHAIRPERSON EAST:  Yes?
22                    MR. JOHNSTON:  Okay. I am eligible
23   for overtime.  We are never allowed to ever work
24   overtime.
25                    CHAIRPERSON EAST: But you are
```

1    eligible for it?

2                    MR. JOHNSTON:  Apparently so.

3                    CHAIRPERSON EAST:  So by contracted

4    work agreement, you're paid hourly?

5                    MR. JOHNSTON:  Correct.

6                    COMMISSIONER LEETHAM:  And your hours

7    are normally 8:00 to 5:00, Monday through Friday?

8                    MR. JOHNSTON:  8:00 to 5:00 Monday

9    through Frieday, never been late, never been sick.

10                    CHAIRPERSON EAST:  Is there another

11    motion to be made, again only regarding whether or

12    not the termination for the FaceBook post was

13    arbitrary and capricious?

14                    We can make a motion and then have

15    some discussion on it.

16                    COMMISSIONER LEETHAM:  Based on just

17    that, I'll make a motion to uphold it as it stands.

18                    COMMISSIONER LAGUNAS:  I would second

19    that.

20                    CHAIRPERSON EAST:  Okay.  The motion

21    has been made to uphold, based on the decision as

22    being arbitrary and capricious.  So do we have any

23    discussion that we'd like to have on it?

24                    I don't know that there is

25    probably a lot of precedence set regarding social

1  media posts in the workplace, or outside of the

2  workplace that might impact the workplace specific

3  to Gila County. It is hard to determine, I guess the

4  relevance of that as outlined with people's ability

5  to function as individuals and constitutional

6  rights.

7              COMMISSIONER LEETHAM:  Partly for my

8  motion would be that when Mr. Johnston was on the

9  witness stand here, he stated as to the couch

10  comment, why would he say that, he works for the

11  County Attorney's Office?  So based on that, that

12  right there, why did he say that?  It goes to why

13  would he say what he did in his FaceBook post? He

14  knows he works at the County Attorney's Office.

15  This is what I see and that's where my motion comes

16  from.

17              COMMISSIONER LAGUNAS:  I have nothing

18  to add so let's move on.

19              CHAIRPERSON EAST:  Anymore

20  discussion?  No.  Okay.  Then we will -- I do just

21  reiterate again, any vote or motions made by this

22  commission do not speak directly to

23  constitutionality.  And, of course, our

24  constitutional rights are always important.

25              With that, a motion to uphold has

1    been made, now we will vote.  All in favor, say aye.

2                    COMMISSIONER LEETHAM:  Aye.

3                    COMMISSIONER LAGUNAS:  Aye.

4                    CHAIRPERSON EAST: Aye.

5                    CHAIRPERSON EAST: The motion is

6    passed, which means the termination is upheld by

7    this Commission.

8                    So with that, we'll take a motion to

9    adjourn.

10                   COMMISSIONER LEETHAM: So made.

11                   COMMISSIONER LAGUNAS:  Seconded.

12                   CHAIRPERSON EAST:  Motion made by

13   Commissioner Leetham and seconded by Commissioner

14   Lagunas, we will be adjourned on this matter at 4:28

15   p.m.

16                   (Meeting was adjourned.)

17

18

19

20

21

22

23

24                        *****

25

CERTIFICATION


        I, DENISE R. VAISHVILLE, do hereby

certify that the foregoing pages constitute a full,

accurate typewritten record of my stenographic notes

taken at said time and place, all done to the best

of my skill and ability.


        DATED this 1st day of December, 2025.


_____//S//_____

            DENISE R. VAISHVILLE
            Certified Court Reporter
            Arizona Certification #50310

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

**Complaint Exhibit # 10**

**Decision of Gila County Personnel Commission
dated December 16, 2025 (13 pages)**



### Gila County Personnel Commission
### Commission's Findings of Fact, Conclusions of Law, and Order
### Robert Johnston Merit Appeal

## INTRODUCTION

1. This matter came before the Gila County Personnel Commission (the "Commission" hereinafter) for hearing on the substance of the Merit Appeal of Appellant Robert Johnston ("Appellant" or "Johnston") before the Commission on October 21, 2025.

2. The matter was heard by a quorum of the Commission, comprised of Commissioner Chair Christa Dalmolin-East, Commissioner David Lagunas, and Commissioner Jesse Leetham.

3. Appellant was represented by attorney Josh Black.

4. Gila County Attorney Bradley D. Beauchamp ("Respondent") was represented by attorney Jessica Scibelli.

5. The proceedings were recorded by court reporter/transcription.

6. The hearing was conducted in accordance with, and adopting all relevant principles contained in, Gila County Merit System Rule ("GCMSR") 12 and A.R.S. §§ 11-351 *et seq*.

7. Headings and paragraph numbers are included herein only for purposes of convenience.

8. Gila County Merit System Rule ("GCMSR") 12.6(N) requires the Commission to make written findings of fact, conclusions of law and an order following the conclusion of the hearing.

## COMMENCEMENT OF APPEAL PROCEEDINGS

9. On or about September 15, 2025, Respondent summoned Appellant to Appellant's office to conduct a pre-disciplinary action meeting and delivered to Appellant a Notice of Dismissal and Notice of Right to Appeal.

This Notice informed Appellant of the basis for the proposed discipline as follows:

> This action is taken under the authority of the Gila County Merit System Rules, Policies and Procedure, Rule 11 for "cause."

> The specific reasons for your dismissal are:

> 1. On Wednesday, September 10, 2025 during your regularly scheduled work hours and while at work, you posted on your social media, Facebook page, "Rot in Hell Charlie Kirk."

> As the Gila County Attorney, it is my statutory duty to prosecute such heinous crimes with the support of my staff. Your posting of

> this comment is totally inappropriate and cannot be tolerated.
> Further, your actions constitute a serious violation of County and/or
> Departmental rules, policies and procedures, which provide for
> appropriate disciplinary measures.

(Hearing Exhibit ["HE"] 2; "HE 2" hereinafter).

10. On or about 9/22/2025, Appellant submitted his Letter of Appeal to the Gila County Human Resources Director.

This Letter stated Appellant's basis for appeal as follows:

a. Appellant has had no prior instances of discipline, for any reason, during his employment at GCAO.

b. Appellant's dismissal is arbitrary and capricious, asserting that the Notice of Discipline provided by Respondent did not sufficiently specify the policy provision that Appellant's conduct violated.

c. Other employees have engaged in prior instances of social media posting during work hours.

d. Notwithstanding Appellant's social media post, Appellant affirmed his commitment to faithfully perform his GCAO work duties.

e. Appellant's dismissal is politically motivated.

f. Appellant's dismissal violated his 1st Amendment rights.

(Appellant's 9/22/2025 Letter of Appeal).

11. On or about 9/26/2025, Respondent delivered to Appellant an Amended Notice of Disciplinary Dismissal, positing that subsequently revealed instances of on-the-job conduct occurring on various dates in August 2025 also provide a sufficient basis to dismiss Appellant's GCAO employment.

*However, during the course of the hearing, Appellant and Respondent stipulated to strike the amended notice of discipline and its purported bases for discipline from the scope of the hearing, and limit the hearing solely to Respondent's original Notice of Discipline and Appellant's original Letter of Appeal. Accordingly, Appellant's Amended Notice of Discipline and Appellant's second Letter of Appeal are only mentioned herein as they pertain to the resulting effects these had on the timing of the Hearing.[1]*

---

[1] NOTE—the parties' stipulation regarding the Amended Notice of Discipline and Appellant's responses thereto was made and granted toward the end of the hearing. Accordingly, this Findings of Fact mentions some of the instances when evidence was presented on those now-stricken matters during the hearing. Because those matters were ultimately stricken by the parties' stipulation, the substance of any evidence and arguments relating to the stricken matters are not discussed in this Findings of Fact, Conclusions of Law and Order document.

12. On or about 10/6/2025, Appellant submitted his Letter of Appeal (in response to Respondent's amended Notice of Discipline) to the Gila County Human Resources Director. (Appellant's 10/6/2025 Letter of Appeal).

*However, during the course of the hearing, Appellant and Respondent stipulated to strike the amended notice of discipline and its purported bases for discipline from the scope of the hearing, and limit the hearing solely to Respondent's original Notice of Discipline and Appellant's original Letter of Appeal. Accordingly, Appellant's Amended Notice of Discipline and Appellant's second Letter of Appeal are only mentioned herein as they pertain to the resulting effects these had on the timing of the Hearing.*

It may also be noted that Appellant's 10/6 Letter of Appeal included a 1-page attachment that stated "Draft Subpoena List" at the top, listed thirty-nine (39) names thereunder, and stated "The aforementioned will testify as to material facts relevant to this matter" at the bottom. (Appellant's 10/6/2025 Letter of Appeal).

13. On 10/9/2025, Gila County Human Resources ("GCHR") delivered the Appeal Hearing Notice to the parties and publicly posted the Hearing Notice pursuant to applicable law and GCMSR Rules. The Hearing Notice set the hearing date as 10/21/2025.

14. On or about 10/14/2025, Appellant submitted a written request to continue the hearing, via certified mail.

15. On or about 10/16/2025, Appellant called the Clerk of the Commission and verbally mentioned his mailed request for continuance.

16. On 10/16/2025, Appellant's attorney submitted an email requesting to continue the hearing, from a google email address.

17. On 10/20/2025, Appellant's written request for continuance was received via regular mail.

## PRE-HEARING MOTIONS & RULINGS

18. <u>Jurisdiction</u>. The Commission confirmed its jurisdiction to hear the appeal. GCMSR 12.5 and 12.6(A), (B)(3) & (H)(2).

19. <u>Appellant's Motion for Counsel to Appear Remotely</u>. Appellant withdrew this motion, as Appellant's counsel appeared in person for the hearing.

20. <u>Appellant's Draft Witness Subpoena List</u>.

Appellant argued that he needed additional time to confirm his witness list and request subpoenas.

Respondent argued that Appellant's request for continuance was untimely, Respondent properly and timely noticed Respondent's witnesses (each of whom bore significant travel and time burdens to appear at the scheduled hearing), and Appellant's draft witness subpoena list was untimely and did not comply with the merit rules' requirements.

GCMSR 12.6 requires that the parties "shall state the reason each witness is being called and the testimony being offered" ten days before the hearing.

Aside from the 10/6 Draft Witness Subpoena List, Appellant never submitted any confirmed witness list. And, aside from stating, "The aforementioned will testify as to material facts relevant to this matter" at the bottom of the Draft List, without any specific nexus to any particular witness, Appellant did not provide any other explanation as to why any of his *draft* witnesses were being called. (Appellant's 10/6/2025 Letter of Appeal).

Appellant's Draft List did not satisfy the requirements of Rule 12.6 and Appellant did not submit any further documents regarding Appellant's witnesses.

By contrast, Respondent's witness disclosure, was timely and, provided specific explanation of why each witness was being called and what testimony each was expected to provide. Notably, all eight of Respondent's witnesses were also included on Appellant's Draft List.

Therefore, Appellant's request to subpoena thirty-nine witnesses was denied.

21. Appellant's Motion to Continue.

Appellant argued that the 1st Amendment implications of his case and his need to subpoena witnesses warranted the Commission granting his request.[2]

Respondent argued that the request was untimely, Appellant had ample time to timely request a continuance, Respondent never received Appellant's 10/16 email, Respondent properly and timely noticed Respondent's witnesses (each of whom bore significant travel and time burdens to appear at the scheduled hearing), and Appellant's draft witness subpoena list was untimely and did not comply with the merit rules' requirements.[3]

GCMSR 12.6(G)(1) requires that requests for continuance must be in writing and must be served on the Clerk of the Commission at least 5 calendar days prior to the hearing date. GCMSR 2.9 provides that documents are to be served via personal service, via regular or certified mail, via first class mail, or via any other method designated by the GCHR Director. The Director has not previously authorized any alternative method(s) of service. GCMSR 2.9 further provides that service is complete upon personal service or five days after mailing.

Regarding Appellant's 10/14/2025 certified mail written request for continuance, per GCMSR 2.9 this was deemed served on 10/19/2025—only two calendar days before the hearing date. Therefore, this request was untimely.

---

[2] NOTE—due to the parties' stipulation to strike the Amended Discipline Notice and responses thereto from the hearing, any party arguments relating to the same are not mentioned or discussed in this Findings of Fact, Conclusions of Law, and Order.

[3] See Footnote 2 above.

Regarding Appellant's 10/16/2025 verbal mention of the mailed request for continuance, GCMSR Rule 12.6 requires that such requests must be written. Therefore, this was not an authorized means of submitting the request.

Regarding Appellant's 10/16/2025 email request for continuance, an IT setting in Gila County's email system (including GCHR, GCAO, and the Clerk of the Commission) automatically rejects emails sent from google email addresses. Furthermore, neither GCMSR 2.9 nor the GCHR Director have authorized service of a document via email. Therefore, this was not an authorized means of submitting the request, nor was it received by the Clerk of the Commission.

22. <u>Respondent's Motion for witnesses to appear and testify remotely</u>. Respondent withdrew this motion, as Respondent's witnesses appeared in person for the hearing.

23. <u>Private Hearing</u>. Appellant requested the hearing be open to the public. GCMSR 12.6(H)(1).

## CONDUCT OF HEARING

24. <u>Appellant's Motion to Exclude Witnesses</u>. Appellant moved to exclude witnesses from the hearing room when they are not testifying. Respondent did not object. Appellant's motion was granted. All witnesses—with the exception of the parties—were ordered out of the hearing room. GCMSR 12.6(J).

25. <u>Appellant's Motion to Sequester Witnesses</u>. Appellant moved to order the witnesses be sequestered prior to their testimony. Respondent objected. The parties offered their arguments in support of their respective positions—the necessity of hearing and evidence integrity; the burden sequestration may impose on the facility staff and witnesses. Appellant's motion was granted. All witnesses—with the exception of the parties—were ordered to separately await their time to testify and admonished to avoid discussing the matter with any other witnesses until the hearing concluded.

### Opening Statements

26. <u>Respondent's Opening Statement</u>. Respondent provided an opening statement regarding: Appellant's Facebook post; the relation this post bore, both in timing and substance, to the public murder of Charlie Kirk; and Respondent's concerns regarding the post's reflection on Respondent's office and role to prosecute all murders within the county regardless of a victim's views, opinions, statements or affiliations.

27. <u>Appellant's Opening Statement</u>. Appellant provided an opening statement regarding: Appellant's Facebook post; Appellant was on a work-day break when he made the post; the post was not sufficiently heinous to justify his dismissal; commonplace media that are available to minors frequently include the phrase 'rot in hell' and similar phrases; Appellant's post did not compromise the mission or operations of GCAO; and Appellant's

post regarded a matter of public concern and therefore warranted 1st Amendment protection.

### Respondent's Case

28. Respondent called the following witnesses, who provided the following testimony and evidence:

    a. Respondent Bradley D. Beauchamp—

        i. Respondent moved to present Exhibit 7, a video exhibit. Appellant objected on the basis of foundation. The objection was granted.

        ii. Respondent presented Exhibit 1, a copy of Appellant's Facebook post, and moved for its admission. Appellant did not object. Hearing Exhibit 1 was admitted into evidence.

        iii. Beauchamp testified that Appellant's post appeared to condone murder.

        iv. Beauchamp testified that Appellant is typically the first person people see when they come to Beauchamp's office.

        v. Beauchamp testified that GCAO is responsible to prosecute all homicides in the County.

        vi. Beauchamp testified of his concerns that Appellant's post would undermine office morale and the public's confidence in GCAO's ability to prosecute all homicides without bias.

        vii. Beauchamp testified that he does not friend-request on Facebook anyone with whom he works (including Appellant).

        viii. Beauchamp testified that he was notified of Appellant's 2pm post later that same day.

        ix. Beauchamp testified that he learned of the post from someone who had received it even though that recipient, while a Facebook user, was not 'Facebook friends' with Appellant.

        x. Beauchamp testified that Appellant's post negatively impacted office morale in the days following the post.

        xi. Exhibits 4 and 5 were admitted on Appellant's motion, without objection.

        xii. Beauchamp testified that his decision to terminate Appellant for the post was based on the aforementioned nexus of the post to a public murder that occurred earlier that same day, the post's appearance of condoning the murder based on the victim's statements and viewpoints, GCAO's responsibility to prosecute all unlawful homicides without bias, Beauchamp's concerns that Appellant's post would significantly undermine

the public's trust in GCAO to fulfill this responsibility, and the significant negative impacts Appellant's post was having on GCAO's personnel, morale and operations.

xiii. Beauchamp testified that his decision to terminate Appellant was not based on anyone's political affiliations or views.

xiv. Beauchamp testified that any visible and public condoning of murder due to a victim's statements and views, regardless of what those statements and views are, by any GCAO employee—including an employee in a very publicly visible role—would pose the same threat and concern of undermining the public's trust in GCAO and negatively impacting GCAO personnel and operations.

xv. Beauchamp testified that there are limits to our Constitutional rights, such as limits on where and when one can bear firearms under the 2nd Amendment as well as limits on when speech is protected under the 1st Amendment.

xvi. Beauchamp testified that because of GCAO's role and responsibility to fairly and lawfully prosecute all homicides in the county, Appellant's post's appearance of condoning Charlie Kirk's murder, Appellant's role in GCAO, the fact that Appellant's post occurred very soon after the murder occurred, and the fact that Appellant's post occurred during work hours and in the workplace—Beauchamp weighed these factors in the days after Appellant's post and ultimately concluded that he had to dismiss Appellant's employment in order to maintain the public's trust and maintain GCAO operations.

b. GCAO Chief Deputy Joseph Collins—

i. Collins discussed Exhibit 1, Appellant's post.

ii. Collins testified that Appellant's post occurred during work hours, while Appellant was at work, and based on Collin's recollection of that day—at a time Collins believes Appellant was Appellant's desk.

iii. Collins testified that multiple GCAO employees complained to him regarding Appellant's post.

iv. Collins testified that, in the past, some GCAO employees, including Appellant generally engaged in lively political discussions and debates.

v. Collins testified that after Appellant's post and the resulting employee complaints, Collins held a meeting that Thursday and told all employees that political debates would no longer be allowed at work.

      vi.   Collins testified that he was not concerned with any employee's specific political viewpoints but rather wanted to avoid disharmony in the office going forward.

  c.  GCAO employee Lisa King—

      i.   King testified that GCAO employees are held to a high standard and that Appellant's post reflected poorly on GCAO.

      ii.  King testified that she took the screenshot of Appellant's post, Exhibit 1.

      iii.  King testified that Appellant's post reflected poor judgment and was offensive.

      iv.  King testified that she blocked Appellant on Facebook thereafter.

      v.  King testified that she was concerned the public would see Appellant's post and wrongly believe it reflected upon GCAO.

  d.  GCAO Investigator Todd Baty—

      i.   Baty testified that Ray Hernandez told him of Appellant's post and showed it to him.

      ii.  Baty testified that he was 'taken aback' by the post.

      iii.  Baty testified that Appellant's post resulted in a 'fall out' involving many people being offended by it.

      iv.  Baty testified that political assassinations are a sensitive matter right now, in light of other recent assassination attempts.

  e.  GCAO Investigator Ray Hernandez—

      i.   Hernandez testified that Appellant's post lacked taste and upset him.

      ii.  Hernandez testified that he asked Baty if he had seen the post.

      iii.  Hernandez testified that he took a screenshot of the post.

      iv.  Hernandez testified that GCAO prosecutes homicides and cannot be seen as condoning it.

      v.  Hernandez testified that Appellant later quoted Che Guevarra and voiced his support of the 'traitors' Guevarra killed.

///

///

    f.  GCAO employee Corey Tinsdale—

        i.  Corey testified regarding the charges in Respondent's 9/26/2025 Amended Notice of Disciplinary Dismissal.[4]

    g.  Garret Tinsdale—

        i.  Garret is Corey's husband and is not a County or GCAO employee.

        ii.  Garret testified regarding the charges in Respondent's 9/26/2025 Amended Notice of Disciplinary Dismissal.

    h.  Deputy County Attorney Tanner Beckwith—

        i.  Beckwith discussed Appellant's social media post.

        ii.  Beckwith testified that the post 'made its way around the office.'

        iii.  Beckwith testified that multiple GCAO employees were upset by the post.

        iv.  Beckwith testified that Appellant said he was "the face" of GCAO.

### Appellant's Case

29. Appellant called the following witnesses, who provided the following testimony and evidence:

    a.  Appellant Robert Johnston—

        i.  Appellant testified that he only meant "Rot in Hell" as the opposite of 'rest in peace.'

        ii.  Appellant testified that he disagreed with Charlie Kirk's position on gun control.

        iii.  Appellant testified that he was not advocating for violence.

        iv.  Appellant testified that his Facebook account is set to 'private' meaning that only his Facebook friends can see his posts.

        v.  Appellant testified that all people had to do was 'unfollow' him on Facebook.

        vi.  Appellant testified that he believes his post and similar posts are appropriate and protected by the 1st Amendment.

---

[4] The parties' stipulation to strike the Amended Notice of Discipline and Appellant's responses thereto was made and granted toward the end of the hearing. Accordingly, this Findings of Fact mentions some of the instances when evidence was presented on those now-stricken matters during the hearing. Because those matters were ultimately stricken by the parties' stipulation, the substance of any evidence and arguments relating to the stricken matters are not discussed in this Findings of Fact, Conclusions of Law, and Order.

vii.    Appellant testified that he believed that he made the post during a restroom break, which would be his personal time rather than work time.

viii.    Appellant testified that he lacks any prosecutorial authority and therefore cannot affect whether and how cases are prosecuted by GCAO.

ix.    Appellant testified that he believes his termination violated his 1st Amendment rights.

### Closing Arguments

30. <u>Respondent's Closing Argument</u>. Respondent discussed Exhibit 1, positing that Appellant's 2:00 p.m. Facebook post occurred almost immediately after Charlie Kirk was publicly murdered, and during Appellant's work hours. Respondent discussed the witnesses' testimony regarding the impact Appellant's post had on GCAO's official responsibility to fairly prosecute all homicides in the county, regardless of the victim's identity or viewpoints. Respondent discussed the impact Appellant's post had on the public's trust in GCAO to fairly and properly prosecute all murders without any bias(es) toward victims. Respondent discussed the post's negative impact on multiple GCAO employees and GCAO operations. Appellant's post resulted in an office-wide prohibition on discussing politics at work. Respondent stated that Appellant was terminated due to these significant material concerns and the impact Appellant's post had. Respondent discussed the evidence demonstrating that Appellant's 'private' post was not private in reality.

31. <u>Appellant's Closing Argument</u>. Appellant stated that no evidence was offered that any member of the public saw Appellant's Facebook post. Appellant stated that GCMSR did not specifically prohibit Appellant's conduct and did not justify Appellant's dismissal.

### STANDARD OF REVIEW

32. "If, after the hearing, a majority of the Commission determines that the appealed action was arbitrary or capricious, the action shall be reversed. Otherwise, the action shall be affirmed." GCMSR 12.6(P).

33. "Following the hearing, … the commission shall either affirm, modify or revoke the order." A.R.S. § 11-356.

### FINDINGS OF FACT

34. On September 10, 2025, at around 2:00 p.m. Arizona Time Appellant posted "Rot in Hell Charlie Kirk" on/via his Facebook account. (HE 1).[5]

---

[5] Kirk appears to have been reported shot at around 12:20 p.m. Mountain Time. At around 2:40 p.m. Mountain Time, Kirk was publicly reported to be dead. From March 9 through November 2, 2025, Arizona time was one-hour behind Mountain Time due to the effects of daylight savings time. Accordingly, it appears that 2:40 p.m. Mountain time would correspond to 1:40 p.m. Arizona Time.

35. Multiple GCAO employees, including some who are not Appellant's Facebook friends and/or who do not personally use Facebook, saw and otherwise learned of Appellant's post on September 10 and in the days that followed.

36. Multiple GCAO employees discussed the post with each other and complained about the post to GCAO's Chief Deputy Joseph Collins as well as to Gila County Attorney Bradley Beauchamp.

37. Beauchamp believed that the post appeared to condone murder based on the victim's political viewpoints and statements and became concerned that this post and perception would reflect on GCAO in the public's eyes and thereby undermine the public's trust in GCAO's official duty to prosecute homicides without bias and without regard to a victim's views, statements, or affiliations.

38. Several other GCAO employees shared the perception that Appellant's post appeared to condone the murder of someone based on their statements and views and shared the concern that this would reflect poorly on GCAO and undermine public trust.

39. Multiple GCAO employees reported being offended or otherwise bothered by the post.

40. Appellant's post resulted in immediate meetings and changes to office practices due to concerns of disharmony within the office and the effects it would have on GCAO operations.

41. Appellant's Facebook account was reportedly set to 'private' which Appellant believed would limit his post to only being seen by his existing Facebook friends and that all his friends had to do if they were upset by his post was 'unfollow' him.

42. Notwithstanding Appellant's Facebook account setting and his belief as to the setting's effect on post-exposures, his post apparently reached multiple witnesses within a short timeframe, including some who either were not his Facebook friends or did not use Facebook at all.

## CONCLUSIONS OF LAW

43. GCMSR 13 authorizes the Personnel Commission to hear appeals of classified employee disciplinary dismissal, demotion, reduction in pay, or suspension on any grounds.

44. GCMSR 11.1(A)(1) provides a non-exhaustive list of causes for employee discipline which includes any conduct or performance which constitutes cause of disciplinary action.

45. GCMSR 11.1(B)(5) provides that the Appointing Authority may dismiss any employee with regular status for cause after serving the employee with a written notice of the specific reasons for dismissal in sufficient detail to inform the employee of the underlying facts. The dismissal is effective upon the employee being personally served with this Notice.

Respondent's 9/15/2025 meeting with Appellant, personal service upon Appellant of Respondent's written Notice of Discipline, and the factual basis stated in the Notice satisfy the requirements of GCMSR 11.1(B)(5).

46. The timing and substance of Appellant's Letter of Appeal satisfied the requirements of GCMSR 12.6.

47. GCMSR 12.6(P) provides that the Commission shall affirm the appointing authority's disciplinary action unless the action was arbitrary or capricious.

48. The evidence introduced in this matter demonstrated that Respondent's decision to dismiss Appellant for Appellant's social media post "Rot in Hell Charlie Kirk" was based on the following:

   a. Appellant's post occurred minutes after Kirk was publicly reported as dead following him being shot at a college campus during a public speech.

   b. Appellant's post occurred during Appellant's work hours and while Appellant was in the office.

   c. The public perception that Kirk was killed due to his political views, beliefs, statements, and/or affiliation(s).

   d. Respondent's perception that Appellant's post condoned killing someone based on their views, beliefs, statements, and/or affiliation(s).

   e. The public legal role that Respondent and his office fill in deciding whether and how to prosecute homicides throughout Gila County.

   f. Respondent's concern that members of the public would likewise perceive Appellant's post as condoning killing someone based on their views, beliefs, statements, and/or affiliation(s).

   g. Respondent's concern that this would damage the public's trust in Respondent and his office's ability to fairly and impartially decide whether and how to prosecute homicides regardless of a victim's views, beliefs, statements, and/or affiliation(s).

   h. Appellant's public role in Respondent's office as being the first person many see upon entering Respondent's office.

   i. Testimony from multiple witnesses attesting to similarly perceiving Appellant's post as condoning killing someone based on their views, beliefs, statements, and/or affiliation(s).

   j. Respondent's concern that Appellant's post would similarly cause disharmony among staff and disrupt the operations of his office.

   k. Testimony from multiple witnesses attesting to staff disharmony and disruptions occurring almost immediately after, and in the days following, Appellant's post—

including staff complaints, colleagues being bothered and offended by Appellant's post, an office meeting, and an immediate change to office standards regarding political debate to avoid further disharmony and staff complaints.

l.   Appellant ultimately decided to dismiss Appellant five days after the post was made.

49. Accordingly, Respondent's reason for dismissing Appellant did not appear to have been decided at random or on a whim, to be founded in prejudice, or to lack a reasonable basis.

50. With regard to Appellant's assertions that his dismissal violated his rights under the 1st Amendment to the United States Constitution, the evidence presented in this hearing did not support Appellant's claim, particularly in light of the close direct nexus between the central mission of Respondent's office—the fair and impartial prosecution of all criminal matters without regard to a crime victim's personal views, opinions, or affiliations and Appellant's post about a public homicide victim, Appellant's role in the office and exposure to members of the public, Respondent's concerns regarding inferences the public would make based on Appellant's post, the fact that almost immediately multiple parties complained regarding Appellant's post and their perception that it condoned murder and reflected poorly on the office, the immediate disruption it caused in Appellant's office, and the immediate and widespread knowledge of Appellant's post.

## ORDERS

51. Therefore, the Commission issues the following order:

a.   **ORDERED**: upholding the decision to dismiss Appellant

Dated: 12-16-85

Christa Dalmolin East

Dr. Christa Dalmolin-East
Chair
Gila County Personnel Commission

Robert D. Johnson, Jr. v. Gila County and Bradley D. Beauchamp

**Complaint Exhibit # 11**

**Social media posting by President Trump
on December 31, 2025**



**Donald J. Trump** ✔️ 🔲
@realDonaldTrump

God Bless Tina Peters, who is now, for two years out of nine, sitting in a Colorado Maximum Security Prison, at the age of 73, and sick, for the "crime" of trying to stop the massive voter fraud that goes on in her State (where people are leaving in record numbers!). Hard to wish her a Happy New Year, but to the Scumbag Governor, and the disgusting "Republican" (RINO!) DA, who did this to her (nothing happens to the Dems and their phony Mail In Ballot System that makes it impossible for a Republican to win an otherwise very winnable State!), I wish them only the worst. May they rot in Hell. FREE TINA PETERS!

**7.51k** ReTruths  **24.8k** Likes                    Dec 31, 2025, 10:27 AM

