**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Robert B Johnston, Jr.,<br>Plaintiff,<br>v.<br>County of Gila, et al.,<br>Defendants. | No. CV-26-00491-PHX-DWL<br><br>**ORDER** |

Robert B. Johnston, Jr. ("Plaintiff") alleges that he was terminated from his position as a legal secretary with the Gila County Attorney's Office for posting a private Facebook message stating "Rot in Hell Charlie Kirk" on the day of Kirk's murder; that after he appealed his termination to the Gila County Personnel Commission ("GCPC") on First Amendment grounds, he received an amended termination notice that, in addition to being untimely, added a false accusation of sexual harassment; and that although the sexual harassment allegation was later abandoned, the GCPC upheld his termination based on the Facebook post without addressing his First Amendment arguments.

Under Arizona law, the sole way to seek judicial review of a decision by an administrative body like the GCPC is to file an action in a state court. A.R.S. § 12-905(A) ("Jurisdiction to review final administrative decisions is vested in the superior court."). "An action to review a final administrative decision shall be commenced by filing a notice of appeal within thirty-five days from the date when a copy of the decision sought to be reviewed is served upon the party affected." *Id.* § 12-904(A). "Unless review is sought of

an administrative decision within the time and in the manner provided in this article, the parties to the proceeding before the administrative agency shall be barred from obtaining judicial review of the decision." *Id.* § 12-902(B). Nevertheless, Plaintiff did not seek review of the GCPC's decision in state court within 35 days of service—instead, on the 35th day after receipt of the decision, he filed this action in federal court, in which he asserts a variety of claims under 42 U.S.C. § 1983 against Gila County and Gila County Attorney Bradley D. Beauchamp ("Beauchamp") (together, "Defendants") and also asserts state-law claims for wrongful termination and for judicial review of the GCPC's decision. (Doc. 1.) Defendants have, in turn, moved to dismiss the complaint and/or to stay or abstain. (Doc. 6.) Additionally, Defendants have moved to seal one of the exhibits to Plaintiff's complaint. (Doc. 7.) For the reasons that follow, Defendants' motion to dismiss is granted in part and denied in part, as is Defendants' motion to seal.

## BACKGROUND

I. <u>Factual Background</u>

The following allegations, presumed true, are derived from the complaint. (Doc. 1.)

A. **The Parties**

Plaintiff was "employed by the Gila County Attorney's office" as a Legal Secretary Senior "from July 31, 2023, until September 15, 2025, when he was terminated effective immediately by Mr. Beauchamp." (*Id.* ¶¶ 13, 14.) Plaintiff was classified as a "regular employee" under the Gila County Merit System ("GCMS") with "regular" status and "a 'property right' to his job." (*Id.* ¶ 15.) Plaintiff "was an exemplary employee who performed his work well, and was never disciplined" or "given any negative performance evaluations or ratings." (*Id.* ¶ 16.)

Beauchamp is the "elected County Attorney for Gila County." (*Id.* ¶ 3.) Beauchamp can "make decisions as to the discipline or termination of persons employed by the County Attorney's office." (*Id.* ¶ 4.)

Gila County "is a body politic" operating "pursuant to Arizona Constitution Art. XII and A.R.S. Title 11," and is also "an employer." (*Id.* ¶ 2.)

B. **Plaintiff's Facebook Post**

"On September 10, 2025, Charlie Kirk, the controversial nationally-known leader of Turning Point USA . . . was assassinated by a sniper while he was speaking at a large policial rally at the Utah Valley University." (*Id.* ¶ 17.)

"Minutes after learning of the Kirk shooting, while at the Gila County branch office" where he worked, Plaintiff "took a short bathroom break after lunch," which "he did almost daily." (*Id.* ¶ 18.) The bathroom was in a Gila County building but "outside of the County Attorney satellite office which was passkey restricted to Gila County employee use." (*Id.*) "[W]hile shocked by the assassination," Plaintiff "used his personal cellphone" to "access[] his Facebook account" and make "a posting which was limited to viewing by his 'friends only.'" (*Id.*) The post said "Rot in Hell Charlie Kirk." (*Id.*)

Nothing in the post "indicated [Plaintiff] was employed by, or had any connection[] to[,] the Gila County Attorney's Office (or any law enforcement agency)." (*Id.* ¶ 19.) Plaintiff also alleges there is "no evidence that the post was known to the general public in Gila County or that it impaired or was likely to impair the efficiency or operations of the Gila County Attorney's office." (*Id.* ¶ 22.)

C. **Plaintiff's Termination**

On September 15, 2025, Beauchamp "handed [Plaintiff] a brief letter telling him that he was terminated effective immediately based solely upon his 'friends only' Facebook post about Charlie Kirk." (*Id.* ¶ 23.) The letter stated that Plaintiff was "terminated for 'cause' for violation of [GCMS] Rule 11." (*Id.* ¶ 24.) That rule "provides 27 specific grounds for employee discipline, but Mr. Beauchamp failed to ever specify or provide any notice as to which of those 27 reasons was the basis for termination." (*Id.* ¶ 25.) This "made it very difficult for [Plaintiff] to know exactly how his post violated a County rule, what the burdens of proof would be for an appeal, and what evidence he might need to successfully reverse Mr. Beauchamp's decision." (*Id.*)

On September 22, 2025, Plaintiff gave Defendants a letter of appeal "protesting the termination, requesting an appeal hearing by the [GCPC] pursuant to GCMS Rule 12, and

stating that [under *Rankin v. McPherson,* 483 U.S. 378 (1987)] the termination was retaliation/punishment for his having exercised his First Amendment right of free speech with his Facebook post for 'friends only.'" (*Id.* ¶ 27.)

D. **The Amended Termination Notice**

Beauchamp "did not respond to [Plaintiff's] 'letter of appeal' directly," but "apparently realizing that [Plaintiff's] Facebook post [regarding] Charlie Kirk's death was constitutionally protected, he issued an 'amended notice of termination' on September 26, 2025." (*Id.* ¶ 28.) This was "eleven days after" Plaintiff was initially fired and one day "after the deadline for amendments" provided for in GCMS Rule 12.5(A)(1). (*Id.*, emphasis omitted.) In the amended termination notice, Beauchamp "added a second 'charge' of sexual harassment of an unnamed female co-worker based upon three comments he was alleged to have made to her." (*Id.*)

Gila County Human Resource Administrative Procedures HRS-001 §§ E and F "require reporting and then investigation and follow up by the Gila County Human Resource Director" for reports of sexual harassment made by a Gila County employee. (*Id.* ¶ 33.) "[T]here never was any such report filed regarding the sexual harassment charge that Mr. Beauchamp added" to the amended termination notice. (*Id.*) The "conduct alleged to be sexual harassment had been known to the County Attorney for at least a month before the charge was added and nothing had been said or done about it until *after* Plaintiff appealed his termination and pointed out that it was unconstitutional" as written. (*Id.* ¶ 29.)

According to Plaintiff, the sexual harassment charge "(1) failed to allege facts constituting sexual harassment, (2) failed to allege the identity of the person alleged to have been harassed, [and] (3) forced [Plaintiff] to divert attention and resources to defending against" that charge. (*Id.* ¶ 30.)

"On October 1, 2025, [Plaintiff] appealed to the GCPC a second time, in response to the amended notice of termination." (*Id.* ¶ 36, emphasis omitted.)

E. **The GCPC Hearing**

On October 21, 2025, the GCPC "heard [Plaintiff's] appeal from the amended notice

of termination, taking testimony of witnesses." (*Id.* ¶ 37.)

Under GCMS Rule 11, Gila County is required to use "'progressive discipline' regarding employee misconduct." (*Id.* ¶ 26.) Beauchamp testified at the GCPC hearing that "the sole reason for his decision to fire [Plaintiff] was his Facebook post," which he viewed "as 'celebrating the murder of a man in front of his wife and children' (who were in fact in Arizona when Mr. Kirk was killed while speaking in Utah)." (*Id.*) Beauchamp further testified "that employing someone who 'celebrated murder' might harm the image or reputation of his office" and that "he never considered any lesser discipline" than immediate termination. (*Id.*)

Also at the GCPC hearing, "the testimony presented in support" of the sexual harassment charge "fell so short of proving sexual harassment that [Gila County] abandoned the charge at the conclusion of the" hearing. (*Id.* ¶ 30.)

F. **The GCPC Decision**

On December 16, 2025, the GCPC issued a 13-page decision upholding Plaintiff's termination. (Doc. 1-1 at 271-83.)

In the Findings of Fact portion of the decision, the GCPC panel concluded, *inter alia*, that "[m]ultiple GCAO employees, including some who are not [Plaintiff's] Facebook friends and/or who do not personally use Facebook, saw and otherwise learned of [Plaintiff's] post on September 10 and in the days that followed." (*Id.* at 281.)

In the Conclusions of Law portion of the decision, the GCPC panel concluded that the decision to terminate Plaintiff was not "decided at random or on a whim, . . . founded in prejudice, or . . . lack[ing] a reasonable basis," and thus not arbitrary or capricious, because (1) Plaintiff worked in an office responsible for prosecuting homicides and was "the first person many see upon entering [that] office," yet Plaintiff's Facebook post could be viewed as "condon[ing] killing someone based on their views, beliefs, statements, and/or affiliations" and thus Plaintiff's post could "damage the public's trust in [Beauchamp] and his office's ability to fairly and impartially decide whether and how to prosecute homicides regardless of a victim's views, beliefs, statements, and/or

affiliation(s); and (2) Plaintiff's post had caused "staff disharmony and disruptions occurring almost immediately after, and in the days following, [the] post." (*Id.* at 282-83.) The GCPC panel also rejected Plaintiff's First Amendment argument, reasoning as follows:

> With regard to [Plaintiff's] assertions that his dismissal violated his rights under the 1st Amendment to the United States Constitution, the evidence presented in this hearing did not support [Plaintiff's] claim, particularly in light of the close direct nexus between the central mission of [Beauchamp's] office—the fair and impartial prosecution of all criminal matters without regard to a crime victim's personal views, opinions, or affiliations and [Plaintiff's] post about a public homicide victim, [Plaintiff's] role in the office and exposure to members of the public, [Beauchamp's] concerns regarding inferences the public would make based on [Plaintiff's] post, the fact that almost immediately multiple parties complained regarding [Plaintiff's] post and their perception that it condoned murder and reflected poorly on the office, the immediate disruption it caused in [Plaintiff's] office, and the immediate and widespread knowledge of [Plaintiff's] post.

(*Id.* at 283.)[1]

On December 19, 2025, Plaintiff received the GCPC's decision via postal mail. (Doc. 1 ¶ 41.)

II. <u>Procedural History</u>

On January 23, 2026—35 days after his receipt of the GCPC's decision—Plaintiff initiated this action. (Doc. 1.)

The complaint asserts five causes of action. In Count One, Plaintiff asserts a First Amendment retaliation claim under § 1983 against Defendants for terminating his employment based on his Facebook post. (*Id.* at 11.) In Count Two, Plaintiff asserts a

---

[1] The complaint alleges that the GCPC panel "expressly declined to hear evidence as to whether the termination violated any of [Plaintiff's] constitutional rights or to make any decision on that subject and limited its decision to a single issue, to-wit: whether the termination of [Plaintiff] was 'arbitrary or capricious.'" (Doc. 1 ¶ 37.) As discussed above, this allegation is demonstrably incorrect—the GCPC panel's decision, which Plaintiff attached as an exhibit to the complaint, shows that the panel considered and rejected Plaintiff's First Amendment argument. Under these circumstances, the Court is not required to accept Plaintiff's allegation that the panel refused to decide the First Amendment issue. *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014) ("Although [courts] normally treat all of a plaintiff's factual allegations in a complaint as true, [courts] need not . . . accept as true allegations that contradict matters properly subject to judicial notice or by exhibit.") (quotation omitted).

First Amendment retaliation claim under § 1983 against Defendants for adding a "groundless" sexual harassment charge after he appealed the original termination notice on constitutional grounds. (*Id.*) In Count Three, Plaintiff asserts a Fourteenth Amendment procedural due process claim under § 1983 against Defendants based on their (1) "[f]ailure to provide pretermination notice and opportunity to respond," (2) failure to give notice of "what specific law or rule [Plaintiff] allegedly violated," and (3) "amending the termination notice after the deadline for amending had passed" by adding the sexual harassment charge "after receiving [Plaintiff's] appeal." (*Id.* at 11-12, emphasis added.) As relief for each of his § 1983 claims, Plaintiff seeks compensatory damages, punitive damages against Beauchamp, unspecified injunctive relief, attorneys' fees, and costs. (*Id.*)

In Count Four, Plaintiff asserts a state-law claim for wrongful termination. (*Id.* at 12.) As relief, Plaintiff seeks compensatory damages and taxable costs. (*Id.*)

In Count Five, Plaintiff requests judicial review of the GCPC's decision pursuant to GCMS Rule 12(K), A.R.S § 11-356(H), and A.R.S § 12-905. (*Id.*) As relief, Plaintiff seeks a "decision and judgment reversing and vacating the GCPC decision that [Plaintiff's] termination was not 'arbitrary and capricious,'" "an order reinstating [Plaintiff] with back pay and all lost benefits and other appropriate relief," and attorneys' fees and costs. (*Id.*)

Plaintiff also filed various documents as exhibits to his complaint, including a transcript of the GCPC hearing (Doc. 1-1 at 40-269), the GCPC's written decision (*id.* at 270-83), and a formal "Notice of Appeal for Judicial Review of Administrative Decision (A.R.S. § 12-905)" of the GCPC's decision (Doc. 1-2).

On March 3, 2026, Defendants filed the pending motion to dismiss. (Doc. 6.) That same day, Defendants filed the pending motion to seal. (Doc. 7.) Both motions are now fully briefed (Docs. 8, 9, 10, 11) and neither side requested oral argument.

After the motions became fully briefed, Defendants and Plaintiff each filed a notice of supplemental authority regarding the motion to dismiss. (Doc. 12, 14.) Plaintiff also filed a notice of supplemental authority regarding the motion to seal. (Doc. 13.)

…

## DISCUSSION

I. Count Five

The Court will begin by addressing Defendants' arguments regarding Count Five—which, as noted, is a request for judicial review of the GCPC's decision—because the resolution of Defendants' challenges to Counts One through Four largely turns on how Count Five is resolved.

A. **Failure To Seek Judicial Review In State Court**

Defendants argue that Count Five is "bar[red]" because Plaintiff failed to seek review of the GCPC's decision in Arizona superior court, as required by Arizona law. (Doc. 6 at 4-5 ["Plaintiff did not file this suit in the superior court. Instead, he filed suit in this Court. His failure to file in superior court bars his claim because he failed to comply with the plain text of the statute."].) In response, Plaintiff argues that "state statutes providing for judicial review of the decision of an administrative agency" in state court "do not preclude a federal district court from exercising subject matter jurisdiction for such claims." (Doc. 10 at 5.) Plaintiff contends that *BNSF Ry. Co. v. O'Dea*, 572 F. 3d 785 (9th Cir. 2009), is "controlling authority directly on point." (*Id.* at 7.) In reply, Defendants acknowledge that federal courts are "capable of hearing" requests for judicial review of state administrative decisions but argue that Plaintiff's "failure to follow the procedure outlined in the ARA [Arizona Administrative Review Act] is fatal to his claims." (Doc. 11 at 3.) Defendants contend that "[t]here is no question that, for example, a state can limit an appeal to its own courts" and that "[c]ourts do not take issue with statutes directing that an appeal from a state superior court be filed in the state court of appeals and not, for example, in a federal district or circuit court." (*Id.* at 4.) Defendants conclude: "This Court should determine that Plaintiff's failure to follow the ARA's express language is fatal. He was required to file in state court, and he failed to do so." (*Id.*)

Plaintiff has the better of this argument. In *BNSF*, a Montana administrative agency received a complaint from O'Dea accusing BNSF of workplace discrimination, held a hearing, and ruled in O'Dea's favor. 572 F.3d at 787. A different Montana administrative

agency affirmed. *Id.* Under Montana law, BNSF's sole avenue for seeking judicial review of the final agency decision was to file an action in Montana state court. *Id.* at 788 (citing Mont. Code Ann. § 2-4-702(2)(a)). Nevertheless, BNSF filed a lawsuit in federal court seeking judicial review. *Id.* at 787. O'Dea moved to dismiss, arguing—similar to Defendants' argument here—"that the federal courts lack subject matter jurisdiction because federal courts do not have diversity jurisdiction over appeals from state agencies, and that is what this action amounts to." *Id.* The district court agreed but the Ninth Circuit reversed, holding that "on-the-record review of [state] administrative actions by a district court is perfectly proper" and that "state legislatures cannot directly affect federal court jurisdiction." *Id.* at 788-89.

*BNSF* compels the conclusion that Plaintiff's effort to seek judicial review of the GCPC's decision in federal court is also permissible, at least as a jurisdictional matter. Even assuming that the Arizona legislature intended, via its enactment of A.R.S. §§ 12-902(B) and 12-905(A), to vest Arizona courts with exclusive jurisdiction over requests for judicial review of the decisions of Arizona administrative agencies, *BNSF* holds that the federal courts' jurisdiction cannot be constrained in this manner. *BNSF*, 572 F.3d at 789 ("Nor do we scry anything in the Montana statute itself that would lead us to the belief that the state even contemplated, intended, or attempted to affect federal jurisdiction. We conclude that it did not and could not have succeeded if it had."). Thus, there is no merit to Defendants' argument that Plaintiff's "failure to comply" with the "express" statutory requirement of "fil[ing] in state court" is "fatal" to his request for judicial review in federal court. (Doc. 11 at 4.) *BNSF* rejected this exact argument: "But, says O'Dea, BNSF could not file an original action in the district court because the appeal procedure set forth in Montana law declares that a petition for review 'must be filed in the state district court for the county where the petitioner resides or has the petitioner's principal place of business or where the agency maintains its principal office.' That means, says he, that original federal jurisdiction is precluded. We disagree. A state cannot confer rights upon private parties and require that litigation between those parties must be confined to the courts of the state

itself." *Id.* at 788 (cleaned up). Nor is there any merit to Defendants' contention that *BNSF* is distinguishable because "[w]hen BNSF filed [its] action in the district court, it also, out of an abundance of caution, filed a parallel action in a Montana state court, in which it sought review of the [final agency] decision." *Id*. Defendants overlook that the existence of that separate state-court filing had no bearing on the *BNSF* panel's assessment of the district court's jurisdiction.

Defendants' reliance on *Johnson v. Ariz. Registrar of Contractors*, 396 P.3d 645 (Ariz. Ct. App. 2017), is also misplaced. There, a party that was dissatisfied with an administrative decision by the Arizona Registrar of Contractors mistakenly filed a "notice of appeal with the Registrar, instead of with the superior court." *Id.* at 646. The superior court dismissed and the Arizona Court of Appeals affirmed, explaining that the relevant "appeal rights are grounded on statutes or rules expressly requiring the appealing party to initiate the appeal by filing a notice of appeal with the entity that rendered the decision. No such statute or rule supports Johnson's argument that filing a notice of appeal with the Registrar is timely for purposes of A.R.S. § 12-904(A)." *Id.* at 649. That reasoning has no bearing on the jurisdictional analysis here, as the only deviation from the statutory scheme identified by Defendants is Plaintiff's decision to seek judicial review in federal rather than state court—a deviation that, as *BNSF* makes clear, cannot provide the basis for denying federal jurisdiction. *See also Wong v. Minn. Dept. of Human Servs.*, 820 F.3d 922, 932 (8th Cir. 2016) ("We are not the first court to confront a state statute that contemplates only state-court review of administrative action. . . . The Third Circuit confronted a similar issue . . . and concluded that a state statute providing for review of a given controversy only in state court could not be read to undermine a federal court's authority to entertain the dispute. The Ninth Circuit reached the same conclusion in *BNSF* . . . . We adopt a similar view here in interpreting [Minnesota law]. Under this view, [Minnesota law] lays out one permissible route through which an aggrieved party may appeal from the Commissioner's order and thus prevent it from becoming final, but it does not strip the federal court of its authority to hear the same appeal through the exercise of supplemental

jurisdiction. This view ensures that the statute does not pose a barrier to the federal court's authority to exercise jurisdiction.") (citations omitted).

B. **Res Judicata**

In their motion, Defendants make several references to the doctrine of res judicata but do not specifically argue that Count Five should be dismissed based on res judicata—rather, Defendants' argument appears to be that if the Court agrees with them that Count Five should be dismissed for other reasons, such a determination would transform the GCPC's decision into a final judgment that would, in turn, have a res judicata effect as to Plaintiff's claims in Counts One through Four. (*See, e.g.*, Doc. 6 at 4 ["The simplest solution is to determine that Plaintiff's failure to follow the ARA means that the underlying decision is final such that . . . res judicata appl[ies]."]; *id.* at 6 n.3 ["[I]f this Court agrees that Count Five is final, res judicata is another reason to dismiss Plaintiff's claims."].)[2] Nevertheless, in their reply, Defendants seem to argue that res judicata also provides a basis for dismissing Count Five. (Doc. 11 at 2 ["Because the GCPC's decision is final, res judicata also bars all the claims. (Dismissal of all claims)."].)

To the extent Defendants intended to seek the dismissal of Count Five based on res judicata, that argument is both untimely and unavailing. Although it is true that, under Arizona law, "[a] party's failure to appeal a final administrative decision makes that decision final and res judicata," *Guertin v. Pinal Cnty.*, 875 P.2d 843, 845 (Ariz. Ct. App. 1994), all of Defendants' res judicata arguments rest on the premise that Plaintiff failed to properly appeal the GCPC's decision by filing suit in federal rather than state court. But as discussed in the preceding section of this order, that premise is mistaken (as least as it relates to the question of this Court's jurisdiction to entertain Count Five).

…

…

---

[2] Plaintiff also appears to interpret Defendants' motion as only raising res judicata as a basis for seeking the dismissal of Counts One through Four. (Doc. 10 at 12 ["[T]he agency decision of the GCPC is neither final nor claim preclusion because it has been timely appealed in Count Five."].)

C. **Discretionary Exercise Of Supplemental Jurisdiction**

1. Legal Standard

"[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). Even so, a court may decline to exercise supplemental jurisdiction over such a claim if (1) it "raises a novel or complex issue of State law"; (2) it "substantially predominates over the claim or claims over which the district court has original jurisdiction"; (3) "the district court has dismissed all claims over which it has original jurisdiction"; or (4) "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c). "[A]ctually exercising discretion and deciding whether to decline, or to retain, supplemental jurisdiction over state law claims" under § 1367(c) "is a responsibility that district courts are duty-bound to take seriously." *Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1001 (9th Cir. 1997). "While discretion to decline to exercise supplemental jurisdiction over state law claims is triggered by the presence of one of the conditions in § 1367(c), it is informed by the [*United Mine Workers of Am. v. Gibbs*, 383 U.S. 715 (1966)] values 'of economy, convenience, fairness, and comity.'" *Id.*

2. The Parties' Arguments

Defendants contend the Court should decline to exercise supplemental jurisdiction over Count Five because (1) it "substantially predominates the federal claims"; and/or (2) this case involves "exceptional circumstances." (Doc. 6 at 6.) As for the former, Defendants argue that Count Five predominates over the federal claims because "the outcome of that claim will bar Plaintiff's federal claims either because this Court will lack jurisdiction or because res judicata will require this Court to dismiss the claims." (*Id.*) Defendants add: "[B]ecause the outcome of Count Five will quite literally determine the result of all of the federal claims, Count Five substantially predominates over Plaintiff's federal claims." (*Id.* at 8.) As for the latter, Defendants contend this case "presents

exceptional circumstances" because "[h]ad Plaintiff filed in state court, as the statute requires, there is no question that the outcome of that decision would be a bar to Plaintiff's claims." (*Id.*)

In response, Plaintiff only addresses Defendants' argument regarding exceptional circumstances. (Doc. 10 at 12.) Plaintiff contends that "none of the Defendants['] arguments for granting their Motion to Dismiss are supported by the facts . . . or the law" and that there "are no such exceptional circumstances." (*Id.* at 12-13.) Plaintiff asserts that "Defendants want to sever Count Five and transfer that claim to the Arizona Superior Court," which "would defeat the purpose of" supplemental jurisdiction, would "ignore the established case law approving of District Courts hearing appeals from state agency decisions," and would "force the same parties to litigate the same issues in two different forums." (*Id.*)

In reply, Defendants accuse Plaintiff of failing to address the merits of their § 1367(c) arguments; reiterate their earlier argument that Count Five predominates over the federal claims because "a final decision on an administrative appeal is res judicata and issue preclusive for all other claims"; and reiterate their earlier argument that this case involves exceptional circumstances because it represents an attempt to avoid the *Rooker-Feldman* doctrine, res judicata/claim preclusion, and issue preclusion. (Doc. 11 at 8-9.)

3. Analysis

The Court agrees with Defendants that it should decline, in its discretion, to exercise supplemental jurisdiction over Count Five pursuant to § 1367(c)(4), the "exceptional circumstances" prong.[3] "[W]hen declining to exercise supplemental jurisdiction for a state-law claim under § 1367(c)(4) . . . , a district court must: (1) sufficiently explain why

---

[3] As for § 1367(c)(2), the "substantially predominates" prong, courts have held that a state-law claim may substantially predominate over federal claims "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought." *Gibbs*, 383 U.S. at 726. It is not obvious that any of those considerations are present here, as Count Five is a claim for review of an administrative decision on a closed record (so it will require, if anything, less expansive evidence than Plaintiff's § 1983 claims) and seeks less expansive remedies (reinstatement and back pay) than Plaintiff's federal claims (money damages, including punitive damages, and injunctive relief).

the circumstances of the case are exceptional under § 1367(c)(4); and (2) show that the balance of the *Gibbs* values provides compelling reasons for declining jurisdiction in such circumstances." *Vo v. Choi*, 49 F.4th 1167, 1171 (9th Cir. 2022) (cleaned up). "[T]hese two inquiries are not particularly burdensome." *Id.* (cleaned up).

The exceptional circumstances present here are that (1) Plaintiff is seeking judicial review of an Arizona agency's administrative decision even though the Arizona legislature has enacted a regulatory scheme that seeks to funnel such challenges exclusively through the Arizona court system; and (2) if the administrative decision is affirmed, it may have a preclusive effect as to all or at least some of Plaintiff's other claims in this action. Even though, as discussed in Part I.A. above, the Arizona legislature lacks the authority to strip this Court of jurisdiction over claims like Count Five, the question whether this Court may exercise jurisdiction over such claims is distinct from the question whether it should exercise jurisdiction over them. *See generally Acri*, 114 F.3d at 1001 ("[W]e emphasize that actually exercising discretion and deciding whether to decline, or to retain, supplemental jurisdiction over state law claims when any factor in subdivision (c) is implicated is a responsibility that district courts are duty-bound to take seriously.").

To that end, it is notable that the leading appellate decisions on this topic seem to go out of their way to encourage district courts to consider declining supplemental jurisdiction over, or otherwise abstaining from resolving, claims like Count Five. In *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156 (1997), the Supreme Court stated: "[T]o say that the terms of § 1367(a) authorize the district courts to exercise supplemental jurisdiction over state law claims for on-the-record review of administrative decisions does not mean that the jurisdiction must be exercised in all cases. Our decisions have established that pendent jurisdiction is a doctrine of discretion, not of plaintiff's right, and that district courts can decline to exercise jurisdiction over pendent claims for a number of valid reasons." *Id.* at 158 (cleaned up). In *BNSF*, Judge Fisher wrote a concurrence noting that "[w]e can only speculate whether today's holding will result in a deluge of cross-system appeals" and stating that, "[g]iven these concerns, . . . I join my colleagues in urging the

district court to decide in the first instance whether any abstention doctrine applies. . . . Careful consideration of these and perhaps other limitations on federal jurisdiction might help the district court proceed with caution, lest it jeopardize the strong interest courts of the State have in controlling the actions of local as well as state agencies." *BNSF*, 572 F.3d at 793-94 (Fisher, J., concurring) (cleaned up). And again, in *Wong*, the Eighth Circuit clarified: "Because the district court improperly concluded that it lacked jurisdiction based solely on the state statute, the district court failed to grapple with whether it *should* exercise supplemental jurisdiction under 28 U.S.C. § 1367 or whether any abstention doctrine applied. We recognize that the court very well could have declined to exercise supplemental jurisdiction." *Wong*, 820 F.3d at 932-33.

The *Gibbs* factors of economy, convenience, fairness, and comity underscore why Arizona state court is the preferable forum for resolving claims like Count Five. Beginning with comity and fairness, Arizona has a strong interest in overseeing the review of decisions of its administrative agencies. *BNSF*, 572 F.3d at 793-94 (Fisher, J., concurring) (emphasizing the "strong interest courts of the State have in controlling the actions of local as well as state agencies") (cleaned up). *Gibbs* counsels that "needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by producing for them a sure-footed reading of applicable law." 383 U.S. at 726. "Cooperation and comity, not competition and conflict, are essential to the federal design." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574 (1999). For these reasons, district courts have repeatedly declined to exercise supplemental jurisdiction over claims akin to Count Five. *See, e.g., Kolaski v. Dart*, 2022 WL 23033304, *1-2 (N.D. Ill. 2022) (where the plaintiff asserted a state-law claim seeking judicial review, under the Illinois Administrative Review Law, of a state agency's decision to terminate his employment, as well as federal disability discrimination and retaliation claims arising from the termination, declining the exercise supplemental jurisdiction over the state-law claim for judicial review: "It therefore appears proper to decline supplemental jurisdiction for one or more of the reasons listed in § 1367(c) or to abstain under . . . federal abstention doctrine.");

*1407, LLC v. City of Fort Wayne*, 2019 WL 341239, *9 (N.D. Ind. 2019) ("The Court has only supplemental jurisdiction over the Plaintiff's petition for judicial review of the zoning ordinance, which arises under state law. The Plaintiff cites [*City of Chicago*] to support its contention that the Court may review the BZA's decisions. This case, however, clearly states that the Court is not obligated to extend its jurisdiction over such claims. . . . The Court will decline to exercise jurisdiction pursuant to this standard for two reasons: first, the Court should not function as a board of zoning appeal . . . ."); *Mory v. City of Chula Vista*, 2011 WL 777914, *2 (S.D. Cal. 2011) ("[T]he issues of federalism and comity . . . loom especially large here. A California citizen is suing a California governmental entity under California law. Plaintiff seeks affirmative relief against Defendants, including, inter alia, a declaration that the Chula Vista Civil Service Commission abused its discretion, an injunction against further statutory violations, expungement of Plaintiff's personnel files, and an order excluding evidence. California has an overwhelming interest in adjudicating these claims in its state courts. Thus, 'other compelling reasons for declining jurisdiction' also exist."); *Quinn v. Village of Elk Grove Village Bd. of Fire & Police Comm'rs*, 2002 WL 47157, *1-2 (N.D. Ill. 2002) (where the plaintiffs asserted a state-law claim "under the Illinois Administrative Review Act, alleging that plaintiffs' scores on the fire lieutenant eligibility test, and their resulting rankings violate the Board of Fire and Police Commissioners Act," as well as a § 1983 claim "alleging that plaintiffs' low scores and rankings on the fire lieutenant exam were the product of an effort by the defendants to retaliate against plaintiffs for the exercise of their rights of freedom of association and speech under the First Amendment," declining to exercise supplemental jurisdiction over the state-law claim because "fairness, economy, and deference to the special interests of state courts in resolving issues of state law demand that such determinations be made by those courts who are familiar with the statutory scheme and objectives of the Illinois Administrative Review Act"). *See also Coastal Comm'ns Serv., Inc. v. City of New York*, 658 F. Supp. 2d 425, 460 (E.D.N.Y. 2009) ("[F]ederal courts have, with rare exception, denied supplemental jurisdiction to Article 78 claims. Case law has catalogued a myriad

of good reasons, especially when, as here, the claims are brought to obtain judicial review of the actions of a state or local administrative agency. Comity suggests such review be afforded by the state apparatus by which the agency is created and authorized to act.").

Finally, although the *Gibbs* factors of economy and convenience may, in isolation, tip in favor of retaining supplemental jurisdiction over Count Five, they do so only weakly (and, thus, fail to counterbalance the stronger comity and fairness factors). Because this case is at the pleading stage, a without-prejudice dismissal of Count Five will not result in any duplication of labor as to that claim.[4] Additionally, because that claim will not require any discovery—it will simply involve review of the existing administrative record—declining jurisdiction over that claim while retaining jurisdiction over Plaintiff's remaining claims will not result in the sort of duplication of labor that sometimes occurs when supplemental jurisdiction is declined over a subset of a plaintiff's claims.

Accordingly, Count Five is dismissed without prejudice. *Vo*, 49 F.4th at 1169 (affirming district court's decision to dismiss, without prejudice, a state-law claim over which the court declined to exercise supplemental jurisdiction while retaining jurisdiction over remaining federal claim).

…

…

[4] Under 28 U.S.C. § 1367(d), "[t]he period of limitations for any claim asserted under subsection (a) . . . shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period." *Id.* This "instruction to 'toll' a state limitations period means to hold it in abeyance, *i.e.*, to stop the clock." *Artis v. Dist. of Columbia*, 583 U.S. 71, 75 (2018). Put another way, § 1367(d) "suspends the statute of limitations for two adjacent time periods: while the claim is pending in federal court and for 30 days postdismissal. . . . [T]he limitations clock stops the day the claim is filed in federal court and, 30 days postdismissal, restarts from the point at which it had stopped." *Id.* at 83-84. Thus, to the extent the 35-day deadline in A.R.S. § 12-904(A) for seeking judicial review of an administrative decision is deemed a "state limitations period," it would appear that, under 28 U.S.C. § 1367(d), Plaintiff will have 30 additional days following the issuance of this decision to seek such review in state court. With that said, the Court obviously cannot dictate how a state court will resolve a hypothetical future dispute over timeliness. The Court further notes that, to the extent Plaintiff had wished to avoid this sort of uncertainty, he could have followed the belt-and-suspenders approach in *BNSF* of filing parallel federal and state actions seeking judicial review of the challenged administrative decision. *BNSF*, 572 F.3d at 788 ("When BNSF filed this action in the district court, it also, out of an abundance of caution, filed a parallel action in a Montana state court, in which it sought review of the Human Rights Commission decision.").

II. Counts One Through Four

A. **Res Judicata And *Rooker-Feldman***

Defendants' primary argument as to Counts One through Four is that because the GCPC's decision is now "final" due to Plaintiff's failure to seek review in state court, Counts One through Four are subject to dismissal based on res judicata and/or the *Rooker-Feldman* doctrine. (*See, e.g.*, Doc. 6 at 1 ["His failure to properly follow the statute means that the administrative decision is final. Thus, this Court is barred from hearing the case under the *Rooker-Feldman* doctrine and, even if it were not, Plaintiff's claims are barred by res judicata."]; *id.* at 4 ["The simplest solution is to determine that Plaintiff's failure to follow the ARA means that the underlying decision is final such that the *Rooker-Feldman* doctrine and res judicata apply."]; Doc. 11 at 2 ["Plaintiff did not comply with ARA, and the GCPC's decision is therefore final and the *Rooker-Feldman* doctrine prevents this court from hearing any of Plaintiff's claims. (Dismissal of all claims). Because the GCPC's decision is final, res judicata also bars all the claims."].)

This argument requires little additional discussion in light of the conclusions reached in Part I above. The GCPC's decision is not yet final—Plaintiff permissibly sought judicial review in this Court, and although the Court has now declined to exercise supplemental jurisdiction over that request, Plaintiff will presumably respond by seeking judicial review in state court.[5] Neither res judicata nor *Rooker-Feldman* applies in this circumstance. *See, e.g.*, *So. Cal. Edison Co. v. Lynch,* 307 F.3d 794, 805 (9th Cir. 2002) ("The *Rooker-Feldman* doctrine does not apply to the actions of the Commission because it is a state administrative agency, not a court. The primary statute from which the *Rooker-Feldman* doctrine has been drawn—28 U.S.C. § 1257—does not, by its terms, describe state administrative decisions. More importantly, the Supreme Court has recently rejected a claim that the *Rooker-Feldman* doctrine barred federal district court review of adjudicatory decisions of state administrative agencies.").

[5] If, as discussed in the preceding footnote, a state court were to subsequently reject Plaintiff's request for judicial review on untimeliness grounds, thereby rendering the GCPC's decision final, Defendants could, at that time, renew their res judicata and *Rooker-Feldman* arguments.

B. **Abstention/Stay**

"[I]n the alternative," Defendants argue that this Court "should stay Counts I-IV pending resolution of Count Five." (Doc. 6 at 2.)

The problem with this request is that it is undeveloped. Although Defendants correctly note that district courts have the authority to "abstain or stay the case under principles of comity" (*id.* at 8), Defendants never purport to identify the abstention doctrine that might justify a stay here, let alone explain why that unspecified doctrine's requirements are satisfied. Furthermore, now that the Court has dismissed Count Five without prejudice so Plaintiff may pursue it in state court, any request for a stay would seem to be governed by *Colorado River Water Conservation Dist. v. United States (Colorado River)*, 424 U.S. 800 (1976). *See generally Ernest Bock, LLC v. Steelman*, 376 F.4th 827, 842-43 (9th Cir. 2023) ("[B]ecause this case involves simultaneous and related federal and state actions, the proper analysis is under *Colorado River*, not [*Landis v. N. Am. Co.*, 299 U.S. 248 (1936)]. . . . [T]he *Colorado River* factors control whether a stay can issue in favor of parallel state proceedings.") (cleaned up). But under *Colorado River*, "a stay of federal litigation in favor of state court proceedings is the exception, not the rule. Only the clearest of justifications will warrant a stay, and the circumstances justifying a stay are exceedingly rare." *Id.* at 836 (cleaned up). Additionally, "where one of two possible state court rulings would necessitate additional litigation in a parallel federal case, a *Colorado River* stay could not issue." *Id.* at 840. Here, Defendants' argument appears to be that *if* they prevail on the merits as to Plaintiff's request for judicial review of the GCPC's decision, resulting in a final decision in their favor, that determination will preclude Plaintiff's § 1983 claims. But Defendants do not argue that a ruling in *Plaintiff's* favor as to his request for judicial review of the GCPC's decision will also have such a preclusive effect. At any rate, given Defendants' failure to develop their abstention/stay request in any depth, it is denied without prejudice.

C. **Discretionary Exercise Of Supplemental Jurisdiction Over Count Four**

Defendants also advance two dismissal arguments directed at individual claims.

First, Defendants argue—albeit with less than ideal clarity—that the Court should decline to exercise supplemental jurisdiction over Count Four, which is Plaintiff's other state-law claim. (Doc. 6 at 2 ["This Court should decline supplemental jurisdiction over his state-law claims . . . ."]; Doc. 11 at 9 n.3 ["Defendants' Motion focused on Count Five but requests that the Court decline supplemental jurisdiction as to both claims."].)

This argument lacks merit. Count Four is a claim for wrongful termination under A.R.S. § 23-1501(A)(3)(b). That provision does not require such claims to be filed in Arizona state court and does not implicate Arizona's interest in overseeing its own administrative apparatus. Thus, Court Four is dissimilar to Count Five and does not trigger the same comity concerns. Indeed, federal courts in Arizona routinely exercise supplemental jurisdiction over wrongful termination claims under § 23-1501(A)(3). *See, e.g.*, *Cohen v. Ariz. State Univ.*, 2022 WL 1747776, *4 (D. Ariz. 2022); *Hinton-McIntyre v. N. Cochise Cmty. Hosp.*, 2015 WL 13767537, *1 (D. Ariz. 2015). In any event, Defendants' only cursory argument regarding why Count Four should be dismissed—raised for the first time in Defendants' reply—is that Count Four will fail on the merits. (Doc. 11 at 9 n.3 ["Plaintiff's only recourse under Arizona law is the administrative appeal, and his wrongful termination claim (Count Four) is not cognizable under Arizona law."].) But this is, at most, an untimely[6] Rule 12(b)(6) argument, not an argument regarding why this Court should decline to exercise supplemental jurisdiction under 28 U.S.C. § 1367(c).

### D. Count Three

Defendants' final argument is that Count Three fails to state a claim. (Doc. 6 at 9.)

#### 1. Legal Standard

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings, Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw

[6] *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted). However, the Court need not accept legal conclusions couched as factual allegations. *Iqbal*, 556 U.S. at 678-80. Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. The Court may also dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

2. <u>The Parties' Arguments</u>

In Count Three, Plaintiff alleges that Defendants violated his Fourth Amendment procedural due process rights by "(A) Fail[ing] to provide pretermination notice and opportunity to respond [as] required by *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985); and (B) [Providing no] notice of what specific law or rule Plaintiff allegedly violated which was grounds for his termination; and (C) Amending the termination notice *after* the deadline for amending had passed by adding a new baseless charge of sexual harassment *after* receiving [Plaintiff's] appeal which cited *Rankin*." (Doc. 1 at 11-12.)

Defendants argue that Count Three fails to state a claim because Plaintiff "was afforded process." (Doc. 6 at 9.) According to Defendants, Plaintiff was entitled under state law to "*post*-termination due process," including an opportunity to participate in a "post-termination due process hearing" with: (1) "[a]dequate written notice of the specific grounds for termination"; (2) "disclosure of the evidence supporting termination, including the names and nature of the testimony of adverse witnesses"; (3) "opportunity to confront and cross-examine available adverse witnesses"; (4) "opportunity to be heard in person and present evidence"; (5) "opportunity to be represented by counsel"; (6) "[a] fair-minded and impartial decision maker"; and (7) "[a] written statement . . . as to the evidence relied upon and the reasons for the determination made." (*Id.*, quoting *Deuel v. Ariz. State Sch. For

*Deaf & Blind*, 799 P.2d 865 (Ariz. Ct. App. 1990).) Defendants argue that the "[c]omplaint and its exhibits demonstrate that GCPC afforded Plaintiff adequate due process." (*Id.*)

In response, Plaintiff argues that Defendants "fail to state any factual deficiencies in his allegations, and apparently failed to read the Complaint which sets out three specific violations of [Plaintiff's] procedural due process rights." (Doc. 10 at 13.) First, Plaintiff argues that Defendants failed to "provide the pretermination notice and opportunity to respond required by" *Loudermill* because "he was terminated effective immediately" and was not given an "opportunity for responding or offering a defense or explanation before the termination became final." (*Id.* at 13-14.) Plaintiff further asserts that this "failure is repeated in the amended notice of termination." (*Id.*) Second, Plaintiff argues that Defendants failed to "provide notice of what specific law or rule [Plaintiff] allegedly violated which was grounds for his termination so he could adequately respond and defend against such a charge," as required under the federal Due Process Clause. (*Id.*) Plaintiff adds that Defendants' own list of state-law procedural due process requirements, from *Deuel*, includes "adequate written notice of the specific grounds for termination." (*Id.* at 14-15.) Third, Plaintiff argues that "Defendants violated [Plaintiff's] procedural due process rights by their violations of their own published rules requiring an investigation into reports of sexual harassment (they did none) and the deadline for amending a notice of termination." (*Id.*) Plaintiff argues this was prejudicial because he had to defend against a second charge that "[h]ad no factual basis and was withdrawn by the Defendants"; "[w]as not first investigated as required by the Defendants"; "[w]as filed by the Defendants in retaliation"; and "[w]as filed as a 'backup charge' in case the Defendants could not sustain their original charge." (*Id.* at 15-16.)

In reply, Defendants argue that Plaintiff's complaint "demonstrate[s] that he was given notice of the reason for his termination, the opportunity to be heard and represented, and that he did, in fact, appear in the hearing and participate." (Doc. 11 at 10.) Defendants also contend that the Ninth Circuit and courts in the District of Arizona "have found that the ARA provides adequate process and that Arizona is an adequate forum for the purposes

of a res judicata analysis." (*Id.*) Last, Defendants argue that *Loudermill* is distinguishable because it involved a plaintiff's "argument that a statute was unconstitutional," not an employer action. (*Id.*)

3. Analysis

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017). Defendants do not dispute that Plaintiff had a protected property interest in his employment. As for the second element, "[f]ederal due process does not necessarily entitle a plaintiff to the same procedures provided by state law. Rather, under federal law, what process is due is determined by context, to be analyzed in accordance with the three-part balancing test described in *Mathews v. Eldridge*, 424 U.S. 319 (1976)." *Id.* at 933.

In *Loudermill*, the Supreme Court held that a "tenured public employee is entitled to oral or written notice of the charges against him, an explanation of the employer's evidence, and an opportunity to present his side of the story . . . prior to termination." 470 U.S. at 546. *See also id.* at 542 ("We have described the root requirement of the Due Process Clause as being that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.") (internal citations omitted). In other words, at least in this context, due process requires "a pretermination opportunity to respond," even if separately "coupled with post-termination administrative procedures." *Id.* at 547-48.

Plaintiff alleges he was given notice of his termination "effective immediately," without "pre-termination notice of intent to terminate" or "opportunity to respond prior to the effective date of termination." (Doc. 1 ¶ 13, emphasis omitted.) This is sufficient to state a federal procedural due process claim. Although Defendants contend that Plaintiff was provided with robust post-termination process, *Loudermill* holds—and the Ninth Circuit has subsequently reaffirmed—that "[i]n light of *Loudermill*'s . . . emphasis on the importance of providing the employee with an opportunity to respond before he is

terminated, . . . post-termination procedures alone cannot provide due process." *Walls v. Central Contra Costa Transit Auth.*, 653 F.3d 963, 969 (9th Cir. 2011). *See also Clements v. Airport Auth. of Washoe Cnty.*, 69 F.3d 321, 331 (9th Cir. 1995) ("Despite the apparent inadequacy of the pre-termination process, the defendants urge that the numerous *post*-termination hearings provided Sue with all the process she was due. They are incorrect. In the context of process due a terminated public employee, a full post-deprivation hearing does not substitute for the required *pre-termination* hearing. Indeed, *Loudermill* itself reveals that post-termination administrative hearings, even if followed by judicial review, are ordinarily insufficient standing alone to satisfy procedural due process in the public employee context. Although the nature of subsequent proceedings may lessen the amount of process that the state must provide pre-termination, subsequent proceedings cannot serve to *eliminate* the essential requirement of a pre-termination notice and opportunity to respond.") (citations omitted).

The cases cited by Defendants do not compel a different conclusion. *Doe v. Ariz. Bd. of Regents*, 2025 WL 3514289 (D. Ariz. 2025), is not a case involving the termination of a public employee, and the plaintiff in that case—a university student challenging the outcome of a disciplinary hearing—acknowledged that he "had access to the Evidence File and an opportunity to respond, twice" and "received a Notice of hearing and Charges" before a final panel decision. *Id.* at *1, *5. Similarly, *Quade v. Ariz. Bd. of Regents*, 700 F. App'x 623 (9th Cir. 2017), involved a university student seeking to challenge the outcome of a disciplinary hearing—as opposed to a public employee seeking to challenge his termination—and Ninth Circuit did not address the merits of the procedural due process claim. *Id.* at 624 ("The district court dismissed all claims against the Board and the university officials on the basis of Eleventh Amendment immunity, the state law claims against the individual defendants for failure to timely file a notice of claim under Arizona law, and the federal claims on the basis of res judicata."). Finally, *Olson v. Morris*, 188 F.3d 1083 (9th Cir. 1999), also did not involve the termination of a public employee, and the only disputed issue in that case—in which a psychologist sought to challenge an

administrative agency's decision to revoke his license—was the res judicata effect of the agency's decision, which the plaintiff failed to appeal to any court. *Id.* at 1086-87.[7]

III. Motion To Seal

Plaintiff filed, as Exhibit 9 to his complaint, the transcript from his GCPC hearing. (Doc. 1-1 at 40-269.) Defendants move to seal Exhibit 9 and "prohibit[] Plaintiff from further disseminating, relying on, or using any information from" the executive session portions of the transcript because anything discussed during executive session "is protected under Ariz. Rev. Stat. § 38-431.03(B) and attorney-client privilege." (Doc. 7 at 1.)

A. **Legal Standard**

In the Ninth Circuit, "[t]wo standards generally govern motions to seal documents." *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 677-78 (9th Cir. 2010). Those two standards are referred to as "the presumptive 'compelling reasons' standard or the 'good cause' exception." *Ctr. for Auto Safety v. Chrysler Grp., LLC*, 809 F.3d 1092, 1097 (9th Cir. 2016). The presumptive "compelling reasons" standard applies when the documents that are the subject of the sealing request are being filed in conjunction with a motion or pleading that "is more than tangentially related to the underlying cause of action" or "the merits of a case." *Id.* at 1099. The "good cause" exception most often applies to "sealed materials attached to a discovery motion unrelated to the merits of a case." *Id.* at 1097. This and other courts have concluded that the "compelling reasons" standard applies to motions to seal the complaint and/or exhibits thereto. *See, e.g., Cable One Inc. v. DataCloud Techs. LLC*, 2022 WL 16527507, *1 (D. Ariz. 2022); *In re Google Location Hist. Litig.*, 514 F. Supp. 3d 1147, 1161 (N.D. Cal. 2021) ("[T]his Court and many others have held that the compelling reasons standard applies to the sealing of a complaint precisely because the complaint forms the foundation of the lawsuit.").

Under that standard, a party seeking to seal a judicial record must overcome "a

---

[7] Given this determination, it is unnecessary at this juncture to decide whether other components of Plaintiff's theory of liability underlying Count Three—such as that Defendants violated the applicable state-law rules when amending the termination notice—are sufficient to state a federal due process claim.

strong presumption in favor of access." *Kamakana v. City & Cnty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006). To do so, the party must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure . . . ." *Id.* at 1178-79 (cleaned up). The Court must then "conscientiously balance the competing interests of the public and the party who seeks to keep certain judicial records secret." *Id.* at 1179 (cleaned up). "After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.* (cleaned up). "The party seeking to seal any part of a judicial record bears the heavy burden of showing that the material is the kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure," *Oliner v. Kontrabecki*, 745 F.3d 1024, 1026 (9th Cir. 2014), at which point that injury is weighed against the public's interest in disclosure. *Kamakana*, 447 F.3d at 1178-79. "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.*

B. **The Parties' Arguments**

Defendants assert that because Exhibit 9 includes "transcribed confidential communications between GCPC and its legal counsel while in executive session," the Court "must seal the exhibit pursuant to Ariz. Rev. Stat. § 38-431.03." (Doc. 7 at 1-2.) Defendants extensively analyze the state statute. (*Id.* at 2-3.) Defendants further contend that Exhibit 9 "contains conversations protected by attorney-client privilege" because the conversations inadvertently included in the transcript "were held for the express purpose of the GCPC obtaining legal advice from its attorney." (*Id.* at 4.) According to Defendants, the appropriate remedy is "sealing Exhibit 9" and "forbidding Plaintiff from further disseminating, using, or relying on any information from executive session." (*Id.* at 5.) However, Defendants clarify they "are not opposed to Plaintiff filing a redacted version of the Exhibit that conceals" only the disputed portions of the transcript. (*Id.* at 3-4.)

In response, Plaintiff asserts that he "do[es] not plan to cite any portion of the executive session." (Doc. 8 at 3.) Plaintiff also explains how he obtained the transcript, stating that he simply ordered it from the court reporter and it was then "provided without redaction, limitation, confidentiality designation, or instruction restricting its use." (*Id.* at 3-4.) Plaintiff also extensively analyzes A.R.S. § 38-431.03. (*Id.* at 4-9.) According to Plaintiff, § 38-431.03 does not bar him from receiving the materials at issue, and "it logically follows" that he was permitted to "disclose such executive session proceedings in subsequent litigation appealing the GCPC decision" as permitted under A.R.S. § 12-904(B)(5).[8] (*Id.* at 5, 11.) Plaintiff also asserts that the federal law of privilege applies and "even if there was a privilege for the GCPC executive sessions, it has been waived and lost by disclosure" because the GCPC reporter was "acting as the agent and under the control of Gila County and acting on its behalf" when she sent Plaintiff the full transcript. (*Id.* at 2, 9.) Plaintiff argues that the "inadvertence" of a disclosure does not preclude waiver. (*Id.* at 10.)

In reply, Defendants argue that "[t]he record clearly demonstrates that the GCPC intended to keep the sessions confidential [a]nd, regardless, the alleged failure to comply with [§ 38-431.03(C)] . . . does not constitute a waiver of any protection or privilege especially where, as here, there is no question that the sessions were in fact kept confidential." (Doc. 9 at 3, cleaned up.) Defendants also assert that "the GCPC attempted to correct the issue as soon as it was aware that Plaintiff had obtained privileged information," including by informing Plaintiff that "disclosure of the unredacted transcript was an error" and offering him a corrected transcript "at no charge." (*Id.* at 5.) Defendants also clarify that they are only seeking to seal the "protected, executive session positions" of the transcript. (*Id.* at 10.)

---

[8] Plaintiff contends that A.R.S. § "12-904(B)(6)" provides that the record before the Court shall include the transcript of the administrative agency hearing. (Doc. 8 at 11.) There is no § 12-904(B)(6). The Court assumes Plaintiff meant to refer to § 12-904(B)(5), which provides: "The record shall consist of the following: . . . [a] copy of the transcript of the administrative hearing, if the party seeking judicial review desires a transcript to be included in the record and provides for preparation of the transcript at the party's own expense." *Id.*

In his notice of supplemental authority, Plaintiff highlights an order from *Potter v. Meza*, 2026 WL 2083232 (D. Ariz. 2026), in which this Court declined to seal "personal financial information of persons involved in this litigation" because that information was "already publicly filed in Arizona state court." *Id.* at *19 n.18.

C. **Analysis**

Exhibit 9 is the 229-page transcript from the GCPC hearing. (Doc. 1-1 at 40-269.) During an early portion of the hearing, one of the commissioners "ma[d]e a motion to go into executive session," which was approved. (*Id.* at 7.) The transcript reflects that, at this point, "[a]ll appropriate parties left the room." (*Id.*) Some discussion followed, which the court reporter continued transcribing. (*Id.* at 7-10.) The commissioners then voted to conclude the executive session, and the transcript reflects that, at that point, "[a]ll parties returned to the room." (*Id.* at 10.)

The commissioners later agreed to go into executive session for a second time. (*Id.* at 30.) The transcript reflects that, at this point, "[a]ll appropriate parties left the room." (*Id.*) Some discussion followed, which the court reporter once again continued transcribing. (*Id.* at 30-45.) The commissioners then voted to conclude the executive session, and the transcript reflects that, at that point, "[a]ll parties are present in the room." (*Id.* at 45.)

The commissioners later agreed to go into executive session for a third time. (*Id.* at 59.) The transcript reflects that, at this point, "[a]ll relevant parties left the room." (*Id.* at 60.) Some discussion followed, which the court reporter once again continued transcribing. (*Id.* at 60-71.) The commissioners then voted to conclude the executive session, and the transcript reflects that, at that point, "[a]ll parties are present in the room." (*Id.* at 71.)

The commissioners later agreed to go into executive session for a fourth time. (*Id.* at 104.) The transcript reflects that, at this point, "[a]ll relevant parties and the witness left the room." (*Id.*) Some discussion followed, which the court reporter once again continued transcribing. (*Id.* at 104-108.) The commissioners then voted to conclude the executive session, and the transcript reflects that, at that point, "[a]ll parties were brought back into

the room." (*Id.* at 108-09.)

The commissioners later agreed to go into executive session for a fifth time. (*Id.* at 204.) The transcript reflects that, at this point, "[a]ll necessary parties left the room." (*Id.*) Some discussion followed, which the court reporter once again continued transcribing. (*Id.* at 204-13.) The commissioners then voted to conclude the executive session, and the transcript reflects that, at that point, "[a]ll parties are present in the room." (*Id.* at 213.)

Although the attorney-client privilege may be a "compelling reason" to seal documents, *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 125 (2nd Cir. 2006), Defendants fail to present any compelling reasons to support sealing Exhibit 9 in its entirety—Defendants' only arguments concern the "executive session" portions of the transcript. The Court would be "unable to grant Defendant's broad requests without also depriving the public of other vital information contained within these documents." *SolarCity Corp. v. Salt River Project Agric. Improvement & Power Dist.*, 2017 WL 6295946, *3 (D. Ariz. 2017). "If Defendant's interest in confidentiality pertains only to a discrete potion of a document, then its motion to seal should be appropriately limited." *Id.*

Defendants alternatively propose that Plaintiff "file[] a redacted version of the Exhibit that conceals the executive session portions." (Doc. 7 at 3.) Because Exhibit 9 contains conversations intended to be kept confidential from Plaintiff and the public—and because Defendants took reasonable precautions to protect those conversations, by asking participants to leave the room and asking the transcriptionist to fix the issue immediately upon discovery of the inadvertent disclosure—those conversations should not remain on the public docket. *Potter* is not to the contrary, as the materials at issue in that case were already part of the public record before they were refiled as part of the new litigation.

For these reasons, Defendants' sealing request is granted in part.

Accordingly,

**IT IS ORDERED** that:

1. Defendants' motion to dismiss (Doc. 6) is **granted in part and denied in part**, as discussed above. Count Five is dismissed without prejudice.

2. Defendants' motion to seal (Doc. 7) is **granted in part and denied in part**. The Clerk shall **seal** the documents appearing at Doc. 1-1 (i.e., Exhibits 1-11 to the complaint).[9] Within 10 days of the date of this order, Plaintiff shall refile Exhibits 1-11, with Exhibit 9 redacted to exclude the executive sessions referenced above.

Dated this 27th day of October, 2026.

Dominic W. Lanza
United States District Judge

[9] Because Plaintiff filed Exhibits 1-11 as a single docket entry (Doc. 1-1), the Clerk's office cannot seal only Exhibit 9.